UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

ABU DHABI INVESTMENT AUTHORITY,                    : Civil Action No.
                                                   :
                                        Plaintiff, : COMPLAINT FOR VIOLATIONS OF
        vs.                                        : THE FEDERAL SECURITIES LAWS
                                                   :
PETRÓLEO BRASILEIRO S.A. – PETROBRAS and           :
PETROBRAS GLOBAL FINANCE B.V.,                     :
                                                   :
                                       Defendants. :
                                                   : DEMAND FOR JURY TRIAL
—————————————————— x

**TABLE OF CONTENTS**

**Page**

I.     NATURE OF THE ACTION ................................................................................1

II.    JURISDICTION AND VENUE ..........................................................................5

III.   PARTIES ............................................................................................................7

       A.    Plaintiff ..................................................................................................7

       B.    Defendants Petrobras and PGF ..............................................................7

       C.    Relevant Non-Parties .............................................................................8

IV.    SUBSTANTIVE ALLEGATIONS ...................................................................10

       A.    The Company .......................................................................................10

       B.    Defendants Engaged in a Massive Kickback Scheme Involving Billions of
             Dollars in Petrobras Contracts .............................................................11

       C.    Examples of Projects and Transactions Implicated in the Kickback
             Scheme ................................................................................................16

       D.    Defendants Violated Petrobras's By-Laws ...........................................23

       E.    Defendants Violated Petrobras's Code of Ethics ..................................24

       F.    Petrobras Instituted New Corporate Governance Controls as a Result of
             the Kickback Scheme ...........................................................................26

       G.    Enforcement Officials from Two Continents Are Investigating the
             Kickback Scheme .................................................................................27

       H.    Petrobras Admitted that Its Financial Statements Were Materially False
             and Misleading During the Relevant Period Due to the Bribery and
             Kickback Scheme .................................................................................28

V.     PETROBRAS'S FINANCIAL REPORTING DURING THE RELEVANT
       PERIOD WAS MATERIALLY FALSE AND MISLEADING ........................39

       A.    Petrobras's False and Misleading Financial Reporting During 2009 and
             2010 .....................................................................................................40

       B.    Petrobras's False and Misleading Financial Reporting During 2011, 2012,
             and 2013 ...............................................................................................47

C.      2010 Statements ......................................................................55

D.      2011 Statements ......................................................................62

E.      2012 Statements ......................................................................68

F.      2013 Statements ......................................................................75

G.      2014 Statements ......................................................................84

H.      The Forms 20-F and Registration Statements Omitted Known Trends, Events, and Uncertainties that Were Impacting, and Would Impact, the Company's Financial Results ...........................................................108

I.      The Forms 20-F and Registration Statements Omitted to Include Significant Risk Factors Required to Be Disclosed Therein .............................111

VI.    ADDITIONAL SCIENTER ALLEGATIONS................................................112

VII.   LOSS CAUSATION.........................................................................117

VIII.  PLAINTIFF'S RELIANCE IS PRESUMED THROUGH THE FRAUD-ON-THE-MARKET DOCTRINE ...............................................................118

IX.    PLAINTIFF'S DIRECT RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS.............................................................120

X.     NO SAFE HARBOR .........................................................................121

XI.    COUNTS.......................................................................................122

COUNT I ......................................................................................122

For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder ...............................................................122

COUNT II .....................................................................................123

For Violation of §18 of the Exchange Act.........................................123

XII.   ADDITIONAL ALLEGATIONS IN SUPPORT OF PLAINTIFF'S CLAIMS AS A PURCHASER OF PETROBRAS U.S. NOTES UNDER THE SECURITIES ACT.............................................................................................124

COUNT III ....................................................................................128

For Violation of §11 of the Securities Act.........................................128

COUNT IV.....................................................................................129

For Violation of §12(a)(2) of the Securities Act.................................................129

COUNT V .................................................................................................................131

For Violation of §15 of the Securities Act.........................................................131

XIII.   PRAYER FOR RELIEF ...........................................................................................131

XIV.   JURY TRIAL DEMANDED....................................................................................132

1243584_1

Abu Dhabi Investment Authority ("ADIA" or "Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of documents created and/or published by Petróleo Brasileiro S.A. – Petrobras ("Petrobras" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, testimony by people involved in the wrongdoing alleged herein, releases and other public statements issued by the Company, media reports about the Company, and related court filings.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.      Plaintiff seeks to pursue claims under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 ("Securities Act") arising out of its purchases of Petrobras securities between March 10, 2010 and July 28, 2015, inclusive (the "Relevant Period").

2.      Defendant Petrobras, an integrated oil and gas company, is the largest corporation in Brazil and one of the largest companies in Latin America.  Petrobras was incorporated in 1953 to conduct the Brazilian government's hydrocarbon activities.  The Brazilian Federal Government, legally known as the Union, the national central government of the Federal Republic of Brazil ("Brazilian Federal Government"), owns a majority of the Company's voting shares.  Petrobras had developed into a large, well-respected company that raised huge amounts of money from investors through equity and debt offerings both in Brazil and other markets around the world.

3.      Unbeknownst to Plaintiff, prior to and during the Relevant Period, Petrobras was at the center of a massive bribery and kickback scheme in which it has been reported that Petrobras executives pocketed approximately $800 million.  Petrobras has admitted that the kickback scheme took place and that its assets and earnings have been materially overstated.  Indeed, according to

- 1 -

Petrobras's Form 6-K for the third quarter of 2014, "***the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments***."[1] The scheme was widespread and far reaching, involving not only senior Petrobras executive officers in positions of authority, but also some of Brazil's largest construction companies and members of the Brazilian Federal Government.  In furtherance of the scheme, the third parties would overcharge Petrobras for construction contracts and then kick back a percentage of the contract values to Petrobras executive officers and Brazilian government officials.  As a result of these contract overpayments, as detailed further herein, Petrobras's financial statements during the Relevant Period were materially false and misleading, as Petrobras's assets, shareholders' equity, and earnings were materially overstated.

4.       Prior to and during the Relevant Period, defendants hid the kickback scheme from investors and made materially false and misleading statements about the Company's earnings and the value of the Company's assets and shareholders' equity.  Moreover, at the same time that Petrobras was touting the Company's purportedly strong Code of Ethics, including that its business was conducted "***with transparency and integrity, creating credibility with its shareholders," and that it has "always guided [its] business and [its] relations with third parties by strong ethical principles[,]***" executives were abusing their control over Petrobras to line their own pockets to the detriment of Petrobras and its shareholders.

5.       Details of the Petrobras kickback scheme began to emerge during September 2014 as a result of a plea bargain between former Petrobras executive and Chief Downstream Officer, Paulo Roberto Costa ("Costa"), who was arrested on money laundering charges.  According to Costa and others involved in the scheme, kickbacks were commonplace at Petrobras, and for more than a

---

[1]    Emphasis added unless otherwise indicated.

decade, those involved siphoned at least hundreds of millions of dollars in kickbacks from companies to whom Petrobras awarded inflated construction contracts. Through intermediaries, those individuals then used the money to bribe Brazilian politicians to guarantee that they would vote in line with the ruling party, while enriching themselves.

6.      According to facts that have been revealed to date, Petrobras granted projects to members of an alleged cartel of at least 25 Brazilian construction companies that systematically inflated their costs by up to 35%. The companies then kicked back approximately 3% of a contract's total value in the form of bribes to Petrobras employees, Brazilian politicians, and money launderers. The kickbacks have been described as a "three percent political adjustment" that amounted to at least $800 million.[2]  The scheme was widespread and far reaching throughout Brazilian politics and business and is alleged to have involved more than 50 government officials, including at least six senators, 25 members of Congress, one minister, three governors, and some of the biggest names in Brazilian business.

7.      As alleged more fully below, the revelations of the fraud prompted investigations of Petrobras by the authorities in both Brazil and the United States, including Brazilian federal and state prosecutors, the Securities Commission of Brazil, and the U.S. Securities and Exchange Commission ("SEC") and Department of Justice ("DOJ"). As a result, numerous people believed to be involved in the scheme have been arrested. A Brazilian judge, Sergio Moro, has already convicted eight individuals involved with the kickback scheme, including Costa.

8.      It is undisputed that the kickback scheme occurred. In fact, Petrobras itself has acknowledged that the kickback scheme involved contracts totaling $81.44 billion and that

---

[2]    All currency amounts are expressed as either "$___" to reflect United States dollars, or "___ reais" to reflect Brazilian reais.

Petrobras's assets were massively overstated during the Relevant Period. Based on Petrobras's own admission made in filings with the SEC on or about April 23, 2015, and based on information and belief, the true inflation of the Company's Property, Plant and Equipment assets (and income) during the Relevant Period ranged from between Petrobras's admitted-to overstatement of $2.527 billion and $27 billion. Petrobras has demanded that over 20 companies allegedly involved in the kickback scheme admit their guilt, a Brazilian court has frozen the assets of a former Petrobras Chief Executive Officer ("CEO"), Jose Sergio Gabrielli de Azevedo ("Gabrielli"), due to his believed involvement in the kickback scheme, and another former Petrobras CEO, Maria Das Graças Silva Foster ("Foster"), and other Petrobras executives have resigned from the Company in the wake of revelations about the fraud. On April 22, 2015, Petrobras provided initial corrections to its financial statements necessary in light of the fraudulent scheme. Specifically, Petrobras took a $14 billion charge to earnings as a result of the current facts and circumstances concerning the Operation Car Wash bribery and kickback scheme.[3]

9.       Petrobras securities traded at artificially inflated prices as a result of the wrongful conduct alleged herein because investors, including Plaintiff, were unaware of the Petrobras kickback scheme, the overstatement of Petrobras's assets and earnings, and the huge potential liabilities that the Company was exposed to as a result of the scheme. As investors began to learn about the nature and scope of the scheme beginning in September 2014, the prices of Petrobras Securities (as defined below) declined significantly, causing substantial losses for Plaintiff.

10.      Plaintiff is seeking to pursue remedies under the Exchange Act in connection with its purchases of Petrobras securities that were listed on a U.S. exchange or were transacted in the United

---

[3]   "Operation Car Wash" was the code name for the Brazilian federal police investigation of the money laundering scheme.

1243584_1

States ("Petrobras U.S. Securities"), including Petrobras American Depository Receipts ("ADRs"), which includes common ADRs ("Common ADRs") (New York Stock Exchange ("NYSE") ticker "PBR") and preferred ADRs ("Preferred ADRs") (NYSE ticker "PBRA"), which are traded on the NYSE, and U.S. Notes, which were listed on the NYSE and traded at the Depository Trust Corporation ("DTC") in New York City, New York.  With regard to all of Plaintiff's purchases of Petrobras U.S. Notes between July 20, 2010 and July 28, 2015, beneficial ownership and title passed to Plaintiff for those Petrobras U.S. Notes in New York City at the DTC.

11.     Plaintiff is also pursuing claims under the Securities Act in connection with its purchases of Petrobras debt securities ("Petrobras Debt Securities"), which were registered with the SEC and beneficial ownership and title for which was passed to Plaintiff in New York City at the DTC.  With regard to Plaintiff's claims brought pursuant to §11 of the Securities Act, Plaintiff purchased the Petrobras Debt Securities pursuant to their respective Registration Statements.  With regard to Plaintiff's claims brought pursuant to §12(a)(2) of the Securities Act, Petrobras sold the Petrobras Debt Securities to Plaintiff in the May 2013 and March 2014 U.S. Notes Offerings.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2) and 77o), §§10(b), 18, and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78r and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction over this action pursuant to §22 of the Securities Act (15 U.S.C. §77v), §27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §§1331, 1332 and 1337.

14.     As detailed in Exhibit A, title passed to Plaintiff for all relevant bond transactions in the United States from a seller located in the United States.

- 5 -

15.     As admitted by Petrobras in filings with the SEC, its U.S. dollar-denominated bonds "trade in DTC's Same-Day Funds Settlement System" located in New York City.

16.     Venue is properly laid in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District, the Company's ADRs trade on the NYSE, which is located in this District, Petrobras Debt Securities were marketed here and sold here and trade at the DTC in New York City, and Petrobras has an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022.  Additionally, the registration statement for the Debt Offerings states that "We have agreed that New York law governs the indenture and the debt securities. . . .  We have consented to the non-exclusive jurisdiction of any U.S. federal court sitting in the borough of Manhattan in the City of New York, New York . . . ."

17.     As admitted by Petrobras in filings with the SEC, its U.S. dollar-denominated bonds "trade in DTC's Same-Day Funds Settlement System" is located in New York City.

18.     Petrobras and Petrobras Global Finance B.V. ("PGF") are not immune from jurisdiction of the United States courts under the Foreign Sovereign Immunities Act (28 U.S.C. §§1330, 1332, 1391(f), 1441(d), 1602-1611), as this action is based upon a commercial activity carried on in the United States by Petrobras and PGF; or upon an act performed in the United States in connection with a commercial activity of Petrobras and PGF elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of Petrobras and PGF elsewhere that caused a direct effect in the United States.  *See* 28 U.S.C. §1605(a)(2).

19.     Petrobras and PGF have sufficient minimum contacts within New York to make the exercise of jurisdiction over them by New York federal courts consistent with traditional notions of

fair play and substantial justice.  Petrobras and PGF transact business, have an agent, and/or are found within New York.  And the unlawful conduct alleged herein had effects in New York.

20.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails, interstate telephone communications, and the facilities of the NYSE.

## III.   PARTIES

### A.     Plaintiff

21.     Abu Dhabi Investment Authority is a sovereign investment institution organized in 1976 under the laws of the Emirate of Abu Dhabi and located at 211 Corniche Street, P.O. Box 3600, Abu Dhabi, United Arab Emirates.  ADIA was founded for the purpose of investing funds on behalf of the Government of the Emirate of Abu Dhabi.  ADIA manages a global investment portfolio that is diversified across more than two dozen asset classes and sub-categories with assets held throughout the world.  ADIA purchased Petrobras Securities during the Relevant Period and was damaged thereby.

### B.     Defendants Petrobras and PGF

22.     Defendant Petrobras operates as an integrated oil and gas company in Brazil and internationally.  Defendant Petrobras maintains an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022, and a trading and procurement office in Houston, Texas.  The Company bases its Global Investor Relations department out of its office in New York.

23.     Defendant PGF is Petrobras's wholly-owned subsidiary incorporated in the Netherlands that functions as a vehicle to raise funds for Petrobras through issuing debt securities in the international capital markets.  Defendant PGF issued the 2013 U.S. Notes and 2014 U.S. Notes (as each of those terms is defined below).

- 7 -

24.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Petrobras Securities by disseminating materially false and misleading statements and/or concealing material adverse facts.    The scheme: (i) deceived the investing public regarding Petrobras's business, operations, management, and the intrinsic value of Petrobras Securities; and (ii) caused Plaintiff to purchase Petrobras Securities at artificially inflated prices.

### C.     Relevant Non-Parties

25.     Almir Guilherme Barbassa ("Barbassa") served as Petrobras's Chief Financial Officer ("CFO") and Chief Investor Relations Officer from July 2005 until his resignation on or about February 6, 2015.

26.     Foster served as Petrobras's CEO from February 2012 and Chief International Officer from July 2012 until her resignation from the Company on or about February 6, 2015.  Foster also served as a member of Petrobras's board of directors ("Board").  From September 2007 through January 2012, Foster served as Petrobras's Chief Gas & Power Officer.

27.     Gabrielli served as Petrobras's CEO and a Board member from July 2005 to February 2012.  Foster replaced Gabrielli on February 13, 2012 as Petrobras's CEO.

28.     Daniel Lima de Oliveira ("Oliveira") has served as Chairman and CEO of PifCo since September 2005.

29.     Sérvio Túlio da Rosa Tinoco ("Tinoco") served as Petrobras's Corporate Finance Manager and PifCo's CFO during the Relevant Period.

30.     Pedro José Barusco Filho ("Barusco") served as a former Petrobras Technology Installation Manager, within the Exploration and Production board of directors, and as a former Petrobras Executive Manager of Engineering, during the Relevant Period.  He stepped down from

- 8 -

his positions at Petrobras during or around February 2013.  On November 21, 2014, Barusco executed a plea agreement with the Brazilian federal police in connection with the kickback scheme. Barusco testified before Brazil's Congress that he began taking bribes during 1997 or 1998 and in total amassed nearly $100 million in bribes.

31.     Nestor Cuñat Cerveró ("Cerveró") served as CFO of Petrobras Distribuidora, a Petrobras subsidiary that operates in the Brazilian fuel-distribution market, during the Relevant Period.  Brazilian federal prosecutors charged Cerveró with racketeering, bribery, and money laundering in connection with accepting bribes to help engineering and construction firms win contracts with Petrobras.  Cerveró was arrested in January 2015.

32.     Costa served as Petrobras's Chief Downstream Officer from May 2004 to April 2012. As admitted by Petrobras, Costa was in a "position of authority" for the Company and reported directly to the CEO.  Costa is under investigation by the Brazilian federal police in connection with Operation Car Wash for money laundering and organized crime, among other offenses.  He was arrested on March 20, 2014.  On April 22, 2015, Costa was convicted of money laundering and racketeering and sentenced to seven years and six months in prison.

33.     Renato de Souza Duque ("Duque") served as Petrobras's Chief Services Officer during the Relevant Period until April 2012.  As admitted by Petrobras, Duque was in a "position of authority" for the Company and reported directly to the CEO.  Duque is under investigation by the Brazilian federal police in connection with Operation Car Wash for money laundering and organized crime, among other offenses.  Duque has been arrested twice in connection with Operation Car Wash, once in November 2014 and another time in March 2015.

34.     José Sergio de Oliveira Machado ("Machado") served as CEO of Transporte S.A. ("Transpetro"), the Petrobras division that operates as a logistics, transportation, and storage

company, during the Relevant Period.   Machado left the Company on non-paid leave on November 3, 2014.

IV.   **SUBSTANTIVE ALLEGATIONS**

  A.   **The Company**

35.   Petrobras, the largest company in Brazil, is one of the world's largest integrated oil and gas companies and is engaged in a broad range of oil and gas activities.  Petrobras, directly or through its subsidiaries, prospects and drills for, refines, processes, trades, and transports crude oil from production onshore and offshore oil fields and from shale or other rocks, as well as it derivatives natural gas and other liquid hydrocarbons.  In addition, Petrobras carries out energy-related activities, such as research, development, production, transport, distribution, and trading of all forms of energy, as well as any other correlated or similar activities.  Petrobras controls more than 90% of Brazil's oil production and it owns more than 90% of the country's refineries.

36.   As of January 31, 2015, the Brazilian Federal Government owned 50.26% of Petrobras's common voting shares.

37.   Due to the nature of Petrobras's business, the Company regularly makes large capital expenditures on the construction and development of pipelines and other assets necessary for the operation of its business.  These assets are listed on the Company's balance sheet as "Property, Plant and Equipment" ("PPE").  As of December 31, 2013, PPE accounted for approximately 71% of the Company's total assets.  According to Petrobras's Form 20-F for the year ended December 31, 2013, PPE is "measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated costs of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses."  Thus, the value of Petrobras's assets

- 10 -

recorded on its financial statements is directly correlated with the costs incurred in connection with the completion of the related contracts. Petrobras represented that the value of its PPE assets totaled $227.90 billion as of December 31, 2013.

38.     As alleged below, however, Petrobras and members of its executive management, members of the Brazilian Federal Government, and a large number of Petrobras's contractors engaged in a massive kickback scheme that resulted in the artificial inflation of the cost of Petrobras's construction contracts. As a result, Petrobras's reported earnings and the value of its PPE were materially inflated during the Relevant Period.

**B.     Defendants Engaged in a Massive Kickback Scheme Involving Billions of Dollars in Petrobras Contracts**

39.     For more than a decade, Petrobras, senior Petrobras officials, the most senior Brazilian Federal Government officials, and numerous Brazilian companies engaged in one of the largest kickback schemes in history. The scheme was a simple one. Construction companies and other firms doing business with Petrobras formed a secret cartel whereby the members agreed to inflate the cost of Petrobras contracts. After Petrobras paid the inflated amounts for the contracts, the recipient firms "kicked back" a percentage of the total contract value to senior Petrobras employees. Those employees lined their own pockets from the kickbacks and also passed along some of the funds to senior Brazilian Federal Government officials in exchange for support from the Brazilian Federal Government and to ensure that those officials would vote in line with Brazil's currently ruling Workers' Party, which in turn controlled Petrobras.

40.     Specifically, the members of the cartel inflated their costs to Petrobras by up to 35% and then kicked back approximately 3% of a contract's total value to Petrobras employees, Brazilian politicians, and money launderers. The graphic below depicts the kickback scheme:



41.   It is undisputed that the kickback scheme occurred.  As admitted by the Company in its Form 6-K filed on January 28, 2015 for the third quarter of 2014 (the "3Q14 Form 6-K"), "the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the costs of our fixed assets, therefore requiring adjustments."

42.   In fact, the Company acknowledged that the kickback scheme occurred after it reviewed evidence gathered by the authorities concerning the scheme.  Petrobras disclosed in the 3Q14 Form 6-K that in connection with its review of the evidence related to the kickback scheme, the Company, among other things, did the following:

- requested full access to the records of ongoing investigations by the Brazilian federal police regarding possible illegal activities committed in connection with the signing of contracts between Petrobras and several suppliers, which has been partially granted by the Brazilian Judiciary;

- established committees to analyze the application of sanctions against suppliers and contractors and a provisional ban on contracting with companies comprising the business groups mentioned in the depositions that have been made public;

- gained access to the testimony of Costa, the former Downstream Director of Petrobras, and Mr. Alberto Youssef at a hearing held at the 13th Federal Court of the State of Paraná (13ª Vara Federal do Paraná) on October 8, 2014, and was authorized by the judge hearing the case to use these testimonies as "borrowed evidence"; and

- gained access to the depositions of Mr. Julio Gerin de Almeida Camargo (Toyo Group) and Mr. Augusto Ribeiro de Mendonça Neto (Setal Group), given as part of their plea bargain agreement with the Brazilian prosecutors.

- 12 -

43.     The kickback scheme is massive by any measure, including in terms of the amount of money and the number of people and firms involved.  On March 10, 2015, Barusco testified before the Congress in Brazil and stated that he first started taking bribes in 1997 or 1998 and that by 2003 or 2004 bribes had become institutionalized.  At least 23 companies were members of the cartel that charged inflated values for contracts related to approximately $76.83 billion worth of Petrobras's assets.  In fact, Petrobras announced on December 30, 2014 that it had temporarily banned 23 business groups from taking part in bids by Petrobras since they had been implicated in the scheme as cartel participants.  According to an article in the *Business Recorder* on January 11, 2015, entitled "Petrobras Offers Leniency Terms to Contractors," Petrobras asked those 23 companies in an email to admit guilt to their involvement in the kickback scheme and pay damages in return for a lifting of the ban on bidding for future contracts.  On March 6, 2015, Petrobras announced that it had temporarily banned an additional two business groups from taking part in bids by Petrobras since they had been implicated in the scheme as cartel participants.

44.     Numerous high level Petrobras executives, including Cerveró, former CFO of Petrobras Distribuidora, Costa, former Chief Downstream Officer, Duque, former Engineering, Technology and Materials Director, and Gabrielli, former Petrobras CEO and Board member, have been arrested or are being investigated in connection with the scheme.

45.     Petrobras executives, including Cerveró, Costa, Duque, Barusco, and Silas Oliva (former Communications Manager), have received requests for indictment from the Brazilian Chamber of Deputies, according to an English translation of a list for requests for indictment by Brazil's rapporteur of the Joint Parliamentary Committee of Inquiry, dated December 18, 2014. Numerous Petrobras executives have resigned as a result of the scheme, including Foster, Barbassa, José Miranda Formigli, former Upstream Director, and José Antônio de Figueiredo, Engineering,

- 13 -

Technology and Procurement Director, according to Petrobras's Form 6-K filed on February 4, 2015. And Machado, former CEO of Transpetro, is on unpaid leave, according to Petrobras's Form 6-K filed on January 23, 2015.

46.     Individuals involved in the kickback scheme have been convicted. On April 22, 2015, Brazilian Judge Sergio Moro convicted eight individuals, including Costa, of racketeering and laundering money obtained from kickbacks on overvalued contracts, including those for the building of a Petrobras refinery in Pernambuco, Brazil between 2009 and 2014. As of April 22, 2015, 97 individuals have been indicted on charges of corruption, money laundering, and cartel formation.

47.     Even though officials are still investigating the kickback scheme, various individuals have had assets seized or have agreed to pay back money. For example, Costa has agreed to turn over assets, including $25.8 million, according to a *Bloomberg* article on October 1, 2014 entitled "Probed Petrobras Documents Show Duque Also Signed Contracts," and former Petrobras CEO Gabrielli's assets were frozen, according to a *Reuters* article on January 29, 2015 entitled "Brazilian Court Freezes Assets of Former Petrobras CEO Gabrielli."

48.     Furthermore, the involvement in the scheme by the Brazilian Federal Government was widespread. More than 50 Brazilian government officials have been implicated in the scheme, including the speakers of both chambers of the Brazilian Congress, and a former president of Brazil (Fernando Collor de Mello). A significant amount of the kickbacks went to the ruling Workers' Party campaign coffers and those of its allies, of which Brazilian President Dilma Rousseff ("Rousseff") is a member. In fact, on March 6, 2015, the Brazilian Supreme Court approved the investigation by the Attorney General of Brazil of 54 politicians in connection with the scandal. According to a March 4, 2015 article on the *Economist.com*, those politicians were identified in plea-bargain deals with former Petrobras executives and others caught up in the investigation.

- 14 -

49.     The most senior officials at Petrobras were aware of the kickback scheme during the Relevant Period.  Petrobras's Executive Directorate (or Executive Board) was made up of its CEO and six senior officers, and the heads of various Company divisions, including the Divisions of Finance, Gas and Energy, Downstream, Services, International, and Exploration and Production. During the Relevant Period, the Executive Directorate was comprised of individuals at the center of the scheme alleged herein, as well as those who were aware of the scheme and its impact on the Company, including Costa (Director of Downstream/Supply), Duque (Chief Services Officer), Barusco (Executive Manager of Engineering and Duque's right-hand man), Cerveró (Director of International Division), Foster (Director of Gas & Energy until 2012 and then CEO), Barbassa (CFO), and Gabrielli (CEO from 2005 to February 2012).

50.     Indeed, according to a December 20, 2014 *Wall Street Journal* article, entitled "Former Petrobras Executive Gives Computer Data to Prosecutors," former Petrobras executive and managing director of Petrobras Singapore Private Ltd., a Petrobras subsidiary, Venina Velosa da Fonseca, handed over a computer containing documents purportedly showing that Foster, former Petrobras CEO, and Petrobras's Board were made aware of an alleged bribery scheme as early as 2009.  According to that article, Fonseca "claims that she sent emails to Petrobras Chief Executive Maria das Gracas Foster and the board of directors on several occasions, and as recently as last month [November 2014], detailing the alleged irregularities."   An *ABC News* article on December 22, 2014, entitled "Ex Petrobras Manager Says She Spoke With CEO About Anomalies," reported that Fonseca advised Foster in 2008 about inflated contracts and payments for services that were not carried out.

51.     Even though the full extent of the transactions involved in the kickback scheme have not yet been publicly revealed, numerous details have been made available.  By January 29, 2015,

- 15 -

Brazilian federal prosecutors had revealed that the kickback scheme involved at least $800 million in bribes and other illegal funds, they had recovered approximately $170 million related to the scheme, over 230 businesses are being investigated, and 86 people are facing charges, as reported in a January 29, 2015 *New York Times* article entitled "Brazil: Petrobras Case Had $800M in Kickbacks Found So Far."

52.     As of February 20, 2015, Brazilian federal prosecutors were seeking $1.55 billion from six construction and engineering companies for their alleged involvement in the kickback scheme, according to an article entitled "Corruption Case" on *ABC News*.  The amount included $111 million in compensation for public money that prosecutors alleged was stolen from Petrobras's coffers, along with $333 million in fines and $1.11 billion in punitive damages.

### C.     Examples of Projects and Transactions Implicated in the Kickback Scheme

53.     Investigations into the kickback scheme are ongoing.  Below are examples of a few Petrobras projects implicated in the kickback scheme:

(a)     **The Pasadena, Texas Refinery**: During 2006, Petrobras paid $360 million for a 50% interest in an oil refinery located in Pasadena, Texas (the "Pasadena Refinery").  This amount was more than 8 times the $42.5 million that a Belgian oil company, Astra, had paid for the refinery merely a year earlier.  That 50% investment eventually cost Petrobras $820.5 million after interest and legal fees.  Ultimately, after litigation over Astra's exercise of a put option requiring Petrobras to purchase the remaining 50%, Petrobras paid a total of $1.18 billion for the refinery. Costa testified that Petrobras's International Director, Cerveró, pushed through this unfavorable transaction in order to obtain $20 to $30 million in bribes from Astra.

(b)     **The Abreu e Lima Refinery ("Abreu e Lima" or "RNEST")**: In 2005, Petrobras approved plans to build RNEST in Pernambuco, Brazil.  It was one of Brazil's first new oil

- 16 -

refinery projects in years, and it was reported to be Petrobras's largest single-investment project.  It was initially budgeted to cost approximately $2.4 billion in 2006, but by the time it began operations in November 2014, the cost had escalated to more than $18 billion.  Costa was primarily responsible for RNEST, including negotiating with contractors.  According to an October 1, 2014 *Wall Street Journal* article entitled "Probed Petrobras Documents Show Duque Also Signed Contracts," Duque signed at least $2.7 billion in contracts for the RNEST project, in which Brazilian prosecutors have identified evidence of fraud, overpricing, and kickbacks.  And according to a January 2, 2015 *Reuters* article entitled "Failure to Stop Petrobras Scandal Could Haunt Brazil's Rousseff," the Brazilian audit court (known as the "TCU") began reviewing contracts for RNEST in 2008 and flagged irregularities in 2009, 2010, 2011, 2012, and 2013, which one TCU auditing official stated were clear warning signs of problems and corruption.  Specifically, in a 2009 report that was sent to Petrobras's executive officers in positions of authority and its Board, the TCU cited irregular tender practices and systematic over-charging on contracts at RNEST.  The TCU's report also criticized Petrobras's delivery of information to the TCU concerning RNEST, stating that it was tantamount to obstruction.  In 2010, the TCU and Brazil's Congress recommended stopping construction of RNEST until irregularities were addressed.  But Petrobras continued construction.  As of 2010, the TCU found at least 1.3 billion reais of overpricing in RNEST contracts.  Several individuals implicated in the Petrobras kickback scheme admitted that RNEST contracts were subject to illegal overbilling.  Costa and Barusco both testified that Petrobras entered into overbilled contracts with cartel members for RNEST projects.  Erton Medeiros Fonseca, the CEO of Brazilian construction company Galvao Engenharia ("Galvao"), testified that Galvao bribed Petrobras to win RNEST construction contracts.  And Venina Velosa da Fonseca described a Petrobras internal audit that revealed that much of the cost increase at RNEST was due to add-on contracts awarded to cartel

1243584_1

participants that approximated $3.1 billion in padded bills.  This audit, which was presented to and approved by the Petrobras Board, blamed Costa for modifying the original plan of RNEST.

(c)   **Complexo Petroquimico do Rio de Janeiro ("Comperj")**: Comperj is a refining complex that broke ground in 2008 and began construction in 2015.  As reported by *Bloomberg* on October 16, 2014, the TCU found that Petrobras must pay $21.6 billion to complete Comperj.  According to an April 7, 2015 *Reuters* article entitled "Petrobras expects a $14.3 bln loss on Comperj refinery O Globo," the unfinished refinery could cost Petrobras nearly 12 times more in losses than the plant is expected to return in cash flow during its lifetime.  *Reuters* added that Comperj was one of the giant refinery projects, according to Brazilian police and prosecutors, on which a cartel of construction and engineering companies conspired with Petrobras executives to overcharge for work.  On April 21, 2015, the *International Business Times* reported in an article entitled "Brazil: As Petrobras scandal spreads economic toll mounts" that construction at Comperj had come to a complete standstill, as Petrobras placed certain members of the cartel, including OAS Engenharia, Galvao, Iesa Oleo e Gas, Schahin Engenharia, and Alusa Engenharia, on a payment blacklist due to the Operation Car Wash bribery and kickback scheme.  As a result of their involvement in the scheme, these firms began filing for bankruptcy protection in November 2014.

(d)   **SBM Offshore**: Petrobras contracted with Netherland-based SBM Offshore ("SBM")  to store oil and gas extracted by the Company.  Foster admitted that Petrobras had found compelling evidence that SBM bribed Petrobras employees to win contracts.

(e)   **Petrobras's Transpetro Subsidiary**: Petrobras's wholly owned subsidiary, Transpetro, transports Petrobras's oil and gas products.  Costa admitted that he received a $500,000 bribe in exchange for his approval of a shipping contract.  Additionally, Barusco testified that he received a bribe for a contract between Transpetro and Progress Company in 1997 or 1998.

54.     The above referenced transactions are simply a few of the many Petrobras projects and transactions involved in the kickback scheme.  Testimony and admissions from those involved in the scheme, information revealed by enforcement officials, and media reports have revealed that the kickback scheme at Petrobras was widespread and far-reaching.  Examples of testimony, admissions, and other sources of information are discussed below:

(a)     Costa admitted to personally receiving tens of millions of dollars and characterized the bribes as a "three percent political adjustment."  He has agreed to pay back these illegally obtained funds to Brazil's public coffers.  He named several construction companies that were a part of the cartel, including, without limitation, Odebrecht SA ("Odebrecht"), OAS SA ("OAS"), and Camargo Correa SA ("Camargo"), three of Brazil's largest construction and engineering firms and historically among Brazil's top political donors, according to an October 20, 2014 article in *Bloomberg* entitled "Petrobras 'Human Bomb' Revelations Fixate Brazil as Vote Looms."

(b)     Costa testified that kickbacks to members of the Workers' Party were commonplace in his and other Petrobras divisions, including the engineering, technology, and materials division headed by Duque, as reported in an article in *The Wall Street Journal* on October 9, 2014, entitled "Ex-Petrobras Executive Says Kickbacks Were Paid to Ruling Party's Officials." According to Costa, another Petrobras division that participated in these kickbacks was Transpetro, the Petrobras division that operates as a logistics, transportation, and storage company, over which Machado served as CEO, as reported in a *Wall Street Journal* article dated October 9, 2014, entitled "Ex-Petrobras Executive Says Kickbacks Were Paid to Ruling Party's Officials."

(c)     Alberto Youssef ("Youssef"), a black-market money dealer involved in the kickback scheme, revealed to prosecutors and police that he laundered money overseas from

- 19 -

overpriced Petrobras contracts and distributed money from construction companies to Brazilian politicians, according to an article in *Bloomberg* dated October 20, 2014, entitled "Petrobras 'Human Bomb' Revelations Fixate Brazil as Vote Looms."  On April 22, 2015, Youssef was convicted for money laundering and sentenced to nine years and two months in prison.

        (d)        Brazilian federal prosecutors emphasized that there was "evidence of fraud and overpricing" in contracts, including one contract for a 3.4 billion reais coking unit and another for a 3.19 billion reais hydro-treater unit, as reported in a *Bloomberg* article on October 1, 2014, entitled "Probed Petrobras Documents Show Duque Also Signed Contracts."  They referenced the coking-unit contract as an example of inflating a price by as much as 446 million reais.

        (e)        According to an article on November 18, 2014 in *Agencia Brasil*, entitled "Petrobras CEO Admits SBM Offshore Bribed Officials," Foster admitted that Petrobras had found compelling evidence that SBM, a contractor for oil-platform-lease services, bribed Petrobras employees to win contracts.  That article also reported that Duque was paid between $19-$23 million in bribes from Augusto Ribeiro de Mendonca Neto, director of Toyo Setal, as part of the kickback scheme.

        (f)        Erton Medeiros Fonseca ("Medeiros"), director of engineering and infrastructure firm Galvao, told Brazilian federal police that he paid approximately $1.5 million (approximately 4 million reais) in bribes to Petrobras to win contracts, according to a November 18, 2014 article in *The Wall Street Journal*, entitled "Executive Says He Paid Bribes to Win Petrobras Contracts."  Medeiros told police that Costa and late Brazilian congressman Jose Janene extorted Medeiros.  Not until Galvao participated in the kickback scheme was Galvao able to win Petrobras bids.  Although Medeiros did not know the total value of the contracts that Galvao won from

- 20 -

Petrobras after the alleged bribe payments, some of the projects were estimated to be as large as two to three billion reais.

55.     Facts about the kickback scheme were revealed in connection with a plea bargain entered into by Barusco with the Brazilian federal police.  An English translation of the plea bargain revealed, among other things, the following:

(a)     Barusco, as a Petrobras Technology Installation Manager within Petrobras's board of directors for its Exploration and Production business segment, began taking bribes in 1997 or 1998 through October 2010 from SBM, and bribes were also given to Duque and Joao Vaccari Neto ("Neto"), the treasurer of the Brazilian Workers' Party.

(b)     Barusco received a bribe for a contract between Transpetro and the Progress Company in 1997 or 1998.

(c)     Barusco accepted bribes of $40-$50 million between 2003 and 2013, while he was a Petrobras Executive Manager of Engineering, related to approximately 90 major construction contracts for Petrobras, on behalf of Duque and Neto.  These contracts were reviewed by the board of directors of Petrobras's Gas & Energy and Exploration and Production business segments and approved by Petrobras's board of executive directors.

(d)     The bribes from contracts involving Petrobras's board of directors of its Supply business segment typically equated to 2% of the contract value and were systematically divided as follows: 1% was managed by Costa; 1% was divided between the Workers' Party – .5% went to Neto for the Workers' Party and .5% went to the "House," which Duque represented; and sometimes a portion of the funds was given to other parties.

(e)     When the contracts involved Petrobras's board of directors of its Gas & Energy business segment, whose directors included Ildo Sauer and Foster, the bribery percentages

- 21 -

ranged typically between 1% and 2%.  Half of the bribes went to Neto for the Workers' Party and the other half went to the "House," which Duque typically represented.

(f)     When the contracts involved Petrobras's board of directors of its Exploration and Production business segment, a director of which was Guilherme Estrela, the bribery percentages ranged typically between 1% and 2%.  Half of the bribes went to Neto for the Workers' Party and the other half went to the "House," which Duque typically represented.

(g)     Between February 2013 and February 2014, Barusco received approximately $5 million in bribes, Duque received approximately $6 million in bribes, and Neto, on the Workers' Party's behalf, received approximately $4.523 million in bribes.

56.     Divisions of the Maersk Group ("Maersk") and Rolls-Royce Holding PLC ("Rolls-Royce") also participated in the Petrobras kickback scheme, as reported in a February 23, 2015 article in *Bidness Etc*, entitled "How Maersk Got Involved in the Petroleo Brasiliero SA (ADR) Corruption Scandal."  Costa claimed that he started receiving monthly commission payments of $10,500 (approximately 30,000 reais), as he provided confidential information about Petrobras's contracts.  Barusco testified that Rolls-Royce allegedly paid bribes to win a $100 million Petrobras contract.

57.     The President (Dalton dos Santos Avancini) and Vice President (Eduardo Hermelino Leite) of Carmargo, a Petrobras contractor, revealed names of Petrobras employees who were involved in the kickback scheme in connection with their plea bargain agreements, as reported in a March 1, 2015 article in the *Zero Hora* newspaper.  According to an English translation of the plea bargains:

(a)     During or around July 2006, Fernando Antonio Falcao Soares ("Soares") and Cerveró (when Cerveró was a director of Petrobras's International business segment) received

- 22 -

approximately $15 million from Julio Camargo in connection with a $586 million contract with Samsung Heavy Industries Co. ("Samsung"), for constructing the Drillship Petrobras 10000, which is owned by Petrobras, registered in the Marshall Islands, and used for deep-water drilling. Cerveró submitted this proposed contract to Petrobras's Executive Board, and Petrobras's Executive Board approved this contract.

(b)     During or around May 2007, Soares and Cerveró (when Cerveró was a director of Petrobras's International business segment), received approximately $25 million from Julio Camargo in connection with a $616 million contract with Samsung related to the Drillship Vitoria 10000. Cerveró submitted this proposed contract to Petrobras's Executive Board, and Petrobras's Executive Board approved this contract.

### D.     Defendants Violated Petrobras's By-Laws

58.     Petrobras's corporate bylaws ("By-Laws") establish the Company's nature and define its lawful objectives. The By-Laws are disclosed on Petrobras's website. Article 3 sets the Company's corporate purpose as "the research, mining, refining, processing, trade and transport of oil from wells, shale and other rocks, its derivatives, natural gas and other fluid hydrocarbons, in addition to other energy related activities." Paragraph 1 of Article 3 explicitly prohibits the Company from engaging in activities related to this purpose in any manner other than those dictated by free and fair market conditions:

> ***Economic activities related to the corporate object shall be developed by the Corporation on a free competition basis with other companies according to market conditions***, due consideration given to further principles and guidelines of Law nº 9,478 of 6 August 1997 and of Law nº 10,438 of 26 April 2002.

59.     Petrobras executives and defendants acted contrary to this provision and the By-Laws by engaging in and failing to prevent a massive kickback scheme that funneled at least hundreds of millions of dollars to insiders and their affiliates through the artificial inflation of Petrobras supply

- 23 -

contracts, the prices of which were not set by prevailing market conditions but were designed to further the scheme and enrich its participants.

> **E.    Defendants Violated Petrobras's Code of Ethics**

60.    Petrobras's Code of Ethics extends to all of its subsidiaries and applies to its Board, executive officers, senior management, employees, interns, and service providers.  As represented by Petrobras in its April 30, 2014 Form 20-F for the year ended December 31, 2013 (the "2013 Form 20-F"), which was signed by Foster and Barbassa, no waivers of the provisions of the Code of Ethics or the Code of Good Practices are permitted.   The Code of Ethics is disclosed on Petrobras's website.  It states, in pertinent part, as follows:

> This Ethics Code covers the members of Boards of Directors, Fiscal Councils, Executive Boards, the occupants of managerial functions, employees, trainees and service providers of Petrobras system, as individual and collective commitment of each and all of them to comply with it and promote its compliance in all actions of the productive chain of Petrobras System and in its relations with all interested parties.

61.    As represented in the 2013 Form 20-F, in 1998, Petrobras's board of executive directors approved the Code of Ethics.  In 2002, the Code of Ethics was renamed as the System Code of Ethics.  In 2006, Petrobras's board of executive officers and the Board approved the current version of the Code of Ethics, after undergoing a revision process with wide participation from Petrobras's business segments, employees, and subsidiaries.

62.    In 2008, Petrobras's executive officers created the Petrobras Ethics Commission, which has been responsible for promoting corporate compliance with ethical principles and acting as a forum for discussing ethics subjects.

63.    The Code of Ethics discusses ethics principles and provides, in pertinent part, as follows:

1243584_1

Respect for life and all human beings, integrity, truth, honesty, justice, equity, institutional loyalty, responsibility, zeal, merit, transparency, legality, impersonality, coherence between speech and practice, are the ethics principles that guide the actions of Petrobras System.

\*   \*   \*

Petrobras System recognizes and respects the legal, social, and cultural aspects of the various environments, regions, and countries in which it operates, always adopting the criterion of maximum execution of rights, compliance with law, rules, and internal procedures.

64.     The Code of Ethics also discusses corporate governance practices and provides, in

pertinent part, as follows:

1.2     conduct its business with transparency and integrity, creating credibility with its shareholders, investors, employees, suppliers, customers, consumers, government, media, communities where it operates and society in general, pursuing to achieve growth and profitability with social and environmental responsibility;

\*   \*   \*

1.5     promote honest and fair negotiations, without receiving inappropriate advantage through manipulation, use of insider information and other practices of such nature; [and]

1.6     register its reports and statements in a correct, consistent, accurate and complete way, without ambiguous information and make its ledgers available with full transparency to internal and external audits and relevant public agencies[.]

65.     The Code of Ethics discusses employee practices and provides, in pertinent part, as

follows:

3.12     do not require nor imply, neither accept nor offer any favor, advantage, benefit, gift, gratuity, for themselves or any other person, in return to their professional activities, and they may accept or offer just promotional, public, not exclusive, without commercial value gifts in their relationships with groups out of System[.]

66.     The Code of Ethics discusses relations with suppliers, service providers, and trainees

and provides, in pertinent part, as follows:

4.2     require to the service providers that their employees comply with the ethics principles and commitments defined in this Code, while contracts with System companies are in force; [and]

4.3     select and hire suppliers and service providers based on criteria strictly legal and technical of quality, cost and timeliness, and demand an ethics profile in their management and social and environmental responsibility practices, refusing unfair competition, child labor, forced or compulsory labor practices, and other practices contrary to the principles of this Code, including the production chain of such suppliers[.]

67.     The Code of Ethics discusses relations with society, government, and state, and provides, in pertinent part, as follows:

8.8     refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions; [and]

8.9     refuse support and contributions to political parties or political campaigns of candidates for elective offices[.]

68.     As alleged herein, unbeknownst to Plaintiff, defendants systematically violated Petrobras's Code of Ethics throughout the Relevant Period by engaging in a massive kickback scheme, but failed to disclose these material facts to investors.  To the contrary, and as discussed further herein, defendants repeatedly represented that Petrobras was acting in compliance with the Company's Code of Ethics and applicable laws and regulations.

**F.     Petrobras Instituted New Corporate Governance Controls as a Result of the Kickback Scheme**

69.     After the public finally learned of the kickback scheme, Petrobras acknowledged internal control weaknesses by implementing new policies and procedures in a purported attempt to prevent future schemes of a similar nature.  As set forth in the 3Q14 Form 6-K, Petrobras instituted the following measures, among others, purportedly "to improve corporate governance and internal controls":

On November 25, 2014 the Board of Directors approved the creation of the position of Executive Director of Governance, Risk and Compliance, with the aim of supporting the Company's compliance programs and mitigating risks in its activities,

- 26 -

including fraud and corruption.  The Executive Director of Governance, Risk and Compliance will participate in the decisions of the Executive Board, and any subjects submitted to the Executive Board for approval must previously be approved by this Director as they relate to governance, risk and compliance.

On January 13, 2015, the Board of Directors approved the appointment of Mr. João Adalberto Elek Junior to the position of Executive Director of Governance, Risk and Compliance from a list of three professionals, previously selected by an executive recruitment and placement firm, Korn Ferry.  Mr. João Adalberto Elek Junior took office on January 19, 2015.  The Executive Director will serve a three-year term, which may be renewable, and will only be removed if determined by the Board of Directors, with quorum including the vote of at least one Board Member elected by the minority or by the preferred shareholders[.]

The Company formed a Special Committee that will purportedly act independently and will have a direct reporting line to the Board of Directors, and report on the independent internal investigation being conducted by the two law firms, Gibson, Dunn & Crutcher LLP and Brazilian firm Trench, Rossi e Watanabe Advogados.  The Special Committee will be composed of Mrs. Ellen Gracie Northfleet, retired Chief Justice of the Brazilian Supreme Court, Andreas Pohlmann, Chief Compliance Officer of Siemens AG from 2007 to 2010, and the Executive Director of Governance, Risk and Compliance, Mr. João Adalberto Elek Junior.

### G.    Enforcement Officials from Two Continents Are Investigating the Kickback Scheme

70.    The kickback scheme is being investigated by numerous government agencies in Brazil and the United States.  Revelations about the scheme were first made public in connection with a plea bargain between Costa and the Brazilian federal police in connection with their investigation of the Operation Car Wash money laundering scheme.  Since November 12, 2014, various other investigations and proceedings have been launched.

71.    In Brazil, the kickback scheme is being investigated by Brazilian federal prosecutors, Brazilian state prosecutors, the Joint Parliamentary Committee of Inquiry, and the Securities Commission of Brazil.  In the United States, the kickback scheme is being investigated by the SEC and the DOJ.

- 27 -

**H.    Petrobras Admitted that Its Financial Statements Were Materially False and Misleading During the Relevant Period Due to the Bribery and Kickback Scheme**

72.    As facts about the Operation Car Wash bribery and kickback scheme became public, defendants acknowledged that the Company's past financial statements would ultimately require correction.  On November 13, 2014, Petrobras announced that it would postpone the release of its third quarter 2014 financial results due to facts made public about the kickback scheme, and during a conference call on November 17, 2014, Foster acknowledged the Company's financial statements could be affected by the kickback scheme.  Barbassa added that if the facts were confirmed, adjustments would need to be made to the PPE line item to deduct from PPE "any amount that could be linked to bribery of any sort; any excessive price that would have been charged."

73.    On January 28, 2015, Petrobras filed the 3Q14 Form 6-K with the SEC and admitted that the Company understood that it would be necessary to make adjustments of the financial statements to correct the values of fixed assets that may have been impacted by amounts related to misconduct involving suppliers, politicians, Petrobras employees, and other groups in the context of the kickback scheme.  Specifically, the Company admitted in its 3Q14 Form 6-K that payments related to the kickback scheme were improperly recognized as part of the cost of PPE and that the costs should not have been capitalized.  The 3Q14 Form 6-K stated, in pertinent part, as follows:

> The payments related to the misconduct previously mentioned were recognized as part of the cost of certain property, plant and equipment and, as of September 30, 2014, most of those assets were under construction or were recently completed, and therefore, had little accumulated depreciation.

> No impairment losses have been recognized in the past for the property, plant and equipment affected by the payments related to misconduct because their recoverability is tested for impairment in cash-generating units (CGU), whose value-in-use has been historically higher than their carrying amounts.  The recoverable amount calculated under the value-in-use approach includes the benefits of existing synergies between the assets that comprise the CGU.

- 28 -

Therefore, under the circumstances described above, the Company believes that amounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount. However, those costs should not have been capitalized.

74.   Additionally, Petrobras admitted in the 3Q14 Form 6-K that its reported PPE assets were artificially inflated as a result of the unlawful activities of its senior managers, stating, in part, that the "Company believes it is necessary to correct the amounts related to the misconduct that were capitalized." The 3Q14 Form 6-K also discussed various methodologies purportedly used by the Company to calculate the amount of the impairment, but stated that those methodologies were not accepted and that further investigation and analysis was warranted.

75.   On April 23, 2015, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the 2014 fiscal year ("4Q14 Form 6-K"). The 4Q14 Form 6-K sets forth two separate and distinct kickback schemes that caused inflation in the Company's PPE assets (and a concomitant understatement of the Company's reported expenses and inflation in income) during the Relevant Period.

76.   The 4Q14 Form 6-K explains that in 2009, the Brazilian federal police began an investigation called "Lava Jato" (Operation Car Wash) aimed at criminal organizations engaged in money laundering in several Brazilian states. During 2014, the Brazilian Federal Prosecutor's Office focused part of its investigation on irregularities involving Petrobras's contractors and suppliers and uncovered a broad payment scheme, referred to in the 4Q14 Form 6-K report as the "payment scheme," involving a wide range of participants, including former Petrobras executive officers in positions of authority.

77.   The 4Q14 Form 6-K explains that, between 2004 and April 2012, a large number of contractors and suppliers colluded with the former Petrobras executive officers in positions of authority to overcharge Petrobras under construction, goods, and services contracts and use the

- 29 -

overpayment received under those contracts to make improper payments to political parties, elected and/or public officials, individual contractor personnel, and former Petrobras executive officers.

78.     In particular, the former Chief Downstream Officer, the former Chief Services Officer, and the former executive manager of the Services area of Petrobras were involved in the payment scheme.  These individuals, who the 4Q14 Form 6-K states "*were all in positions of authority at Petrobras*," not only failed to report the existence of the cartel, they also used their influence to further the objectives of the payment scheme, primarily by ensuring that the cartel members would be selected to participate in bidding rounds for goods and services contracts with Petrobras, so that the cartel members would secure contracts with the Company.

79.     In addition to the payment scheme, the investigations identified several other specific instances in which other contractors and suppliers allegedly overcharged Petrobras in connection with the acquisition of PPE and used the overpayments received from their contracts with the Company to fund improper payments, unrelated to the payment scheme, to former Petrobras executive officers, including a former Chief International Officer.  The contractors and suppliers that participated in this second scheme, which is referred to in the 4Q14 Form 6-K as "unrelated payments," purportedly acted individually and were not cartel members.

80.     Even though the 4Q14 Form 6-K confirms that "the Company believes that the amount of its contract payments representing overpayments to contractors and suppliers pursuant to the [above noted schemes] should not have been capitalized as property, plant and equipment," Petrobras was unable to appropriately restate its previously issued financial statements because, according to Petrobras, it lacks "sufficient information to allow the Company to determine the specific period during which the Company made specific overpayments."  As a result, the Company wrote off the entire amount of the "overpayments [it deemed to be] incorrectly capitalized . . . in the

third quarter of 2014, because it is impracticable to determine the period-specific effect in each prior period."

81.     Because Petrobras determined that it was "impracticable" to determine "the actual amount of overpayment and the periods to be corrected," it constructed a methodology to guesstimate the amount of the overpayments that Petrobras incorrectly capitalized as PPE during the Relevant Period.  As noted in the 4Q14 Form 6-K:

> Petrobras believes that under [applicable accounting standards], the amounts it overpaid pursuant to this payment scheme should not have been included in historical costs of its property, plant and equipment.  However, Petrobras cannot specifically identify either the individual contractual payments that include overcharges or the reporting periods in which overpayments occurred.  As a result, Petrobras developed a methodology to estimate the aggregate amount that it overpaid under the payment scheme, in order to determine the amount of the write-off representing the overstatement of its assets resulting from overpayments used to fund improper payments.

82.     The 4Q14 Form 6-K described, in pertinent part, the methodology that Petrobras employed to estimate the inflation in the Company's PPE assets (and overstatement of the Company's earnings) as follows:

> In order to account for the impact of overpayments, the Company developed an estimation methodology to serve as a proxy for the adjustment that should be made to property plant and equipment using the five steps described below:
>
> (1)     Identify contractual counterparties: the Company listed all the companies identified in public testimony, and using that information the Company identified all of the contractors and suppliers that were either so identified or were consortia including entities so identified.
>
> (2)     Identify the period: the Company concluded from the testimony that the payment scheme was operating from 2004 through April 2012.
>
> (3)     Identify contracts: the Company identified all contracts entered into with the counterparties identified in step 1 during the period identified in step 2, which included supplemental contracts when the original contract was entered into between 2004 and April 2012.  It has identified all of the property, plant and equipment related to those contracts.

- 31 -

(4)    Identify payments: the Company calculated the total contract values under the contracts identified in step 3.

(5)    Apply a fixed percentage to the amount determined in Step 4: the Company estimated the aggregate overpayment by applying a percentage indicated in the depositions (3%) to the total amounts for identified contracts.

The calculation considered all the recorded amounts in the Company's books and records from 2004 through September 2014 with respect to contracts initially entered into between 2004 and April 2012, and any related supplemental contracts, between the companies of the Petrobras group and the cartel members (individually or in a consortium).  This broad scope was used to produce the best estimate for quantifying the aggregate amount of the overpayment, even if there was no specific evidence of overcharging or improper payments under every affected contract.  The Company also identified amounts recorded in its books and records concerning specific contracts and projects with the non-cartel members to account for the amounts those companies overcharged Petrobras to fund improper payments they made, unrelated to the payment scheme and the cartel.

For overpayments attributable to non-cartel members, unrelated to the payment scheme, the Company included in the write-off for incorrectly capitalized overpayments the specific amounts of improper payments or percentages of contract values, as described in the testimony, which were used by those suppliers and contractors to fund improper payments.

83.    The 4Q14 Form 6-K included the following chart to illustrate the methodology employed by the Company to estimate the inflation in the Company's assets:

| "Write-off – overpayments incorrectly capitalized" | E&P | RTM | GAS & POWER | DISTRIB. | INTER. | CORP. | TOTAL |
|---|---|---|---|---|---|---|---|
| Payment scheme: | | | | | | | |
| Total contract amounts [*] | 25,573 | 45,233 | 8,663 | 309 | 307 | 1,355 | 81,440 |
| Estimated aggregate overpayments (3%) | 767 | 1,358 | 260 | 9 | 9 | 41 | 2,444 |
| Unrelated payments (outside the cartel) | 57 | – | 4 | – | – | – | 61 |
| | 824 | 1,358 | 264 | 9 | 9 | 41 | 2,505 |
| Reversal of depreciation of the affected assets | (35) | (81) | (21) | – | – | (4) | (141) |
| Impact on property, plant and equipment | 789 | 1,277 | 243 | 9 | 9 | 37 | 2,364 |
| Write-down of tax credits related to affected assets [**] | 15 | 121 | 23 | – | – | 4 | 163 |
| Write-off – overpayments incorrectly capitalized | 804 | 1,398 | 266 | 9 | 9 | 41 | 2,527 |

[*] Of this amount, US$ 17,999 represents amounts scheduled to be paid after September 30, 2014.
[**] Write-down of tax credits that will not be applicable in the future.

84.    The above-noted methodology is the basis for Petrobras's conclusion that two separate and distinct kickback schemes caused $2.527 billion in inflation in the Company's PPE assets and income during the Relevant Period.   As detailed below, however, Petrobras's

- 32 -

$2.527 billion figure is, in fact, a self-serving guesstimate that minimizes the financial effect on the Company's operations during the Relevant Period.

85.     For example, the 4Q14 Form 6-K also discloses that during the fourth quarter of 2014, Petrobras recorded impairment charges on its PPE assets totaling $16.788 billion.  Petrobras's Comperj and RNEST refining units jointly account for $11.662 billion, or approximately 70%, of the $16.788 billion in impairment charges.

86.     Although the Comperj and RNEST refinery projects were plagued by rampant corruption and bribery prior to and during the Relevant Period, the Company inexplicably attributes **none** of the $11.662 billion in impairment charges on those properties to fraudulent overpayments. Rather, the 4Q14 Form 6-K represents that the impairment charges on both Comperj and RNEST were attributable to associated: (i) "planning deficiencies"; (ii) "the use of a higher discount rate"; (iii) "delays in expect future cash flows"; and (iv) "lower projected economic growth."

87.     As discussed below, however, the 4Q14 Form 6-K makes clear that the $11.662 billion in impairment charges on the Comperj and RNEST refining units resulted, in part, from the bribery and kickback scandal.

88.     The bribery and kickback scandal limited the Company's access to the capital markets. Indeed, *The Wall Street Journal*, in an April 22, 2015 article entitled "Brazil's Petrobras Reports Nearly $17 Billion in Asset and Corruption Charges," noted that the Company had been locked out of the capital markets during 2014 due to its inability to issue accurate financial statements.  In addition, when the bribery and kickback scandal began to unravel, payments to suppliers and contractors on the Comperj and RNEST projects ceased, causing many of them to become insolvent.  As reported in a February 11, 2015 article in the *New York Times*, entitled "Corruption Scandal at Petrobras Threatens Brazil's Economy," in the wake of Operation Car Wash,

- 33 -

Alumini Engineering filed for bankruptcy and OAS, the country's fifth-largest engineering company and a major Petrobras subcontractor, missed bond payments and was trying to negotiate with creditors to avoid bankruptcy.

89.    The 4Q14 Form 6-K noted that these two factors, *i.e.,* the inability of Petrobras to access the capital markets and the insolvency of suppliers and contractors on the Comperj and RNEST projects, caused the Company to postpone its refining projects for an extended period of time.  According to the 4Q14 Form 6-K, this, in turn, caused the Company to use a higher discount rate and delay expected future cash flows in the calculus of the impairment charges on those assets.

90.    On April 22, 2015, Petrobras admitted that its financial statements failed to disclose the impact that Operation Car Wash had on the recoverable values of material portions of its long-lived assets throughout the Relevant Period.  Specifically with regard to the Comperj and RNEST refinery projects, Petrobras disclosed:

**Impairment**

**Property, plant and equipment and intangible assets**

For impairment testing purposes the Company generally uses the value in use of its property, plant and equipment and intangible assets (individually or grouped into cash-generating units – CGUs) as their recoverable amount.  In measuring value in use, the Company bases its cash flow projections on (i) the estimated useful life of the asset or assets grouped into the CGU; (ii) assumptions and financial budgets/forecasts approved by Management for the period corresponding to the expected life cycle of each different business; and (iii) a pre-tax discount rate, which is derived from the Company's post-tax weighted average cost of capital (WACC).  The Company's identified cash-generating units are set out in note 5.2.

*     *     *

***However, during the quarter ended December 31, 2014, changes in circumstances prompted a review of the Company's planned projects and ultimately led Management to revise certain projects under construction***.  As a result, Petrobras has recently decided to postpone for an extended period of time the completion of the following refining projects: (i) Petrochemical Complex of Rio de Janeiro (Complexo Petroquímico do Rio de Janeiro - Comperj); and (ii) the second refining unit in the Abreu e Lima refinery (RNEST).  For that reason, as of

- 34 -

December 31, 2014, those assets under construction were removed from the "Downstream CGU" and were tested for impairment individually.

*Those circumstances include*: (i) a decrease in expected future operating revenues following the decline of international crude oil prices; (ii) the devaluation of the Brazilian real, and the increased cash outflows to service the Company's debt in the near term, most of which is denominated in foreign currencies; (iii) *Petrobras's current inability to access the capital markets*; and (iv) *insolvency of contractors and suppliers and a consequent shortage of qualified contractors and suppliers (as a result of the difficulties created for suppliers by the Lava Jato investigation or otherwise)*.

*        *        *

**Comperj**

*An impairment loss of [US$ 8,220 million] was recognized in Comperi*. . . . The impairment loss is mainly attributable to: (i) project planning deficiencies; (ii) the use of a higher discount rate, reflecting a specific risk premium for the postponed projects; iii) a delay in expected future cash inflows resulting from postponing the project; and (iv) the Company's business context of lower projected economic growth.

**Second refining unit in RNEST**

*An impairment loss of [US$ 3,442 million] was recognized in the second refining unit in RNEST*. . . . The impairment loss is mainly attributable to: (i) project planning deficiencies; (ii) the use of a higher discount rate, reflecting a specific risk premium for the postponed projects; (iii) a delay in expected future cash inflows resulting from postponing the project; and (iv) the Company's business context of lower projected economic growth.

91.     As noted above, the Company's use of a higher discount rate and delay of expected future cash flows in the calculus of the 2014 fourth quarter impairment charges gave rise to the combined $11.662 billion impairment charge on Petrobras's Comperj and RNEST refining assets. Accordingly, the $11.662 billion impairment charge on Petrobras's Comperj and RNEST refining assets was a result of the bribery and kickback scandal.

92.     That the impairment charge on the Comperj and RNEST refining units was due, at least in part, to the payment and unrelated payment schemes is further demonstrated by the fact that

- 35 -

Petrobras has now written off **85%** of the value that it previously reported for Comperj and **55%** of the value that it previously reported for RNEST.

93.     Indeed, in an April 28, 2015 article entitled "Three Petrobras Board Members Criticize 2014 Earnings Calculations," *The Wall Street Journal* reported that three independent members of Petrobras's 10-member Board chided the Company's calculations of its 2014 financial results.  The April 28, 2015 article further reported that Petrobras Board member Mauro Rodrigues da Cunha, who decided not to run for re-election due to frustration with the government's role in the Company, "***blasted Petrobras' methodology in calculating the asset impairment, saying it only partially reduced the massive overvaluation of refineries on Petrobras' books***."  According to the April 28, 2015 article, Silvio Sinedino Pinheiro ("Pinheiro"), another independent Petrobras Board member, "***also cited Petrobras' methodology for calculating the asset impairment as a reason for voting against the [4Q14 Form 6-K] release***."  He noted that part of the troubled Abreu e Lima refinery (RNEST) was not included in the impairment, even though it cost the Company $81,000 per barrel of capacity to build, compared with a "'maximum international average' of $35,000."

94.     As noted above, the Company's estimation methodology for quantifying the financial-statement impact of overpayments was calculated by multiplying the values of the contracts identified as being entered into between Petrobras and the consortium contractors and suppliers between 2004 and April 2012 by a fixed percentage of 3%.

95.     According to the 4Q14 Form 6-K, the estimate "assumes that all contracts with the identified counterparties were affected and that 3% represents the amount by which the Company overpaid on those contracts."  The 4Q14 Form 6-K explained further that the 3% overstatement estimate was supported by the October 8, 2014 testimony of Costa, Youssef, and others (collectively "payment scheme deponents") that publicly described the payment scheme.

- 36 -

96.     The Company's quantification analysis, however, ignores a material consequence of the payment and unrelated payment schemes.  While the payment scheme deponents testified generally about bribes and kickbacks averaging 3% of contract values, they also testified about the existence of cartel contracts being awarded at inflated values.

97.     Costa and Youssef testified that when awarding contract bids, Petrobras: (i) established a reasonable price for a given contract, *i.e.*, the budget or reference value; (ii) put the contract out for bid; and (iii) accepted contract bids that, generally, were no less than 15% and no more than 20% of the contract's budget or reference value.  In addition, Youssef testified that the existence of the cartel typically resulted in contracts being awarded close to the maximum amount possible, *i.e.*, 20%, more than the contract's budget or reference value.

98.     Accordingly, the 3% overstatement estimate used by Petrobras, which was only associated with the kickbacks, does not account for overpayments resulting from non-competitive bids when the Company awarded contracts to cartel members.

99.     Since Petrobras generally accepts contract bids within a 35% range (15% below and 20% more than the contract's budget or reference value), the identified contract values ($81.44 billion) could have been inflated by as much as 35%.  Substituting a 35% fixed percentage value in the Company's above-noted estimation methodology results in a reasonable possible maximum PPE and income overstatement during the Relevant Period of approximately $27 billion.

100.    Accordingly, Plaintiff believes that the true inflation of the Company's PPE assets (and income) during the Relevant Period ranged between the $2.527 billion already recorded by Petrobras and $27 billion (assuming that all contracts identified by Petrobras were inflated by 35%).

101.    Furthermore, even if Petrobras's quantification of the magnitude of the overstatement of the Company's PPE assets (and income) resulting from the kickback scheme was appropriate, the charges associated therewith were a foreseeable consequence of the kickback scheme.

102.    Material risks and negative financial consequences associated with the Operation Car Wash bribery scheme are posed by long-standing Brazilian civil law that prohibits the offering, payment, and/or receipt of bribes by government officials.  For example, Law No. 8429/1992 (Brazil's Administrative Misconduct Law) sets forth civil sanctions for domestic public officials and for any entity that either induces or assists in the misconduct of public officials or that benefits, directly or indirectly, from the commission of bribery.  The Administrative Misconduct Law applies to any person or entity that induces, assists in, or is involved in a bribery scheme.  Indeed, as reported by the *New York Times* on December 16, 2014, in an article entitled "Rio Prosecutors File New Case Against Petrobras," officials from the Rio de Janeiro public prosecutors' office had filed a civil suit for violations of "'administrative misconduct'" against Petrobras and one of Brazil's biggest builders working on the Comperj project, Andrade Gutierrez.  In connection with the civil suit, the prosecutors' office has requested that the bank accounts of former Petrobras CEO and President, Gabrielli, and seven others be frozen.  To date, Gabrielli is the highest ranking former Petrobras executive to be implicated in the bribery and kickback scheme.

103.    Brazil's Administrative Misconduct Law provides for the following civil sanctions: (a) forfeiture of assets and/or values obtained by bribery; (b) full compensation for the loss caused by any act of bribery; (c) suspension of political rights; (d) treble damages; and (e) the harsh penalty of prohibition against contracting with the public administration or receiving any benefit from public entities.  Effectively, entities that have engaged in improper bribery schemes may be put out of

- 38 -

business because the primary source of their revenues is the Brazilian government or state-controlled entities such as Petrobras.

104.    The Operation Car Wash bribery scheme – and the implications arising from its blatant violation of Brazil's Administrative Misconduct Law – had the direct effect of placing the recoverable amounts of critical Petrobras capital projects, such as the Comperj and RNEST refineries, at high risk of being materially less than their carrying value on the Company's books during the Relevant Period.  Because the Comperj and RNEST refinery projects were plagued by rampant corruption and bribery prior to and during the Relevant Period, Petrobras not only faced the risk of significant fines and sanctions and being locked out of the capital markets during the Relevant Period, but that the contractors and suppliers who were working on completing the Comperj and RNEST projects would be unable to complete those projects and/or otherwise be forced into bankruptcy.  Had investors known that Petrobras was actively engaged in and associated with wide-ranging corruption in blatant violation of the Administrative Misconduct Law during the Relevant Period, the market would have been in a position to price the attendant risks of Operation Car Wash into the Company's securities prices.  As alleged herein, however, defendants concealed the risks associated with the Company's unlawful conduct, which is shaping up to be one of biggest corruption scandals ever uncovered in Brazil.

## V.    PETROBRAS'S FINANCIAL REPORTING DURING THE RELEVANT PERIOD WAS MATERIALLY FALSE AND MISLEADING

105.    During the Relevant Period, defendants represented that the Company's financial statements, and their related financial disclosures, were presented in accordance with applicable accounting standards.  These representations were materially false and misleading when made because, in its attempt to mask the unlawful kickback schemes from investors, Petrobras, in violation

- 39 -

of applicable accounting principles, recorded billions of dollars in bribes and overpayments as assets on the Company's balance sheet during the Relevant Period.

106.    As detailed herein, prior to 2011, Petrobras represented that its financial statements were presented in conformity with Generally Accepted Accounting Principles in the United States ("U.S. GAAP") and, after 2010, represented that its financial statements were presented in conformity with International Financial Reporting Standards ("IFRS").[4]  These representations were materially false and misleading because, as the Company has now admitted, both U.S. GAAP and IFRS precluded Petrobras from reporting the bribes and contract overpayments it paid during the Relevant Period as assets.  Rather, such payments were required to have been immediately expensed as they were incurred.  In addition, both U.S. GAAP and IFRS required Petrobras to disclose the loss contingencies ensuing from the unlawful practices of its management.

**A.    Petrobras's False and Misleading Financial Reporting During 2009 and 2010**

107.    Prior to 2011, Petrobras issued quarterly and annual financial statements, and related financial disclosures, that were falsely represented to have been presented in conformity with U.S. GAAP.  In its Forms 20-F for the years ended December 31, 2009 and December 31, 2010 ("2009 and 2010 Forms 20-F"), Petrobras represented "the Company has followed accounting policies that are in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP")."  In this regard, the 2009 and 2010 Forms 20-F and the financial statements included therein represented, in pertinent part, as follows:

---

[4]    Beginning in 2011, Petrobras adopted IFRS and discontinued using U.S. GAAP as the basis for the preparation and presentation of its financial statements and financial reporting.

**2009 Form 20-F**:

The audited consolidated financial statements of Petrobras and our consolidated subsidiaries as of December 31, 2009 and 2008, and for each of the three years in the period ended December 31, 2009, and the accompanying notes, contained in this annual report have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP.

*        *        *

**Basis of financial statements preparation**

The accompanying consolidated financial statements of Petróleo Brasileiro S.A. -Petrobras (the Company) [the consolidated balance sheets of Petróleo Brasileiro S.A. - Petrobras and subsidiaries as of December 31, 2009 and 2008, and the related consolidated statements of income, changes in shareholders' equity and cash flows for each of the years in the three-year period ended December 31, 2009] have been prepared in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP) and the rules and regulations of the Securities and Exchange Commission (SEC).  U.S. GAAP differs in certain respects from Brazilian accounting practice as applied by Petrobras in its statutory financial statements prepared in accordance with Brazilian Corporate Law and regulations promulgated by the Brazilian Securities and Exchange Commission (CVM).

**2010 Form 20-F**:

The audited consolidated financial statements of Petrobras and our consolidated subsidiaries as of December 31, 2010 and 2009, and for each of the three years in the period ended December 31, 2010, and the accompanying notes, contained in this annual report have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP.

*        *        *

In preparing these consolidated financial statements[consolidated balance sheets of Petróleo Brasileiro S.A. -Petrobras and subsidiaries as of December 31, 2010 and 2009, and the related consolidated statements of income, changes in shareholders' equity and cash flows for each of the years in the three-year period ended December 31, 2010], the Company has followed accounting policies that are in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

108.    These representations were materially false and misleading when made because, in violation of U.S. GAAP, defendants knowingly or recklessly caused Petrobras to issue quarterly and annual financial statements, and related financial disclosures, during 2009 and 2010 that improperly:

- 41 -

(i) overstated the amount of Petrobras's assets; (ii) understated the Company's expenses, which resulted in an concomitant overstatement of Petrobras's reported income; and (iii) failed to disclose loss contingencies associated with the unlawful bribery and kickback scheme perpetrated by Petrobras management.

109.   Compliance with U.S. GAAP is a basic fundamental obligation of publicly traded companies.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [U.S. GAAP] will be presumed to be misleading or inaccurate . . . ."  17 C.F.R. §210.4-01(a)(1).

110.   U.S. GAAP generally defines assets classified as "Property, Plant and Equipment," or PPE, as long-lived tangible assets used to create and distribute an entity's products and services. These assets include land and land improvements, buildings, machinery, and equipment and furniture and fixtures.  Like most assets, PPE is to be initially measured at its historical cost, or the costs "necessarily incurred" to bring the asset to the condition and location necessary for its intended use.  *See, e.g.*, Accounting Standards Codification ("ASC") Topic 360, *Property, Plant, and Equipment*.

111.   Pursuant to ASC Topic 360, the "historical cost" of PPE includes only "the costs necessarily incurred to bring it to the condition and location necessary for its intended use."  The monies received by Petrobras executives and Brazilian politicians as bribes and the additional costs incurred due to illegal (but Petrobras-sanctioned) bid-rigging were not costs necessarily incurred to bring the PPE to the condition and location necessary for their intended use and, therefore, could not be recorded as PPE assets in the Company's financial statements.  Rather, U.S. GAAP required that such payments be immediately expensed, as they did not provide any future economic benefit.  *See,*

*e.g.*, FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*.

112.    In a manner consistent with the requirements of U.S. GAAP, the financial statements included in the 2009 and 2010 Forms 20-F represented, in pertinent part,  the following with respect to Petrobras's PPE assets:

**<u>2009 Form 20-F</u>**:

**Property, plant and equipment**

- **Costs incurred in oil and gas producing activitie**s

    The costs incurred in connection with the exploration, development and production of oil and gas are recorded in accordance with the "successful efforts" method.  This method requires that costs the Company incurs in connection with the drilling of developmental wells and facilities in proved reserve production areas and successful exploratory wells be capitalized.  In addition, costs the Company incurs in connection with geological and geophysical activities are charged to the statements of income in the year incurred, and the costs relating to exploratory dry wells on unproved reserve properties are charged to the statements of income when determined as dry or uneconomical.

- **Capitalized costs**

    The capitalized costs are depreciated based on the unit-of-production method using proved developed reserves.  These reserves are estimated by the Company's geologists and petroleum engineers in accordance with SEC standards and are reviewed annually, or more frequently when there are indications of significant changes.

- **Property acquisition costs**

    Costs of acquiring developed or undeveloped leaseholds including lease bonus, brokerage, and other fees are capitalized.  The costs of undeveloped properties that become productive are transferred to a producing property account.

- **Exploratory costs**

    Exploratory wells that find oil and gas in an area requiring a major capital expenditure before production begins are evaluated annually to assure that commercial quantities of reserves have been found or that additional exploration work is underway or planned.  Exploratory costs related to areas where commercial quantities have been found are capitalized, and exploratory costs where additional

- 43 -

work is underway or planned continue to be capitalized pending final evaluation. Exploratory well costs not meeting either of these tests are charged to expense.  All other exploratory costs (including geological and geophysical costs) are expensed as incurred.  Exploratory dry holes are expensed.

• **Development costs**

Costs of development wells including wells, platforms, well equipment and attendant production facilities are capitalized.

• **Production costs**

Costs incurred with producing wells are recorded as inventories and are expensed when the products are sold.

*      *      *

Property, plant and equipment, *at cost*, are summarized as follows:

| | As of December 31, | | | | | |
| | 2009 | | | 2008 | | |
| | Cost | Accumulated depreciation | Net | Cost | Accumulated depreciation | Net |
|---|---|---|---|---|---|---|
| Buildings and improvements | 7,093 | (1,982) | 5,111 | 4,060 | (1,310) | 2,750 |
| Capitalized expenses | 47,958 | (21,633) | 26,325 | 26,281 | (12,682) | 13,599 |
| Equipment and other assets | 60,592 | (27,637) | 32,955 | 45,742 | (21,230) | 24,512 |
| Capital lease - platforms and vessels | 813 | (63) | 750 | 2,752 | (2,073) | 679 |
| Rights and concessions | 3,172 | (1,009) | 2,163 | 2,439 | (655) | 1,784 |
| Land | 574 | - | 574 | 441 | - | 441 |
| Materials | 4,360 | - | 4,360 | 2,219 | - | 2,219 |
| Expansion projects: | | | | | | |
| Construction and installations in progress: | | | | | | |
| Exploration and production | 27,664 | - | 27,664 | 19,779 | - | 19,779 |
| Refining, Transportation & Marketing | 22,683 | - | 22,683 | 11,973 | - | 11,973 |
| Gas & Power | 11,010 | - | 11,010 | 4,908 | - | 4,908 |
| Distribution | 285 | - | 285 | 185 | - | 185 |
| International | 680 | - | 680 | 1,346 | - | 1,346 |
| Corporate | 1,607 | - | 1,607 | 544 | - | 544 |
| | 188,491 | (52,324) | 136,167 | 122,669 | (37,950) | 84,719 |

## 2010 Form 20-F:

## Property, plant and equipment

## Costs incurred in oil and gas producing activities

The costs incurred in connection with the exploration, development and production of oil and gas are recorded in accordance with the "successful efforts" method.  This method requires that costs the Company incurs in connection with the drilling of developmental wells and facilities in proved reserve production areas and successful exploratory wells be capitalized.  In addition, costs the Company incurs in connection with geological and geophysical activities are charged to the statements

- 44 -

of income in the year incurred, and the costs relating to exploratory dry wells on unproved reserve properties are charged to the statements of income when determined as dry or uneconomical.

**Capitalized costs**

The capitalized costs are depreciated based on the unit-of-production method using proved developed reserves.  These reserves are estimated by the Company's geologists and petroleum engineers in accordance with SEC standards and are reviewed annually or more frequently when there are indications of significant changes.

**Property acquisition costs**

Costs of acquiring developed or undeveloped leaseholds including lease bonus, brokerage, and other fees are capitalized.  The costs of undeveloped properties that become productive are transferred to a producing property account.

**Exploratory costs**

Exploratory wells that find oil and gas in an area requiring a major capital expenditure before production begins are evaluated annually to assure that commercial quantities of reserves have been found or that additional exploration work is underway or planned.  Exploratory costs related to areas where commercial quantities have been found are capitalized, and exploratory costs where additional work is underway or planned continue to be capitalized pending final evaluation.  Exploratory well costs not meeting either of these tests are charged to expense.  All other exploratory costs (including geological and geophysical costs) are expensed as incurred.  Exploratory dry holes are expensed.

**Development costs**

Costs of development wells including wells, platforms, well equipment and attendant production facilities are capitalized.

**Production costs**

Costs incurred with producing wells are recorded as inventories and are expensed when the products are sold.

*        *        *

Property, plant and equipment, *at cost*, are summarized as follows:

| | As of December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2010 | | | 2009 | | |
| | Cost | Accumulated depreciation | Net | Cost | Accumulated depreciation | Net |
| Buildings and improvements | 9,710 | (2,062) | 7,648 | 7,093 | (1,982) | 5,111 |
| Capitalized expenses | 58,146 | (26,082) | 32,064 | 47,958 | (21,633) | 26,325 |
| Equipment and other assets | 83,017 | (32,664) | 50,353 | 60,592 | (27,637) | 32,955 |
| Capital lease - platforms and vessels | | | | | | |
| Petroleum Production Rights | 516 | (45) | 471 | 813 | (63) | 750 |
| - Assignment Agreement | 43,868 | - | 43,868 | - | - | - |
| Rights and concessions | 4,835 | (1,421) | 3,414 | 3,172 | (1,009) | 2,163 |
| Land | 757 | - | 757 | 574 | - | 574 |
| Materials | 4,566 | - | 4,566 | 4,360 | - | 4,360 |
| Expansion projects: | | | | | | |
| Construction and installations in progress: | | | | | | |
| Exploration and production | 33,491 | - | 33,491 | 27,664 | - | 27,664 |
| Refining, Transportation & Marketing | 33,062 | - | 33,062 | 22,683 | - | 22,683 |
| Gas & Power | 6,218 | - | 6,218 | 11,010 | - | 11,010 |
| Distribution | 328 | - | 328 | 285 | - | 285 |
| International | 158 | - | 158 | 680 | - | 680 |
| Corporate | 2,169 | - | 2,169 | 1,607 | - | 1,607 |
| | 280,841 | (62,274) | 218,567 | 188,491 | (52,324) | 136,167 |

113.     The above-noted representations were materially false and misleading when made because, in violation of U.S. GAAP, defendants knowingly or recklessly caused Petrobras to issue financial statements and related financial disclosures in the 2009 and 2010 Forms 20-F, as well its 2009 and 2010 quarterly financial statements, that failed to report Petrobras's PPE assets at their true cost.

114.     The bribes and overpayments disbursed by the Company provided it with no "future economic benefits" and were required to be immediately recognized and reported as an expense during the Relevant Period.  Defendants concealed the unlawful kickback scheme from investors by fraudulently recording such disbursements as PPE and, in doing so, materially understated Petrobras's expenses and overstated its reported income by between $2.527 billion and $27 billion during the Relevant Period.

115.     Now the Company has admitted that its widespread, multi-year, unlawful bribery and kickback schemes caused its PPE assets during the Relevant Period to be overstated by, at least,

- 46 -

$2.527 billion, and it has written down the value of these assets by an additional $16.823 billion to correct for the inflation in the value of these assets.

116.    Further, U.S. GAAP, in ASC Topic 450, *Contingencies*, provides that disclosure of loss contingencies is required when there is "at least a reasonable possibility [*i.e.*, a greater than slight chance] that a loss or an additional loss may have been incurred."  ASC Topic 450 defines a contingency as an existing condition, situation, or set of circumstances involving an uncertainty as to possible gain or loss.

117.    The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. §210.10-01], which provides that disclosures in interim-period financial statements may be abbreviated and need not duplicate the disclosure contained in the most-recent audited financial statements, ***except that*** "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

118.    As shown by the facts detailed herein, defendants knowingly or recklessly ignored that there was more than a slight chance that Petrobras would incur substantial fines and/or legal liability as a result of the illegal conduct by its management.  Nonetheless, defendants, in violation of U.S. GAAP, caused Petrobras to issue financial statements during the Relevant Period that failed to disclose such loss contingencies associated with the blatant violation of Brazil's anti-corruption laws, including the Administrative Misconduct Law.

   **B.    Petrobras's False and Misleading Financial Reporting During 2011, 2012, and 2013**

119.    After 2010, Petrobras issued quarterly and annual financial statements, and related disclosures, that were falsely represented to have been presented in conformity with IFRS.  With respect to the annual financial statements included in its Forms 20-F for the years ended

- 47 -

December 31, 2011, December 31, 2012, and December 31, 2013 ("2011, 2012 and 2013 Forms 20-F"), Petrobras represented that such financial statements were presented "in accordance with International Financial Reporting Standards ('IFRS') as issued by the International Accounting Standards Board."

120.    The 2011, 2012 and 2013 Forms 20-F and the financial statements included therein represented, in pertinent part, as follows:

**2011 Form 20-F**:

The audited consolidated financial statements of Petrobras and our consolidated subsidiaries as of and for each of the three years ended December 31, 2011, 2010 and 2009 and the accompanying notes contained in this annual report have been presented in U.S. dollars and prepared in accordance with International Financial Reporting Standards (IFRS) issued by the International Accounting Standards Board (IASB).

\*        \*        \*

**Basis of preparation**

**2.1  Statement of compliance**

The consolidated financial statements are being presented in accordance with the international financial reporting standards (IFRS) issued by the International Accounting Standards Board (IASB) in U.S. dollar.

**2012 Form 20-F**:

The audited consolidated financial statements of Petrobras and our consolidated subsidiaries as of and for each of the three years ended December 31, 2012, 2011 and 2010 and the accompanying notes contained in this annual report have been presented in U.S. dollars and prepared in accordance with International Financial Reporting Standards, or IFRS, issued by the International Accounting Standards Board, or IASB.

\*        \*        \*

**Basis of preparation**

**2.1  Statement of compliance and authorization of financial statements**

The consolidated financial statements have been prepared and are being presented in accordance with the International Financial Reporting Standards (IFRS)

- 48 -

as issued by the International Accounting Standards Board (IASB).  They are presented in U.S. dollars.

**2013 Form 20-F**:

Our audited consolidated financial statements as of and for each of the three years ended December 31, 2013, 2012 and 2011 and the accompanying notes contained in this annual report have been presented in U.S. dollars and prepared in accordance with International Financial Reporting Standards, or IFRS, issued by the International Accounting Standards Board, or IASB.

*       *       *

**Basis of preparation**

**2.1.  Statement of compliance and authorization of financial statements**

The consolidated financial information has been prepared and is being presented in accordance with the International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB). The information is presented in U.S. dollars.

121.    These representations were materially false and misleading when made because in violation of IFRS, defendants knowingly or recklessly caused Petrobras to issue quarterly and annual financial statements and related financial disclosures during 2011, 2012 and 2013 that improperly: (i) overstated the amount of Petrobras's assets; (ii) understated the Company's expenses, which resulted in a concomitant overstatement of Petrobras's reported income; and (iii) failed to disclose loss contingencies associated with the unlawful bribery and kickback scheme perpetrated by Petrobras management.

122.    Pursuant to International Accounting Standard ("IAS") 16, *Property, Plant and Equipment*, the cost of an item of property, plant and equipment shall be recognized as an asset if, and only if: (a) it is probable that future economic benefits associated with the item will flow to the entity; and (b) the cost of the item can be measured reliably.  In this regard, cost is defined as the amount of cash or cash equivalents paid or the fair value of the other consideration given to acquire an asset at the time of its acquisition or construction or, where applicable, the amount attributed to

- 49 -

that asset when initially recognized in accordance with the specific requirements of other IFRS.  IAS 16 explicitly provides that the cost of property, plant and equipment does ***not*** include "administration and other general overhead costs."

123.     Not unlike U.S. GAAP, IFRS requires the immediate recognition of an expense when an expenditure provides no future economic benefit.  *See, e.g.*, IFRS *Conceptual Framework for Financial Reporting*, 4.52.

124.     In a manner consistent with the requirements of IAS 16, the financial statements included in the Company's 2011, 2012 and 2013 Forms 20-F represented, in pertinent part, the following with respect to Petrobras's PPE assets:

**2011 Form 20-F**:

Property, plant and equipment, net is stated at the cost of acquisition or construction, which represents the costs incurred for bringing the asset to the condition for operation, adjusted during hyperinflationary periods, less accumulated depreciation and impairment losses.

The costs incurred in connection with the exploration, development and production of oil and gas are accounted for in accordance with the successful efforts method.  This method requires that capitalization of costs incurred in connection with the development of proved reserve areas and successful exploratory wells.  In addition, costs related to geological and geophysical activities are expensed when incurred and exploratory wells drilled in areas of unproved reserves are expensed when determined to be dry or non-economical.

*          *          *

| | Land, buildings and improvements | Equipment and other assets | Assets under construction (*) | Oil and gas producing properties | Total |
|---|---|---|---|---|---|
| **Balance at December 31, 2009** | **4,169** | **39,766** | **66,863** | **17,954** | **128,752** |
| Additions | 126 | 2,950 | 32,727 | 1,784 | 37,587 |
| Capitalized interest | | | 3,141 | | 3,141 |
| Business combination | 49 | 56 | 14 | | 119 |
| Write-offs | (81) | (51) | (863) | (635) | (1,630) |
| Transfers | 1,068 | 19,829 | (22,459) | 4,478 | 2,916 |
| Depreciation, amortization and depletion | (331) | (4,368) | | (3,259) | (7,958) |
| Impairment – provision | | (104) | | (156) | (260) |
| Impairment – reversal | | 77 | | 240 | 317 |
| Accumulated translation adjustment | 256 | 166 | 3,747 | 951 | 5,120 |
| **Balance at December 31, 2010** | **5,256** | **58,321** | **83,170** | **21,357** | **168,104** |
| Cost | 7,450 | 96,353 | 83,170 | 46,545 | 233,518 |

| | Land, buildings and improvements | Equipment and other assets | Assets under construction (*) | Oil and gas producing properties | Total |
|---|---|---|---|---|---|
| Accumulated depreciation, amortization and depletion | (2,194) | (38,032) | | (25,188) | (65,414) |
| **Balance at December 31, 2010** | **5,256** | **58,321** | **83,170** | **21,357** | **168,104** |
| Additions | 101 | 1,570 | 31,840 | 2,059 | 35,570 |
| Capitalized interest | | | 4,382 | | 4,382 |
| Business combination | | | 12 | | 12 |
| Write-offs | (25) | (262) | (1,296) | (326) | (1,909) |
| Transfers | 2,413 | 18,406 | (23,598) | 8,401 | 5,622 |
| Depreciation, amortization and depletion | (473) | (5,800) | | (3,904) | (10,177) |
| Impairment – provision | | (50) | (150) | (213) | (413) |
| Impairment – reversal | 1 | 15 | | 36 | 52 |
| Accumulated translation adjustment | (685) | (5,838) | (9,831) | (2,424) | (18,778) |
| **Balance at December 31, 2011** | **6,588** | **66,362** | **84,529** | **24,986** | **182,465** |
| Cost | 8,990 | 104,477 | 84,529 | 52,272 | 250,268 |
| Accumulated depreciation, amortization and depletion | (2,402) | (38,115) | | (27,286) | (67,803) |
| **Balance at December 31, 2011** | **6,588** | **66,362** | **84,529** | **24,986** | **182,465** |

(*) It includes oil and gas exploration and development assets.

**2012 Form 20-F**:

Property, plant and equipment are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

Rights over tangible assets to be used in the normal course of business, arising from transactions which transfer substantially all the risks and rewards incidental to ownership of the asset (finance leases) are initially recognized at the lower of the fair value of the assets or the present value of the minimum payments of the contract. Capitalized lease assets are depreciated on a systematic basis consistent with the depreciation policy the Company adopts for property, plant and equipment that are owned. Where there is no reasonable certainty that the Company will obtain ownership by the end of the lease term, capitalized lease assets are depreciated over the shorter of the lease term or the estimated useful life of the asset.

Expenditures on major maintenance of industrial units and vessels are capitalized if the recognition criteria of IAS 16 are met. These comprise the cost of replacement assets or parts of assets, equipment assembly services, as well as other related costs. Such maintenance occurs, on average, every four years and the respective expenses are depreciated as production costs through the date of the beginning of the following stoppage.

\*      \*      \*

- 51 -

| | Land, buildings and improvements | Equipment and other assets | Assets under construction (*) | Exploration and development Costs (Oil and gas producing properties) | Total |
|---|---|---|---|---|---|
| **Balance at December 31, 2010** | **5,256** | **58,321** | **83,170** | **21,742** | **168,489** |
| Additions | 101 | 1,570 | 31,840 | 2,141 | 35,652 |
| Additions to decommissioning assets / review of estimates | - | - | - | 1,407 | 1,407 |
| Capitalized borrowing costs | - | - | 4,382 | - | 4,382 |
| Business combination | - | - | 12 | - | 12 |
| Write-offs | (25) | (262) | (1,296) | (333) | (1,916) |
| Transfers | 2,413 | 18,406 | (23,598) | 7,057 | 4,278 |
| Depreciation, amortization and depletion | (473) | (5,800) | - | (3,955) | (10,228) |
| Impairment – recognition | - | (50) | (150) | (213) | (413) |
| Impairment – reversal | 1 | 15 | - | 36 | 52 |
| Cumulative translation adjustment | (685) | (5,838) | (9,831) | (2,443) | (18,797) |
| **Balance at December 31, 2011** | **6,588** | **66,362** | **84,529** | **25,439** | **182,918** |
| Cost | 8,990 | 104,477 | 84,529 | 53,030 | 251,026 |
| Accumulated depreciation, amortization and depletion | (2,402) | (38,115) | - | (27,591) | (68,108) |
| **Balance at December 31, 2011** | **6,588** | **66,362** | **84,529** | **25,439** | **182,918** |
| Additions | 50 | 2,073 | 32,571 | 1,703 | 36,397 |
| Additions to decommissioning assets / review of estimates | - | - | - | 5,207 | 5,207 |
| Capitalized borrowing costs | - | - | 3,792 | - | 3,792 |
| Business combination | 83 | 182 | 2 | - | 267 |
| Write-offs | (6) | (59) | (2,651) | (106) | (2,822) |
| Transfers | 2,504 | 24,818 | (30,413) | 6,994 | 3,903 |
| Depreciation, amortization and depletion | (477) | (6,626) | - | (3,765) | (10,868) |
| Impairment – recognition | (20) | (178) | (37) | (149) | (384) |
| Impairment – reversal | - | 44 | 134 | 65 | 243 |
| Cumulative translation adjustment | (559) | (4,908) | (6,264) | (2,022) | (13,752) |
| **Balance at December 31, 2012** | **8,164** | **81,708** | **81,663** | **33,366** | **204,901** |
| Cost | 10,834 | 122,647 | 81,663 | 62,348 | 277,492 |
| Accumulated depreciation, amortization and depletion | (2,670) | (40,939) | - | (28,982) | (72,591) |
| **Balance at December 31, 2012** | **8,164** | **81,708** | **81,663** | **33,366** | **204,901** |

(*) It includes oil and gas exploration and development assets.
(**) It includes assets depreciated based on the units of production method.

**2013 Form 20-F**:

Property, plant and equipment are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

Expenditures on major maintenance of industrial units and vessels are capitalized if the recognition criteria are met.  Expenditures comprise: replacement of certain assets or parts of assets, equipment assembly services, as well as other related costs.   Such maintenance occurs, on average, every four years.   Capitalized expenditures are depreciated on a straight line basis based on the estimated time of the maintenance cycle.

- 52 -

\*       \*       \*

| | Land, buildings and improvements | Equipment and other assets | Assets under construction (*) | Exploration and development costs (Oil and gas producing properties) | Total |
|---|---|---|---|---|---|
| Balance at January 1, 2012 | 6,588 | 66,362 | 84,529 | 25,439 | 182,918 |
| Additions | 50 | 2,073 | 32,571 | 1,703 | 36,397 |
| Additions to / review of estimates of decommissioning costs | – | – | – | 5,207 | 5,207 |
| Capitalized borrowing costs | – | – | 3,792 | – | 3,792 |
| Business combinations | 83 | 182 | 2 | – | 267 |
| Write-offs | (6) | (59) | (2,651) | (106) | (2,822) |
| Transfers | 2,504 | 24,818 | (30,413) | 6,994 | 3,903 |
| Depreciation, amortization and depletion | (477) | (6,626) | – | (3,765) | (10,868) |
| Impairment recognition (****) | (20) | (178) | (37) | (149) | (384) |
| Impairment reversal (****) | – | 44 | 134 | 65 | 243 |
| Cumulative translation adjustment | (558) | (4,908) | (6,264) | (2,022) | (13,752) |
| Balance at December 31, 2012 | 8,164 | 81,708 | 81,663 | 33,366 | 204,901 |
| Cost | 10,834 | 122,647 | 81,663 | 62,348 | 277,492 |
| Accumulated depreciation, amortization and depletion | (2,670) | (40,939) | – | (28,982) | (72,591) |
| Balance at December 31, 2012 | 8,164 | 81,708 | 81,663 | 33,366 | 204,901 |
| Additions | 68 | 1,794 | 36,125 | 663 | 38,650 |
| Additions to / review of estimates of decommissioning costs | – | – | – | (629) | (629) |
| Capitalized borrowing costs | – | – | 3,909 | – | 3,909 |
| Business combinations | 17 | 31 | 16 | – | 64 |
| Write-offs | (4) | (121) | (2,399) | (25) | (2,549) |
| Transfers (***) | 1,224 | 23,626 | (29,620) | 25,896 | 21,126 |
| Depreciation, amortization and depletion | (518) | (7,513) | – | (4,939) | (12,970) |
| Impairment recognition (****) | – | (11) | (6) | (85) | (102) |
| Impairment reversal (****) | – | 49 | – | 72 | 121 |
| Cumulative translation adjustment | (1,083) | (9,158) | (9,930) | (4,449) | (24,620) |
| Balance at December 31, 2013 | 7,868 | 90,405 | 79,758 | 49,870 | 227,901 |
| Cost | 10,729 | 133,368 | 79,758 | 77,117 | 300,972 |
| Accumulated depreciation, amortization and depletion | (2,861) | (42,963) | – | (27,247) | (73,071) |
| Balance at December 31, 2013 | 7,868 | 90,405 | 79,758 | 49,870 | 227,901 |

(*) See note 30 for assets under construction by business area
(**) Includes exploration and production assets depreciated based on the units of production method.
(***) Includes the amount of US$ 22,134, reclassified from Intangible Assets to Property, Plant and Equipment as a result of the declaration of commerciality of areas of the Assignment Agreement (Franco and Sul de Tupi), as described in note 13; the amount related to PO&G (US$ 2,366), which have ceased to be consolidated; and amounts transferred to assets classified as held for sale, set out in note 10.3.
(****) Impairment charges and reversals are recognized in profit or loss as other operating expenses.

125.    The above-referenced representations were materially false and misleading when made because, in violation of IFRS, defendants knowingly or recklessly caused Petrobras to issue financial statements and related financial disclosures in its 2011, 2012 and 2013 Forms 20-F, as well as its 2011, 2012 and 2013 quarterly financial statements, that failed to report Petrobras's PPE assets at their true cost.

1243584_1

126.    The bribes and overpayments disbursed by the Company provided it with no "future economic benefits" and were required to be immediately recognized and reported as an expense during the Relevant Period.  Defendants concealed the unlawful kickback scheme from investors by fraudulently recording such disbursements as PPE and, in doing so, materially understated Petrobras's expenses and overstated its reported income by between $2.527 billion and $27 billion during the Relevant Period.

127.    Now the Company has admitted that its widespread, multi-year, unlawful bribery and kickback schemes caused its PPE assets during the Relevant Period to be overstated by, at least, $2.527 billion and it has written down the value of these assets by an additional $16.823 billion to correct for the inflation in the value of these assets.

128.    Further, IFRS, like U.S. GAAP, requires the disclosure of loss contingencies when the possibility of any outflow in settlement is greater than remote.  *See, e.g.*, IAS 37, *Provisions, Contingent Liabilities and Contingent Assets*.  Nonetheless, defendants, in violation of IFRS, caused Petrobras to issue financial statements during the Relevant Period that failed to disclose loss contingencies associated with the blatant violation of Brazil's anti-corruption laws, including the Administrative Misconduct Law.

129.    The bribery and kickback schemes perpetrated by the Company's management subjected Petrobras to massive contingent liabilities, including fines and legal liability, which, in violation of applicable accounting principles, was not disclosed in Petrobras's financial statements during the Relevant Period.

130.    As a result of defendants' schemes, Petrobras issued financial statements that improperly overstated the Company's reported assets and failed to report the Company's true

expenses or otherwise inform investors concerning the contingent risks associated with the Company's unlawful activity.

131.    In addition, the overstatement of the Company's reported shareholders' equity materially distorted the Company's financial ratios, including its debt-to-equity and financial-leverage ratios.  Financial ratios were material to Petrobras maintaining an investment grade rating and its ability to raise capital.  During the Relevant Period, the Company represented, including in a presentation to investors dated March 15, 2013, that a key financial assumption for its investment grade rating was a leverage ratio lower than 35%.  During the Relevant Period, Petrobras materially breeched this important financial-leverage ratio.

132.    Moreover, the Forms 20-F Petrobras filed with the SEC during the Relevant Period failed to disclose, in accordance with Item 5 of Form 20-F, the "significant factors" that either had or could have had a material effect on the Company's operating results during the Relevant Period, including information regarding governmental, economic, fiscal, monetary, or political policies or factors that materially affected, or could materially affect, directly or indirectly, the Company's operations.

### C.    2010 Statements

133.    On May 20, 2010, Petrobras filed with the SEC a Form 20-F for the year ended December 31, 2009 ("2009 Form 20-F"), which was signed by Gabrielli and Barbassa on behalf of Petrobras, and Oliveira and Tinoco on behalf of PifCo.  Among other things, the 2009 Form 20-F provided details about the financial condition and performance of the Company, including, among other things, earnings, expenses, and the value of the Company's assets.  The 2009 Form 20-F represented that the Company had total assets of $200.27 billion, a book value of $136.2 billion for Petrobras's net PPE, and shareholders' equity of $94.06 billion, all as of December 31, 2009.  The

- 55 -

2009 Form 20-F further represented that a substantial part of the $136.2 billion in net PPE consisted of oil and gas producing properties, which the Company "reviewed for impairment whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable."

134.    The statements referenced above in ¶133 were materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, which were known to defendants or recklessly disregarded by them:

(a)    for more than a decade, senior Petrobras executives actively participated in a massive collusion, bribery, and kickback scheme pocketing at least $800 million in exchange for causing Petrobras to pay inflated amounts on at least $81.4 billion in contracts;

(b)    Petrobras's financial results and condition were materially overstated due to the kickback scheme alleged herein, including the material overstatement in the value of the Company's assets, book value, PPE, shareholders' equity, and income, and an understatement in the Company's expenses and debt-to-equity ratio;

(c)    the Company's SEC filings failed to disclose then presently known trends, events, or uncertainties associated with the kickback scheme that were reasonably likely to have a material effect on Petrobras's future operating results;

(d)    the fraudulent kickback scheme alleged herein subjected the Company to numerous undisclosed risks, including monetary risks and reputational risks, which would adversely affect its future financial condition and prospects; and

(e)    the value of the Company's assets and shareholders' equity were false and misleading because the inflated amounts associated with the scheme had been incorporated into the total assets, book value of PPE, and shareholders' equity recorded on the Company's financial statements, which were presented in violation of applicable accounting standards.  Additionally, the

- 56 -

statements that total assets were $200.27 billion, the book value of net PPE was $136.2 billion, and

shareholders' equity was $94.06 billion were materially false and misleading because total assets, the

book value of net PPE, and shareholders' equity were materially overstated as a result of the

kickback scheme.

135.    The Company's 2009 Form 20-F also discussed the strong ethical principles followed

by the Company and stated, in pertinent part: "We have always guided our business and our relations

with third parties by strong ethical principles."

136.    The statement referenced above that Petrobras has "always guided" its business and

relations "with third parties by strong ethical principles" was materially false and misleading because

at that very time, defendants were engaged in a massive and corrupt kickback scheme with third

parties that violated the Company's own Code of Ethics.

137.    The 2009 Form 20-F's discussion of Petrobras's internal controls was as follows:

The managements of Petróleo Brasileiro S.A. – Petrobras and Petrobras International
Finance Company – PifCo (each, a "Company") are responsible for establishing and
maintaining effective internal control over financial reporting and for their
assessments of the effectiveness of internal control over financial reporting.

Each Company's internal control over financial reporting is a process designed by, or
under the supervision of Petrobras' Audit Committee and each of the Company's
Chief Executive Officer, Chief Financial Officer and effected by each Company's
board of directors, management, and other personnel to provide reasonable assurance
regarding the reliability of financial reporting and the preparation of consolidated
financial statements for external purposes in accordance with accounting principles
generally accepted in the United States.  Each Company's internal control over
financial reporting includes those policies and procedures that (i) pertain to the
maintenance of records that, in reasonable detail, accurately and fairly reflect the
transactions and dispositions of the assets of the Company; (ii) provide reasonable
assurance that transactions are recorded as necessary to permit preparation of
consolidated financial statements in accordance with accounting principles generally
accepted in the United States, and that receipts and expenditures of the Company are
being made only in accordance with authorizations of management and directors of
the Company; and (iii) provide reasonable assurance regarding prevention or timely
detection of unauthorized acquisition, use, or disposition of the Company's assets
that could have a material effect on the consolidated financial statements.

- 57 -

138.    The statements referenced above concerning the Company's internal controls and procedures and disclosure controls and procedures were materially false and misleading when made for the reasons set forth in ¶¶69-104 above.

139.    The statements referenced above, which were known to the defendants to be materially false and misleading, were then falsely certified by Gabrielli and Barbassa on behalf of Petrobras and Oliveira and Tinoco on behalf of PifCo in certifications included in the 2009 Form 20-F.

140.    The statements referenced above were each materially false and misleading when made because the defendants knew, or recklessly disregarded, that Petrobras's financial statements violated U.S. GAAP disclosure requirements during the Relevant Period.

141.    On May 27, 2010, Petrobras issued a press release announcing its financial results for the first quarter of 2010 ("5/27/10 Release"), which was attached to a Form 6-K filed with the SEC the same day signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $204.22 billion, a book value of $140.57 billion for Petrobras's net PPE, shareholders' equity of $95.33 billion, and a debt-to-equity ratio of 53%, all as of March 31, 2010.

142.    The statements referenced in ¶141 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $204.22 billion, book value of net PPE was $140.57 billion, shareholders' equity was $95.33 billion, and the debt-to-equity ratio was 53% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

143.    In the 5/27/10 Release, as part of his work at Petrobras, Gabrielli stated, in pertinent part, as follows:

We are going through a period of crucial importance regarding our shareholders.  During the next few months we are planning an important capitalization that will prepare Petrobras to go ahead with the investments needed for its integrated growth and the development of new frontiers. ***We are fully committed to implementing a fair and transparent operation, respecting our minority shareholders' rights and following the best practices of corporate governance***.

144.    The statements referenced above in ¶143 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statement that Petrobras was "fully committed to implementing a fair and transparent operation, respecting our minority shareholders' rights and following the best practices of corporate governance" was materially false and misleading when made because contrary to this statement, for more than a decade, senior Petrobras executives actively participated in a massive kickback scheme that violated the Company's code of ethics.

145.    On May 28, 2010, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the first quarter of 2010, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $204.22 billion, a book value of $140.57 billion for Petrobras's net PPE, and shareholders' equity of $95.33 billion, all as of March 31, 2010.

146.    The statements referenced above in ¶145 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $204.22 billion, book value of net PPE was $140.57 billion, and shareholders' equity was $95.33 billion were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated as a result of the kickback scheme.

147.    On August 24, 2010, Petrobras issued a press release announcing its financial results for the second quarter of 2010, which was attached to a Form 6-K filed with the SEC on August 26, 2010 signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of

- 59 -

$210.56 billion, a book value of $147.08 billion for Petrobras's net PPE, shareholders' equity of $97.52 billion, and a debt-to-equity ratio of 54%, all as of June 30, 2010.

148.    On August 25, 2010, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the second quarter of 2010, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $210.56 billion, a book value of $147.08 billion for Petrobras's net PPE, and shareholders' equity of $97.52 billion, all as of June 30, 2010.

149.    The statements referenced above in ¶¶147-148 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $210.56 billion, the book value of net PPE was $147.08 billion, shareholders' equity was $97.52 billion, and the debt-to-equity ratio was 54% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

150.    On September 28, 2010, Petrobras filed with the SEC a Form 424(b)(2) Prospectus Supplement ("2010 Prospectus Supplement") for an offering of Petrobras Common Shares, including Common ADRs, and Preferred Shares, including Preferred ADRs.  Among other things, the 2010 Prospectus Supplement provided details about the financial condition and performance of the Company, including earnings, expenses, and the value of the Company's assets.  The 2010 Prospectus Supplement reported total assets of $200.27 billion, a book value of $136.17 billion for Petrobras's net PPE, and shareholders' equity of $94.06 billion, all as of December 31, 2009.  The 2010 Prospectus Supplement also reported total assets of $210.56 billion, a book value of $147.08 billion for Petrobras's net PPE, and shareholders' equity of $97.52 billion, all as of June 30, 2010.

- 60 -

151.    The statements referenced above in ¶150 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that as of December 31, 2009 total assets were $200.27 billion, the book value of net PPE was $136.17 billion and shareholders' equity was $94.06 billion, and that as of June 30, 2010 total assets were $210.56 billion, the book value of net PPE was $147.08 billion and shareholders' equity was $97.52 billion, were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated as a result of the kickback scheme.

152.    On November 23, 2010, Petrobras issued a press release announcing its financial results for the third quarter of 2010, which was attached to a Form 6-K filed with the SEC on November 24, 2010 signed by Barbassa (the "11/23/10 Release").  For the quarter, the Company reported, among other things, total assets of $298.14 billion, a book value of $206.28 billion for Petrobras's net PPE, shareholders' equity of $174.58 billion, and a debt-to-equity ratio of 41%, all as of September 30, 2010.

153.    The statements referenced above in ¶152 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $298.14 billion, the book value of net PPE was $206.28 billion, shareholders' equity was $174.58 billion, and the debt-to-equity ratio was 41% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

154.    In the 11/23/10 Release, as part of his work at Petrobras, Gabrielli stressed that the Company was committed to being truthful and transparent to investors, stating, in pertinent part, as follows:

- 61 -

The success of our Global Offering was due to the confidence of our shareholders and investors, the Company's excellent reputation in the capital markets and ***our commitment to transparency*** and investor returns.

155.   The statement referenced above in ¶154 about the Company's "commitment to transparency" was materially false and misleading when made because the Company was involved in a secret kickback scheme.

156.   On November 24, 2010, Petrobras filed with the SEC a Form 6-K/A reporting the Company's financial statements and results for the third quarter of 2010, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $298.14 billion, a book value of $206.28 billion for Petrobras's net PPE, and shareholders' equity of $174.58 billion, all as of September 30, 2010.

157.   The statements referenced above in ¶156 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $298.14 billion, the book value of net PPE was $206.28 billion, and shareholders' equity was $174.58 billion were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated as a result of the kickback scheme.

## D.   2011 Statements

158.   On March 15, 2011, Petrobras issued a press release announcing its financial results for the 2010 fiscal year, which was attached to a Form 6-K filed with the SEC on March 17, 2010 signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $308.68 billion, a book value of $218.57 billion for Petrobras's net PPE, shareholders' equity of $181.49 billion, and a debt-to-equity ratio of 41%, all as of December 31, 2010.

159.   On March 17, 2011, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the 2010 fiscal year, which was signed by Barbassa.

- 62 -

For the quarter, the Company reported, among other things, total assets of $308.68 billion, a book value of $218.57 billion for Petrobras's net PPE, and shareholders' equity of $181.49 billion, all as of December 31, 2010.

160.    The statements referenced above in ¶¶158-159 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $308.68 billion, the book value of net PPE was $218.57 billion, shareholders' equity was $181.49 billion, and the debt-to-equity ratio was 41% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

161.    On April 7, 2011, Petrobras filed with the SEC a Form 6-K concerning the Company's April 28, 2011 ordinary general meeting and extraordinary general meeting ("4/7/11 Form 6-K"), which was signed by Barbassa.  The 4/7/11 Form 6-K discussed Petrobras's internal controls over financial reporting:

> *The management of PETRÓLEO BRASILEIRO S.A. - Petrobras and subsidiaries ("the Company") is responsible for establishing and maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting*.
>
> The Company's internal control over financial reporting is a process designed by, or under the supervision of, the Company's Audit Committee, Chief Executive Officer, Chief Financial Officer and effected by the Company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted.
>
> *                    *                    *
>
> *Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2010.  Based on that assessment management has concluded that as of December 31, 2010 the Company's internal control over financial reporting is effective*.

- 63 -

162.     The 4/7/11 Form 6-K also represented that all of the relevant information that may have had a significant influence on the Company's operational performance was disclosed, stating, in pertinent part, that "[e]very relevant information regarding the operational performance of the company has been disclosed in this section."

163.     The statements referenced above in ¶¶161-162 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements were materially false and misleading when made because contrary to these statements, for more than a decade, senior Petrobras executives actively participated in a massive kickback scheme that violated the Company's Code of Ethics.

164.     On May 24, 2011, Petrobras issued a press release announcing its financial results for the first quarter of 2011, which was attached to a Form 6-K filed with the SEC on May 26, 2011 signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $330.55 billion, a book value of $230.37 billion for Petrobras's net PPE, shareholders' equity of $190.61 billion, and a debt-to-equity ratio of 42%, all as of March 31, 2011.

165.     On May 26, 2011, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the first quarter of 2011, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $330.55 billion, a book value of $230.37 billion for Petrobras's net PPE, and shareholders' equity of $190.61 billion, all as of March 31, 2011.

166.     The statements referenced above in ¶¶164-165 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $330.55 billion, the book value of net PPE was $230.37 billion, shareholders' equity was $190.61 billion, and the debt-to-equity ratio was 42% were materially false and misleading because

- 64 -

total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

167.    On May 26, 2011, Petrobras filed with the SEC a Form 20-F for the year ended December 31, 2010 ("2010 Form 20-F"), which was signed by Gabrielli and Barbassa on behalf of Petrobras and Oliveira and Tinoco on behalf of PifCo.  Among other things, the 2010 Form 20-F provided details about the financial condition and performance of the Company, including earnings, expenses, and the value of the Company's assets.  The 2010 Form 20-F represented that for the year, the Company had total assets of $308.68 billion, a book value of $218.57 billion for Petrobras's net PPE, and shareholders' equity of $181.49 billion, all as of December 31, 2010.  The 2010 Form 20-F further represented that a substantial part of the $218.57 billion in net PPE consisted of oil and gas producing properties, which the Company "reviewed for impairment whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable."

168.    The statements referenced above in ¶167 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $308.68 billion, the book value of net PPE was $218.57 billion, and shareholders' equity was $181.49 billion were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated as a result of the kickback scheme.

169.    The Company's 2010 Form 20-F also discussed the strong ethical principles followed by the Company, stating, in pertinent part: "We have always guided our business and our relations with third parties by strong ethical principles."

170.    The statement referenced above in ¶169 that Petrobras has "always guided" its business and relations "with third parties by strong ethical principles" was materially false and

misleading because at that very time, defendants were engaged in a massive and corrupt kickback scheme with third parties.

171.    The 2010 Form 20-F discussed Petrobras's internal controls and procedures and disclosure controls and procedures with substantially the same language as set forth in ¶137 above.

172.    The statements referenced above in ¶171 concerning the Company's internal controls and procedures and disclosure controls and procedures were materially false and misleading when made for the reasons set forth in ¶¶69-104 above.

173.    The statements referenced above, which were known to the defendants to be materially false and misleading, were then falsely certified by Gabrielli and Barbassa on behalf of Petrobras and Oliveira and Tinoco on behalf of PifCo in certifications included in the 2010 Form 20-F.

174.    The statements referenced above were each materially false and misleading when made because the defendants knew, or recklessly disregarded, that Petrobras's financial statements violated U.S. GAAP disclosure requirements during the Relevant Period.

175.    On August 24, 2011, Petrobras issued a press release announcing its financial results for the second quarter of 2011, which was attached to a Form 6-K filed with the SEC on August 25, 2011 signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $350.66 billion, a book value of $247.28 billion for Petrobras's net PPE, shareholders' equity of $205.92 billion, and a debt-to-equity ratio of 41%, all as of June 30, 2011.

176.    On August 25, 2011, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the second quarter of 2011, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $350.66 billion,

- 66 -

a book value of $247.28 billion for Petrobras's net PPE, and shareholders' equity of $205.92 billion, all as of June 30, 2011.

177.    The statements referenced above in ¶¶175-176 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $350.66 billion, the book value of net PPE was $247.28 billion, shareholders' equity was $205.92 billion, and the debt-to-equity ratio was 41% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

178.    On November 22, 2011, Petrobras issued a press release announcing its financial results for the third quarter of 2011, which was attached to a Form 6-K filed with the SEC the same day signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $308.96 billion, a book value of $220.31 billion for Petrobras's net PPE, shareholders' equity of $175.46 billion, and a debt-to-equity ratio of 43%, all as of September 30, 2011.

179.    On November 22, 2011, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the third quarter of 2011, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $308.96 billion, a book value of $220.31 billion for Petrobras's net PPE, and shareholders' equity of $175.46 billion, all as of September 30, 2011.

180.    The statements referenced above in ¶¶178-179 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $308.96 billion, the book value of net PPE was $220.31 billion, shareholders' equity was $175.46 billion, and the debt-to-equity ratio was 43% were materially false and misleading because

total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

### E.   2012 Statements

181.   On February 3, 2012, Petrobras and PifCo filed with the SEC a Form 424(b)(2) Prospectus Supplement ("2012 Prospectus Supplement") for PifCo's 5.375% Global Notes due 2021, 6.750% Global Notes due 2041, 2.875% Global Notes due 2015, and 3.500% Global Notes due 2017 (the "2012 U.S. Notes").   Among other things, the 2012 Prospectus Supplement provided details about the financial condition and performance of the Company, including earnings, expenses, and the value of the Company's assets.   The 2012 Prospectus Supplement represented that the Company had total assets of $308.68 billion, a book value of $218.57 billion for Petrobras's net PPE, and shareholders' equity of $183.4 billion, all as of December 31, 2010.   The 2012 Prospectus Supplement also represented that the Company had total assets of $308.96 billion, a book value of $220.31 billion for Petrobras's net PPE, and shareholders' equity of $175.46 billion, all as of September 30, 2011.

182.   The statements referenced above in ¶181 were materially false and misleading when made for the reasons set forth in ¶134 above.   Additionally, the statements that as of December 31, 2010 total assets were $308.68 billion, the book value of net PPE was $218.57 billion and shareholders' equity was $183.4 billion, and that as of September 30, 2011 total assets were $308.96 billion, the book value of net PPE was $220.31 billion and shareholders' equity was $175.46 billion, were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated as a result of the kickback scheme.

183.   On February 21, 2012, Petrobras filed with the SEC a Form 6-K concerning the Company's March 19, 2012 ordinary general meeting and extraordinary general meeting ("2/21/12

- 68 -

Form 6-K"), which was signed by Barbassa.  The 2/21/12 Form 6-K discussed Petrobras's internal controls over financial reporting, stating, in pertinent part, as follows:

> The Petróleo Brasileiro – Petrobras and subsidiaries ("the Company") administration is responsible for establishing and maintaining the effective internal controls to the preparation and disclosing of consolidated accounting statements.

> The Company's internal controls referring to the preparation and disclosing of consolidated accounting statements are processes developed by or under the supervision of the Company's Audit Committee, the Chairman and the Financial Director and executed by the directors and other officers in order to provide reasonable safety in relation to the dependability of the development process and disclosing of the financial reports and to the development of accounting statements for external use, according to the accounting principles generally accepted.

> \*     \*     \*

> The Administration has assessed the efficacy of the Company's internal controls referring to the process of development and disclosure of the consolidated accounting statements on December 31, 2011.  Based on this assessment, the Administration has concluded that, on December 31, 2011, the Company's internal controls referring to the development of the consolidated financial statements are effective.

184.    The statements referenced above in ¶183 concerning the Company's internal controls over financial reporting were materially false and misleading when made for the reasons set forth in ¶¶69-104 above.

185.    The February 21, 2012 Form 6-K also represented that all of the relevant information that may have had a significant influence on the Company's operational performance was disclosed, stating, in pertinent part, that "[e]very relevant information regarding the operational performance of the company has been disclosed in this section."

186.    The statements referenced above in ¶185 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements were materially false and misleading when made because contrary to these statements, for more than a decade, senior

Petrobras executives actively participated in a massive kickback scheme that violated the Company's Code of Ethics.

187.    On February 28, 2012, Petrobras issued a press release announcing its financial results for the 2011 fiscal year, which was attached to a Form 6-K filed with the SEC on February 29, 2012 signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $319.41 billion, a book value of $182.47 billion for Petrobras's net PPE, shareholders' equity of $177.11 billion, and a debt-to-equity ratio of 24%, all as of December 31, 2011.

188.    On February 29, 2012, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the 2011 fiscal year, which was signed by Barbassa. For the quarter, the Company, among other things, reported total assets of $319.41 billion, a book value of $182.47 billion for Petrobras's net PPE, and shareholders' equity of $177.11 billion, all as of December 31, 2011.

189.    The statements referenced above in ¶¶187-188 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $319.41 billion, the book value of net PPE was $182.47 billion, shareholders' equity was $177.11 billion, and the debt-to-equity ratio was 24% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

190.    On April 2, 2012, Petrobras filed with the SEC a Form 20-F for the year ended December 31, 2011 ("2011 Form 20-F"), which was signed by Foster and Barbassa on behalf of Petrobras and Oliveira and Tinoco on behalf of PifCo.  Among other things, the 2011 Form 20-F provided details about the financial condition and performance of the Company, including earnings, expenses, and the value of the Company's assets.  The 2011 Form 20-F represented that the

Company had total assets of $319.41 billion, a book value of $182.5 billion for Petrobras's net PPE, and shareholders' equity of $175.84 billion, all as of December 31, 2011.  The 2011 Form 20-F further represented that a substantial part of the $182.5 billion in net PPE consisted of oil and gas producing properties, which the Company "reviewed for impairment whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable."

191.    The statements referenced above in ¶190 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $319.41 billion, the book value of net PPE was $182.5 billion, and shareholders' equity was $175.84 billion were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated as a result of the kickback scheme.

192.    The Company's 2011 Form 20-F also discussed the strong ethical principles followed by the Company and stated, in pertinent part: "We guide our business and our relations with third parties by ethical principles."

193.    The statement referenced above in ¶192 that Petrobras "guide[s]" its business and relations "with third parties by ethical principles" was materially false and misleading because at that very time, defendants were engaged in a massive and corrupt kickback scheme with third parties.

194.    The 2011 Form 20-F discussed Petrobras's internal controls and procedures and disclosure controls and procedures with substantially the same language set forth in ¶¶137 and 183 above.

195.    The statements referenced above in ¶194 concerning the Company's internal controls and procedures and disclosure controls and procedures were materially false and misleading when made for the reasons set forth in ¶¶69-104 above.

- 71 -

196.    The statements referenced above, which were known to the defendants to be materially false and misleading, were then falsely certified by Foster and Barbassa on behalf of Petrobras and Oliveira and Tinoco on behalf of PifCo in certifications included in the 2011 Form 20-F.

197.    The statements referenced above were each materially false and misleading when made because the defendants knew, or recklessly disregarded, that Petrobras's financial statements violated U.S. GAAP disclosure requirements during the Relevant Period.

198.    On May 15, 2012, Petrobras issued a press release announcing its financial results for the first quarter of 2012, which was attached to a Form 6-K filed with the SEC the same day signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $337.97 billion, a book value of $194.1 billion for Petrobras's net PPE, shareholders' equity of $185.95 billion, and a debt-to-equity ratio of 24% all as of March 31, 2012.

199.    On May 18, 2012, Petrobras filed with the SEC a Form 6-K/A reporting the Company's financial statements and results for the first quarter of 2012, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $337.97 billion, a book value of $194.1 billion for Petrobras's net PPE, and shareholders' equity of $185.95 billion, all as of March 31, 2012.

200.    The statements referenced above in ¶¶198-199 were each materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $337.97 billion, the book value of net PPE was $194.1 billion, shareholders' equity was $185.95 billion, and the debt-to-equity ratio was 24% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

- 72 -

201.    On August 3, 2012, Petrobras issued a press release announcing its financial results for the second quarter of 2012 ("8/3/12 Release"), which was attached to a Form 6-K filed with the SEC on August 10, 2012 signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $310.7 billion, a book value of $185 billion for Petrobras's net PPE, shareholders' equity of $167.66 billion, and a debt-to-equity ratio of 28%, all as of June 30, 2012.

202.    The statements referenced above in ¶201 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $310.7 billion, the book value of net PPE was $185 billion, shareholders' equity was $167.66 billion, and the debt-to-equity ratio was 28% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

203.    The 8/3/12 press release contained a letter from Foster to investors and shareholders discussing Petrobras's business and management plan, including the Company's capital discipline, stating, in pertinent part, as follows:

> The new Plan focuses on oil and gas production in Brazil and is underpinned by realism, precise targets and rigorous project management with capital discipline. Since its publication, we have made advances with several important issues.  Recent examples include the signature of contracts for the construction of drilling rigs and pre-salt replicant platform topsides.  The Brazilian shipyards have also made progress, exemplified by the successful deck mating of the P-55 platform in the Navy Complex of Rio Grande and the definition of Estaleiro Atlântico Sul's new technological partner.  We will also continue with our efforts to recover the operational efficiency of the Campos Basin and optimize operating costs, two essential vectors for ensuring better results.

204.    The statements referenced above in ¶203 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statement that Petrobras's business and management plan was underpinned by "rigorous project management with capital discipline"

- 73 -

was materially false and misleading when made because contrary to this statement, for more than a decade, senior Petrobras executives actively participated in a massive kickback scheme.

205.    On August 6, 2012, Petrobras held a conference call with investors and analysts to discuss the Company's second quarter 2012 financial results.  During that call, Foster, as part of his work at Petrobras, emphatically told investors that the Company's financial results could be relied upon, stating in pertinent part, as follows:

> We have qualified personnel, we know how to work, and we know how to execute. Throughout our history we've invested billions of dollars in research and development, and we know what we are doing. ***Our reserves are absolutely real and legitimate.***

206.    The statements referenced above in ¶205 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statement "[o]ur reserves are absolutely real and legitimate" was materially false and misleading when made because Petrobras's financial results were false and grossly misrepresented as a result of the kickback scheme alleged herein.

207.    On August 10, 2012, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the second quarter of 2012, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $310.7 billion, a book value of $185 billion for Petrobras's net PPE, and shareholders' equity of $167.66 billion, all as of June 30, 2012.

208.    The statements referenced above in ¶207 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $310.7 billion, the book value of net PPE was $185 billion, and shareholders' equity was $167.66 billion were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated as a result of the kickback scheme.

- 74 -

209.    On October 26, 2012, Petrobras issued a press release announcing its financial results for the third quarter of 2012, which was attached to a Form 6-K filed with the SEC on October 29, 2012 signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $318.47 billion, a book value of $191.4 billion for Petrobras's net PPE, shareholders' equity of $169.73 billion, and a debt-to-equity ratio of 28%, all as of September 30, 2012.

210.    On October 30, 2012, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the third quarter of 2012, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $318.47 billion, a book value of $191.4 billion for Petrobras's net PPE, and shareholders' equity of $169.73 billion, all as of September 30, 2012.

211.    The statements referenced above in ¶¶209-210 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $318.47 billion, the book value of net PPE was $191.4 billion, shareholders' equity was $169.73 billion, and the debt-to-equity ratio was 28% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

**F.    2013 Statements**

212.    On February 4, 2013, Petrobras issued a press release announcing its financial results for the fourth quarter of 2012 ("2/4/13 Release"), which was attached to a Form 6-K filed with the SEC on February 6, 2013 signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $331.64 billion, a book value of $204.9 billion for Petrobras's net PPE, shareholders' equity of $169.04 billion, and a debt-to-equity ratio of 30%, all as of December 31, 2012.

213.    The statements referenced above in ¶212 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $331.64 billion, the book value of net PPE was $204.9 billion, shareholders' equity was $169.04 billion, and the debt-to-equity ratio was 30% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

214.    The 2/4/13 Release contained a letter from Foster to investors and shareholders discussing, in pertinent part, Petrobras's efforts to reverse difficulties in achieving the Company's financial results, including the Company's cost-reduction initiatives in its Operating Cost Optimization Program ("Procop"):

> Despite the adversities faced by Petrobras in 2012, I would like to reiterate my strong belief in the Company's medium and long-term prospects.  This Administration fully recognizes the difficulties we face and is working ceaselessly to overcome them.  ***Following an extensive and detailed diagnosis of our operating problems, we defined priorities and implemented short and medium-term structuring initiatives to improve our financial and economic results.  The Operating Cost Optimization Program (Procop), the Program to Increase the Operating Efficiency of the Campos Basin (Proef), the Divestment Program (Prodesin) and the Logistics Infrastructure Optimization Program (Infralog) are examples of these initiatives, which have built-in goals and indicators established by various working teams and approved by the Executive Board, and are currently being intensely monitored by top Management***.

> The positive results are already measurable. The Proef has already begun to reverse the sharp drop in the efficiency of the Campos Basin Operational Unit, which fell to as low as 67% in April of 2012 when the program was implemented, but improved to 78% in December; ***the Procop established 515 cost reduction initiatives that will generate savings of U.S.$15.7 billion between 2013 and 2016***; and Infralog will rationalize the port, airport, pipeline and terminal project portfolios in order to meet expected oil and oil product output and market demand by 2020.

> ***These new processes are now part of our daily routine and dialogue.  I would like to highlight the Executive Board meetings, which are now held twice weekly to focus on the physical and financial monitoring of the principal projects in our investment plan.  We have also implemented a number of important structural and organizational changes throughout the Company during 2012,***

- 76 -

*enhancing efficiency, while at the same time promoting needed administrative changes. We are fully aware that only the constant pursuit of efficiency will allow us to achieve permanent gains that will improve the Company's long term profitability, which is this Administration's primary objective*.

215.    The statements referenced above in ¶214 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that "Procop established 515 cost reduction initiatives that will generate savings of U.S. $15.7 billion between 2013 and 2016" and that the "new processes are now part of our daily routine and dialogue" were materially false and misleading when made because contrary to these statements, for more than a decade, senior Petrobras executives actively participated in a massive kickback scheme.

216.    On February 6, 2013, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the fourth quarter of 2012, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $331.64 billion, a book value of $204.9 billion for Petrobras's net PPE, and shareholders' equity of $169.04 billion, all as of December 31, 2012.

217.    The statements referenced above in ¶216 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $331.64 billion, the book value of net PPE was $204.9 billion, and shareholders' equity was $169.04 billion were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated as a result of the kickback scheme.

218.    On March 27, 2013, Petrobras filed with the SEC a Form 6-K concerning the Company's April 29, 2013 annual general meeting and extraordinary general meeting ("3/27/13 Form 6-K"), which was signed by Barbassa.  The 3/27/13 Form 6-K stated that Petrobras had effective internal controls over financial reporting, stating, in pertinent part, as follows:

1243584_1

The Petróleo Brasileiro – Petrobras and subsidiaries ("the Company") administration is responsible for establishing and maintaining the effective internal controls to the preparation and disclosing of consolidated accounting statements.

The Company's internal controls referring to the preparation and disclosing of consolidated accounting statements are processes developed by or under the supervision of the Company's Audit Committee, the Chairman and the Financial Director and executed by the directors and other officers in order to provide reasonable safety in relation to the dependability of the development process and disclosing of the financial reports and to the development of accounting statements for external use, according to the accounting principles generally accepted.

*     *     *

The Administration has assessed the efficacy of the Company's internal controls referring to the process of development and disclosure of the consolidated accounting statements on December 31, 2012.  Based on this assessment, the Administration has concluded that, on December 31, 2012, the Company's internal controls referring to the development of the consolidated financial statements are effective.

219.    The statements referenced above in ¶218 concerning the Company's internal controls over financial reporting were materially false and misleading when made for the reasons set forth in ¶¶69-104 above.

220.    The March 27, 2013 Form 6-K also represented that all of the relevant information that may have had a significant influence on the Company's operational performance was disclosed, stating, in pertinent part, that "[a]ll relevant aspects on the result of the operational performance for the year were discussed herein."

221.    The statements referenced above in ¶220 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements were materially false and misleading when made because contrary to these statements, for more than a decade, senior Petrobras executives actively participated in a massive kickback scheme that violated the Company's Code of Ethics.

- 78 -

222.    On April 26, 2013, Petrobras issued a press release announcing its financial results for the first quarter of 2013, which was attached to a Form 6-K filed with the SEC on the same day signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $345.27 billion, a book value of $214.46 billion for Petrobras's net PPE, shareholders' equity of $167.68 billion, and a debt-to-equity ratio of 31%, all as of March 31, 2013.

223.    On April 30, 2013, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the first quarter of 2013, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $345.27 billion, a book value of $214.46 billion for Petrobras's net PPE, and shareholders' equity of $167.68 billion, all as of March 31, 2013.

224.    The statements referenced above in ¶¶222-223 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $345.27 billion, the book value of net PPE was $214.46 billion, shareholders' equity was $167.68 billion, and the debt-to-equity ratio was 31% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

225.    On April 29, 2013, Petrobras filed with the SEC a Form 20-F for the year ended December 31, 2012 ("2012 Form 20-F"), which was signed by Foster and Barbassa.  Among other things, the 2012 Form 20-F provided details about the financial condition and performance of the Company, including earnings, expenses, and the value of the Company's assets.  The 2012 Form 20-F represented that the Company had total assets of $331.65 billion, a book value of $204.9 billion for Petrobras's net PPE, and shareholders' equity of $169.04 billion, all as of December 31, 2012.  The 2012 Form 20-F further represented that a part of the $204.9 billion in net PPE consisted of oil and

gas producing properties, which the Company "tested for impairment whenever there is any indication that the carrying amounts may not be recoverable."

226.    The statements referenced above in ¶225 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $331.65 billion, the book value of net PPE was $204.9 billion, and shareholders' equity was $169.04 billion were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated as a result of the kickback scheme.

227.    The Company's 2012 Form 20-F also discussed the strong ethical principles followed by the Company and stated, in pertinent part: "We guide our business and our relations with third parties by ethical principles."

228.    The statement referenced above in ¶227 that Petrobras "guide[s]" its business and relations "with third parties by ethical principles" was materially false and misleading when made because at that very time, defendants were engaged in a massive and corrupt kickback scheme with third parties that violated the Company's Code of Ethics.

229.    The 2012 Form 20-F discussed Petrobras's internal controls and procedures and disclosure controls and procedures with substantially the same language as set forth in ¶¶137 and 183 above.

230.    The statements referenced above in ¶229 concerning the Company's internal controls and procedures and disclosure controls and procedures were materially false and misleading when made for the reasons set forth in ¶¶69-104 above.

231.    The statements referenced above, which were known to the defendants to be materially false and misleading, were then falsely certified by Foster and Barbassa in certifications included in the 2012 Form 20-F.

- 80 -

232.    The statements referenced above were each materially false and misleading when made because the defendants knew, or recklessly disregarded, that Petrobras's financial statements violated U.S. GAAP disclosure requirements during the Relevant Period.

233.    On May 15, 2013, defendants Petrobras and PGF filed with the SEC a Form 424(b)(2) Prospectus Supplement ("2013 Prospectus Supplement") for PGF's 2.000% Global Notes due 2016, 3.000% Global Notes due 2019, 4.375% Global Notes due 2023, 5.625% Global Notes due 2043, Floating Rate Global Notes due 2016, and Floating Rate Global Notes due 2019 (the "2013 U.S. Notes").  Among other things, the 2013 Prospectus Supplement provided details about the financial condition and performance of the Company, including earnings, expenses, and the value of the Company's assets.  The 2013 Prospectus Supplement reported that the Company had total assets of $334.65 billion, a book value of $204.9 billion for Petrobras's net PPE, and shareholders' equity of $161.72 billion, all as of December 31, 2012.  The 2013 Prospectus Supplement also reported that the Company had total assets of $345.27 billion, a book value of $214.46 billion for Petrobras's net PPE, and shareholders' equity of $167.68 billion, all as of March 31, 2013.

234.    The statements referenced above in ¶233 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that as of December 31, 2012 total assets were $334.65 billion, the book value of net PPE was $204.9 billion and shareholders' equity was $161.72 billion, and that as of March 31, 2013 total assets were $345.27 billion, the book value of net PPE was $214.46 billion and shareholders' equity was $167.68 billion, were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated as a result of the kickback scheme.

1243584_1

235.     On or about May 20, 2013, Petrobras and PGF filed with the SEC a Form 8-A12B Registration Statement for the 2013 U.S. Notes, which along with the 2012 Registration Statement and 2013 Prospectus Supplement are collectively referred to herein as the "2013 U.S. Notes Registration Statement."

236.     The 2013 U.S. Notes Registration Statement incorporated by reference a Form 6-K that Petrobras filed with the SEC on May 15, 2013, which attached a copy of a May 13, 2013 Underwriting Agreement between Petrobras, PGF, and some of the underwriters ("2013 Underwriting Agreement").  The 2013 Underwriting Agreement stated that neither Petrobras nor any of its officers had engaged in any corruption, including the making of "any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds" or violating "any provision of the U.S. Foreign Corrupt Practices Act of 1977 or the UK Bribery Act 2010."  The 2013 Underwriting Agreement also stated that neither Petrobras nor any of its officers had "made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment."

237.     The statements referenced above in ¶236 were materially false and misleading when made for the reasons set forth in ¶134 above.  Contrary to the statements that no Petrobras officers had "made any bribe[s] . . . [or] kickback[s] or other unlawful payment[s,]" as alleged in detail herein, Petrobras and senior executives engaged in a massive kickback scheme.

238.     On August 9, 2013, Petrobras issued a press release announcing its financial results for the second quarter of 2013, which was attached to a Form 6-K filed with the SEC on the same day signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $338.07 billion, a book value of $203.72 billion for Petrobras's net PPE, shareholders' equity of $153.47 billion, and a debt-to-equity ratio of 34%, all as of June 30, 2013.

- 82 -

239.    On August 13, 2013, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the second quarter of 2013, which was signed by Barbassa. For the quarter, the Company reported, among other things, total assets of $338.07 billion, a book value of $203.72 billion for Petrobras's net PPE, and shareholders' equity of $153.47 billion, all as of June 30, 2013.

240.    The statements referenced above in ¶¶238-239 were materially false and misleading when made for the reasons set forth in ¶134 above. Additionally, the statements that total assets were $338.07 billion, the book value of net PPE was $203.72 billion, shareholders' equity was $153.47 billion, and the debt-to-equity ratio was 34% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

241.    On October 25, 2013, Petrobras issued a press release announcing its financial results for the third quarter of 2013, which was attached to a Form 6-K filed with the SEC on October 28, 2013 signed by Barbassa. For the quarter, the Company reported, among other things, total assets of $340.11 billion, a book value of $208.36 billion for Petrobras's net PPE, shareholders' equity of $153.86 billion, and a debt-to-equity ratio of 36%, all as of September 30, 2013.

242.    On October 28, 2013, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the third quarter of 2013, which was signed by Barbassa. For the quarter, the Company reported, among other things, total assets of $340.11 billion, a book value of $208.36 billion for Petrobras's net PPE, and shareholders' equity of $153.86 billion, all as of September 30, 2013.

243.    The statements referenced above in ¶¶241-242 were materially false and misleading when made for the reasons set forth in ¶134 above. Additionally, the statements that total assets

were $340.11 billion, the book value of net PPE was $208.36 billion, shareholders' equity was $153.86 billion, and the debt-to-equity ratio was 36% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

244.    On November 13, 2013, Petrobras published a "Clarification" on its Facts and Data website, which is a page that the Company launched with the purported purpose of promoting and enhancing transparency, about allegations in the press regarding possible kickbacks from the Company's contracts with Odebrecht, as set forth above.  In this posting, the Company discussed its bidding process, stating (according to an English translation of the posting): "The processes of bidding, contracting and executing Petrobras services are constantly being evaluated by its Internal Auditor and its recommendations are diligently analyzed with a view to protecting the Company's interests."

245.    The statements referenced above in ¶244 that Petrobras's bidding and contracting processes were "constantly being evaluated" by its Internal Audit department was materially false and misleading when made because those statements made it appear that the Company was reviewing transactions to uncover and prevent wrongdoing.  Contrary to those statements, senior Petrobras executives were engaged in a massive kickback scheme that violated the Company's Code of Ethics.

### G.    2014 Statements

246.    On February 25, 2014, Petrobras issued a press release announcing its financial results for the fourth quarter of 2013 ("2/25/14 Release"), which was attached to a Form 6-K filed with the SEC on February 26, 2014 signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $321.42 billion, a book value of $227.9 billion for Petrobras's net

PPE, shareholders' equity of $149.12 billion, and a debt-to-equity ratio of 39%, all as of December 31, 2013.

247.    The statements referenced above in ¶246 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $321.42 billion, the book value of net PPE was $227.9 billion, shareholders' equity was $149.12 billion, and the debt-to-equity ratio was 39% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

248.    In the 2/25/14 Release, Foster emphasized the Company's financial discipline and efforts to prevent fraud and corruption, stating, in pertinent part, as follows:

> Indeed, 2013 stands out for the successful implementation of our Structuring Programs, which by establishing new benchmarks for productivity and management of investment projects, imposed discipline in the use of the company's financial resources.

*     *     *

> Additionally, I would like to notice that in the second half of 2013 we implemented the Corruption Prevention Program, reaffirming the commitment of the Petrobras Executive Board and of its employees with ethics and transparency at our organization.  The program complies with both national and international initiatives against fraud and corruption, as well as with the laws of the countries where Petrobras operates, with positive impacts in the relations with all its stakeholders.

> We are building a higher value company: training our employees, mastering the necessary technologies to implement projects, our relevant oil reserves and rising output in the short-run along with our continuous commitment to increase efficiency, productivity and capital discipline will lead us to achieve even better results.  Rising share prices and ensuring a fair return to our shareholders is a natural consequence of fulfilling our obligations.

249.    The statements referenced above in ¶248 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that Petrobras "imposed discipline in the use of the company's financial resources" and was "reaffirming the commitment of

the Petrobras Executive Board and of its employees with ethics and transparency at our organization" were materially false and misleading when made because, contrary to these statements, for more than a decade, senior Petrobras executives actively participated in a massive kickback scheme that violated the Company's own Code of Ethics.

250.    On February 26, 2014, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the fourth quarter of 2013, which was signed by Barbassa.  On March 10, 2014, a Form 6-K/A was filed amending the February 26, 2014 Form 6-K. For the quarter, the Company reported, among other things, total assets of $321.42 billion, a book value of $227.9 billion for Petrobras's net PPE, shareholders' equity of $149.12 billion, and a debt-to-equity ratio of 39%, all as of December 31, 2013.

251.    The statements referenced above in ¶250 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $321.42 billion, the book value of net PPE was $227.9 billion, shareholders' equity was $149.12 billion, and the debt-to-equity ratio was 39% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

252.    On March 7, 2014, Petrobras issued a press release announcing the Company's Management's Report on Internal Control over Financial Reporting:

> Petrobras announces that its management is responsible for establishing and maintaining effective internal control over financial reporting and for its assessments of the effectiveness of internal control over financial reporting.
>
> Our internal control over financial reporting is a process designed by, or under the supervision of our Audit Committee and ours Chief Executive Officer and Chief Financial Officer, and effected by our board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with IFRS, as issued by the IASB.

- 86 -

\*     \*     \*

Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control-Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013***.

253. The statements referenced above in ¶252 concerning the Company's internal controls over financial reporting were materially false and misleading when made for the reasons set forth in ¶¶69-104 above.

254. On March 11, 2014, defendants Petrobras and PGF filed with the SEC a Form 424(b)(2) Prospectus Supplement ("2014 Prospectus Supplement") for PGF's 3.250% Global Notes due 2017, 4.875% Global Notes due 2020, 6.250% Global Notes due 2024, 7.250% Global Notes due 2044, Floating Rate Global Notes due 2017, and Floating Rate Global Notes due 2020 ("2014 U.S. Notes"). Among other things, the 2014 Prospectus Supplement provided details about the financial condition and performance of the Company, including earnings, expenses, and the value of the Company's assets. The 2014 Prospectus Supplement reported that the Company had total assets of $321.42 billion, a book value of $227.9 billion for Petrobras's net PPE, and shareholders' equity of $149.12 billion, all as of December 31, 2013.

255. The statements referenced above in ¶254 were materially false and misleading when made for the reasons set forth in ¶134 above. Additionally, the statements that total assets were $321.42 billion, the book value of net PPE was $227.9 billion, and shareholders' equity was $149.12 billion, all as of December 31, 2013, were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated as a result of the kickback scheme.

- 87 -

256.    On April 30, 2014, Petrobras filed with the SEC a Form 20-F for the year ended December 31, 2013 ("2013 Form 20-F"), which was signed by Foster and Barbassa.  Among other things, the 2013 Form 20-F provided details about the financial condition and performance of the Company, including earnings, expenses, and the value of the Company's assets.  The 2013 Form 20-F represented that the Company had total assets of $321.42 billion, a book value of $227.9 billion for Petrobras's net PPE, shareholders' equity of $149.12 billion, and a debt-to-equity ratio of 39%, all as of December 31, 2013.  The 2013 Form 20-F further represented that PPE is "tested for impairment when there is an indication that the carrying amount may not be recoverable."

257.    The statements referenced above in ¶256 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $321.42 billion, the book value of net PPE was $227.9 billion, shareholders' equity was $149.12 billion, and the debt-to-equity ratio was 39% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

258.    The Company's 2013 Form 20-F also discussed the strong ethical principles followed by the Company and stated, in pertinent part: "We guide our business and our relations with third parties by ethical principles."

259.    The statement referenced above in ¶258 that Petrobras has "guide[d]" its business and relations "with third parties by ethical principles" was materially false and misleading because at that very time, defendants were engaged in a massive and corrupt kickback scheme with third parties that violated the Company's own Code of Ethics.

260.    In or around March 2014, Brazil's federal prosecutor and federal police were investigating alleged bribery between Petrobras and SBM.  On March 12, 2014, Brazil's Chamber of

- 88 -

Deputies approved the creation of an external commission to investigate these charges related to SBM.  Petrobras was also conducting an internal investigation of these charges.  The 2013 Form 20-F discussed the Company's ad-hoc internal commissions established to investigate allegations of wrongdoing, including a commission that purportedly did not find evidence of bribery with SBM, stating, in pertinent part, as follows:

> We periodically establish ad hoc internal commissions (comissões internas de apuração) to evaluate our compliance with applicable regulations.  The scope of each internal commission is established by our management.  Upon the conclusion of each internal commission's evaluation, its material findings will be publicly disclosed and the results used to improve our compliance efforts.

> ***On March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations***.

> We currently have a number of internal commissions in place that were set up in certain instances to evaluate past transactions mentioned in public press reports, including: ***(i) a commission formed on March 24, 2014 to evaluate aspects of the Pasadena refinery acquisition; . . . and (iv) two commissions formed on April 25, 2014 to evaluate our contracts with service providers involved in our refining projects Refinaria Abreu e Lima (RNEST) and COMPERJ.  Each of these internal commissions has between 30 and 60 days to complete its work.  Based on the information that is currently available, we do not believe that the findings of any of these internal commissions would have a material effect on our financial statements***.

261.    The statements referenced above in ¶260 were materially false and misleading when made for the reasons set forth in ¶134 above.  Contrary to the statements that Petrobras's internal commission "confirmed that it found no internal evidence to support" allegations of bribery with SBM, as alleged in detail herein, Petrobras and senior executives engaged in a massive kickback scheme for which there was ample evidence, including, without limitation, the facts and documents that Fonseca brought to the attention of senior Petrobras executives starting in 2008 that concerned the kickback scheme, the ultimate revelation of which has had a "material effect on [Petrobras's] financial statements."  Additionally, contrary to the statement that "we do not believe that the

- 89 -

findings of any of these internal commissions would have a material effect on our financial statements," service providers and contracts for services involved in the Pasadena, Abreu e Lima, and COMPERJ refineries were implicated in the kickback scheme.

262.    The 2013 Form 20-F discussed Petrobras's internal controls and procedures and disclosure controls and procedures with substantially the same language as set forth in ¶¶137 and 183 above.

263.    The statements referenced above in ¶262 concerning the Company's internal controls and procedures and disclosure controls and procedures were materially false and misleading when made for the reasons set forth in ¶¶69-104 above.

264.    The statements referenced above, which were known to the defendants to be materially false and misleading, were then falsely certified by Foster and Barbassa in certifications included in the 2013 Form 20-F.

265.    The statements referenced above were each materially false and misleading when made because the defendants knew, or recklessly disregarded, that Petrobras's financial statements violated U.S. GAAP disclosure requirements during the Relevant Period.

266.    On May 9, 2014, Petrobras issued a press release announcing its financial results for the first quarter of 2014, which was which was attached to a Form 6-K filed with the SEC on May 12, 2014 signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $354.4 billion, a book value of $240.79 billion for Petrobras's net PPE, shareholders' equity of $157.21 billion, and a debt-to-equity ratio of 39%, all as of March 31, 2014.

267.    On May 12, 2014, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the first quarter of 2014, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $354.4 billion, a book value of

$240.79 billion for Petrobras's net PPE, and shareholders' equity of $157.21 billion, all as of March 31, 2014.

268.    The statements referenced above in ¶¶266-267 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $354.4 billion, the book value of net PPE was $240.79 billion, shareholders' equity was $157.21 billion, and the debt-to-equity ratio was 39% were materially false and misleading because total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

269.    On May 12, 2014, Petrobras hosted a conference call for investors and analysts, during which Foster stated in her opening comments, in pertinent part, as follows:

> Finally, this is not a slide, but it's my final comment to you.  Refers to the processes of investigation we've set up in the last few months.  We have answered different questions.  We have been inquired not only at the House of Representatives but also at the Senate.  We have answered questions about facts which are extremely unfavorable for our Company, and we have been working hard to investigate many of these episodes, such as the SBM Offshore situation.

> We have our own internal investigation committee.  They conducted investigations during 45 days.  ***And regarding Petrobras action, regarding our operations, there are no facts or documents that would document the payment of bribery to any employees of Petrobras***.  The final report by the investigation committee was offered to the national authorities, as not only executive and legislative but also judicial authorities.

>                                  *      *      *

> And there are also two other investigation proceedings about – well, one of them, about the acquisition of a refinery.  We're now speaking about RNEST refinery and Comperj refinery. And these two investigation committees – I'm sorry. I said acquisition, but it's not acquisition.  It is the contracts for the implementation of RNEST and Comperj refineries.  These investigations will continue in June.

>                                  *      *      *

> So, talking about these investigation committees, the number one message is the commitment of the Company's management and the commitment of the

Company's employees.  This is a commitment of the whole Company with ethic values and transparency in all operations of Petrobras.

270.   The statements referenced above in ¶269 were materially false and misleading when made for the reasons set forth in ¶134 above.  Contrary to the statements that "there are no facts or documents that would document the payment of bribery to any employees of Petrobras," as alleged in detail herein, Petrobras and senior executives engaged in a massive kickback scheme, and there were numerous facts and documents that did "document the payment of bribe[s]" to Petrobras employees.  For example, since 2008, Fonseca had brought facts and documents to the attention of senior Petrobras executives concerning the kickback scheme.

271.   On August 8, 2014, Petrobras issued a press release announcing its financial results for the second quarter of 2014, which was attached to a Form 6-K filed with the SEC on August 11, 2014 signed by Barbassa.  For the quarter, the Company reported total assets of $363.39 billion, a book value of $253.96 billion for Petrobras's net PPE, shareholders' equity of $164.47 billion, and a debt-to-equity ratio of 40%, all as of June 30, 2014.

272.   On August 11, 2014, Petrobras filed with the SEC a Form 6-K reporting the Company's financial statements and results for the second quarter of 2014, which was signed by Barbassa.  For the quarter, the Company reported, among other things, total assets of $363.39 billion, a book value of $253.96 billion for Petrobras's net PPE, and shareholders' equity of $164.47 billion, all as of June 30, 2014.

273.   The statements referenced above in ¶¶271-272 were materially false and misleading when made for the reasons set forth in ¶134 above.  Additionally, the statements that total assets were $363.39 billion, the book value of net PPE was $253.96 billion, shareholders' equity was $164.47 billion, and the debt-to-equity ratio was 40% were materially false and misleading because

total assets, the book value of net PPE, and shareholders' equity were materially overstated and the debt-to-equity ratio was materially understated as a result of the kickback scheme.

274.    Information about the kickback scheme and the fraud alleged herein began to be publicly revealed in early September 2014.  At that time, the media reported that former Petrobras executive Costa (who had been arrested back in March 2014 in connection with the "Operation Car Wash" investigation) had confessed to his participation in, and had provided information about, the Petrobras kickback scheme in a plea bargain for a reduced sentence.

275.    On Saturday, September 6, 2014, the Brazilian magazine *Veja* published an article describing allegations of a widespread kickback scheme at Petrobras.  On September 7, 2014, the *Anadolu Agency* published an article entitled "Dozens of Brazilian politicians named in corruption scandal," which described the *Veja* article.

276.    On September 8, 2014, the Company issued a press release discussing the kickback allegations by Costa, stating, in pertinent part, as follows:

> 1.    It is inappropriate to comment on non-official information published by media outlets.  It is also inappropriate to comment on ongoing investigations or on the declarations of individuals or companies under investigation by the Federal Police or by any other authorities.
>
> 2.    Regarding its projects and businesses, Petrobras has continued to provide information to the public via its website www.petrobras.com.br, Press Releases, responses to media outlets and announcing any Material Facts.  This ensures transparency in all matters relating to the cases that are under analysis or under investigation.
>
> 3.    Furthermore, Petrobras fully complies with its obligations and has been providing all information requested by the Federal Police – PF, Federal Audit Court – TCU, Office of the Federal Controller General – CGU and the Public Prosecutor's Office – MP.  In addition, the company always notifies these entities of new facts and information that come to its attention.
>
> 4.    Petrobras's management is interested in seeing the conclusion of all ongoing investigations by all such entities.  The company will continue to contribute swiftly and effectively for this to happen.  In this regard, Petrobras has requested to the judge

- 93 -

responsible for the "Lava Jato" operation to gain access to the information pertaining to Petrobras that has been provided by Mr. Paulo Roberto Costa within the scope of his whistleblower status. In addition, the company has sent letters to the companies cited by the media outlets requesting information regarding the existence of its contracts with the companies connected to Mr. Alberto Youssef and on any involvement with the activities object of this investigation. This information will aid the work of the Internal Investigative Commissions that have been set-up.

5.        Lastly, the Executive Board announces to its shareholders and employees that the company continues to operate normally across all of its units to meet its business objectives. The illegal activities, which may have been committed by an individual or by a group of individuals, employed or not by the company, do not represent the conduct of the Petrobras institution or of its workforce consisting of thousands of employees.

277.       In response to the reported allegations about the Petrobras kickback scheme, the price of Petrobras Common ADRs declined from $19.38 on September 5, 2014, prior to the reporting of the allegations, to $18.35 per ADR (an over 5% decline) on September 8, 2014, on extremely heavy trading volume. The price of Petrobras Preferred ADRs declined from $20.27 on September 5, 2014, prior to the reporting of the allegations, to $19.24 per ADR (an approximate 5% decline) on September 8, 2014. The price of Petrobras Common Shares declined from $21.73 per share on September 5, 2014, prior to the reporting of the allegations, to $20.69 per share (a 4.79% decline) on September 8, 2014. The price of Petrobras Preferred Shares declined from $22.82 per share on September 5, 2014, prior to the reporting of the allegations, to $21.70 per share (a 4.91% decline) on September 8, 2014. The full extent of defendants' fraud had not yet been revealed, so Petrobras Securities continued to remain artificially inflated.

278.       On September 8, 2014, *TheStreet.com* published an article entitled "Why Petroleo Brasileiro Petrobras (PBR) Stock Is Declining Today," which discussed Costa's testimony about the kickback scheme.

279.       The price of the Company's Common ADRs continued to decline over the next several days, closing at $17.83 per ADR on September 9, 2014 and $17.38 per ADR on

September 10, 2014, down $2 per ADR, or 10.32%, from the closing price on September 5, 2014. The price of the Preferred ADRs declined to $18.71 per ADR on September 9, 2014 and $18.26 per ADR on September 10, 2014, down $2.01 per ADR, or 9.92%, from the closing price on September 5, 2014.  The price of the Company's Common Shares continued to decline over the next several days, closing at $20.39 per share on September 9, 2014 and $19.90 per share on September 10, 2014, down $1.83 per share, or 8.42%, from the closing price on September 5, 2014. The Preferred Shares declined to $21.48 per share on September 9, 2014 and $20.95 per share on September 10, 2014, down $1.87 per share, or 8.19%, from the closing price on September 5, 2014. The full extent of defendants' fraud had not yet been revealed, so Petrobras Securities continued to remain artificially inflated.

280.    On October 9, 2014, recordings of Costa's testimony describing the Petrobras kickback scheme were released online by a Brazilian federal court.  An October 9, 2014 article in *The Wall Street* Journal, entitled "Ex-Petrobras Executive Says Kickbacks Were Paid to Ruling Party's Officials; Brazilian Court Releases Taped Testimony Claiming Bribes Paid to President Rousseff's Allies," stated, in pertinent part, that Costa testified that it was common in Petrobras divisions to pay kickbacks to members of Rousseff's Workers' Party.

281.    On October 20, 2014, *TheStreet.com* reported, in an article entitled "Why Petrobras (PBR) Stock is Down Today," that Rousseff acknowledged that there was evidence money was illegally diverted from Petrobras.

282.    An article by the *Associated Press* released on October 24, 2014 – after the close of trading – entitled "Brazil's Rousseff Slams Magazine's Allegations," stated, in pertinent part, that Youssef testified that he helped launder Petrobras kickbacks and that Rousseff and other executive-branch members knew about the scheme.

- 95 -

283.    In response to revelations referenced above, the price of Petrobras Common ADRs declined from $16.77 per ADR on October 9, 2014, to $11.16 per ADR (a 33.45% decline) on October 27, 2014, on extremely heavy trading volume.  The price of Petrobras Preferred ADRs declined from $17.77 per ADR on October 9, 2014, to $11.49 per ADR (a 35.34% decline) on October 27, 2014.  The price of Petrobras Common Shares declined from $19.96 per share on October 9, 2014, to $14.07 per share (a 29.5% decline) on October 27, 2014, on extremely heavy trading volume.  The price of Petrobras Preferred Shares declined from $21.20 per share on October 9, 2014, to $14.52 per share (a 31.5% decline) on October 27, 2014.  The full extent of defendants' fraud had not yet been revealed, so Petrobras Securities continued to remain artificially inflated.

284.    On November 13, 2014, the Company issued a press release announcing that it would not file its third quarter 2014 financial statements as scheduled.  The press release stated, in pertinent part, as follows:

> As has become known publicly, Petrobras is undergoing a unique moment in its history, in light of the accusations and investigations of the "*Lava Jato Operation*" being conducted by the Brazilian Federal Police, which has led to charges of money laundering and organized crime against the company's former Downstream Director, Paulo Roberto Costa.  The former director is currently under investigation for corruption and embezzlement, among other offenses.

> Faced with these circumstances, and considering the declarations of the former Downstream Director in a federal court on October 8, 2014 that, if found to be true, could potentially affect the company's financial statements, Petrobras has taken numerous steps aimed at furthering related investigations.

> Within this context, on October 24 and 25, 2014 Petrobras hired two independent law firms specialized in conducting investigations – Brazilian firm Trench, Rossi e Watanabe Advogados and U.S. firm Gibson, Dunn & Crutcher LLP – to examine the nature, extent and impact of the acts that may have been committed within the context of the allegations made by former Downstream Director Paulo Roberto Costa, as well as to investigate related facts and circumstances that have a significant impact on the company's business operations.  Hiring these independent firms was recommended by the Audit Committee of the Board of Directors in

- 96 -

compliance with the best international practices and authorized by the Executive Board.

However, as a result of the time needed to (i) gain greater understanding from the ongoing investigations by the independent law firms (ii) make any adjustments to the financial statements based on the accusations and investigations related to the "Lava Jato Operation" and (iii) evaluate the need for internal controls improvements, Petrobras is unable to release its third quarter 2014 financial statements at this time.

As a result, and in recognition of the importance of transparency, Petrobras expects to release its third quarter 2014 financial statements, without a review by its Independent Auditors, on December 12, 2014, reflecting its balance sheet based on facts that are known as of that date.

Petrobras is committed to releasing its third quarter 2014 results duly reviewed by its Independent Auditors as soon as possible.

285.    On November 14, 2014, *The Wall Street Journal* published an article entitled "Petrobras Scandal Widens, Earnings Delayed," which stated, in pertinent part, that Brazilian federal police served dozens of search warrants and raided the offices of 11 companies and arrested 18 people suspected of participating in the kickback scheme, including Duque.

286.    On November 17, 2014, before the market opened, Petrobras held a conference call with analysts and investors to discuss the Company's intention not to file its third quarter 2014 financial statements as scheduled.  During the conference call, Foster stated that "Petrobras is unable to publish its third-quarter 2014 financial statements because these accusations, if found to be true, could potentially affect the Company's financial statements."  During the conference call, an analyst asked about the potential impact on the Company's financial statements if the allegations of the kickback scheme are confirmed.  Barbassa responded that adjustments would be made to the fair price of the Company's PPE that was acquired, so that any overpayment "should be removed from PPE line item [adjusted] value and should be taken to the result."  In determining a fair value, Barbassa elaborated that Petrobras would need to deduct from PPE "any amount that could be linked to bribery of any sort; any excessive price that would have been charged."

- 97 -

287.    In response to the revelations referenced above, the price of Petrobras Common ADRs declined from $9.95 per ADR on November 14, 2014, to $9.33 per ADR (a 6.23% decline) on November 17, 2014, on extremely heavy trading volume.  The price of Petrobras Preferred ADRs declined from $10.23 per ADR on November 14, 2014, to $9.64 per ADR (a 5.77% decline) on November 17, 2014.  Between September 5, 2014 and November 17, 2014, as the details of the Petrobras kickback scheme unraveled, the price of Petrobras Common ADRs declined from $19.38 per ADR to $9.33 per ADR, or more than 51%.  Similarly, the price of Petrobras Preferred ADRs declined from $20.27 per ADR to $9.64 per ADR, or more than 52%, between September 5, 2014 and November 17, 2014.  The price of Petrobras Common Shares declined from $12.78 per share on November 14, 2014 to $12.13 per share (a 5.09% decline) on November 17, 2014, on extremely heavy trading volume.  The price of Petrobras Preferred Shares declined from $13.20 per share on November 14, 2014 to $12.60 per share (a 4.55% decline) on November 17, 2014.   Between September 5, 2014 and November 17, 2014, as the details of the Petrobras kickback scheme unraveled, the price of Petrobras Common Shares declined from $21.73 per share to $12.13 per share, or more than 44%.  Similarly, the price of Petrobras Preferred Shares declined from $22.82 per share to $12.60 per share, or more than 44%, between September 5, 2014 and November 17, 2014.  Petrobras Debt Securities also suffered significant declines during this period.  The full extent of defendants' fraud had not yet been revealed, so Petrobras Securities continued to remain artificially inflated.

288.    On November 24, 2014, Petrobras issued a press release announcing that the Company had received a subpoena from the SEC, stating, in pertinent part, as follows:

> Petrobras hereby informs that on November 21 it received a subpoena from the U.S. Securities and Exchange Commission ("SEC") requesting certain documents relating to the SEC's investigation of the Company.

- 98 -

The subpoena requires the production of certain documents that will be gathered with the assistance of Trench, Rossi e Watanabe Advogados and Gibson, Dunn & Crutcher, the Brazilian and U.S. law firms previously retained by Petrobras to conduct an independent internal investigation.

Petrobras reiterates its commitment to cooperate with the U.S. authorities with the same dedication that it has been cooperating with the authorities in Brazil.

289.    On December 12, 2014, the Company issued a press release announcing that it would not file its consolidated interim financial statements for the third quarter of 2014 as scheduled, stating, in pertinent part, as follows:

Petrobras announces that today, in light of new facts that occurred after November 13, 2014, directly or indirectly related to the "Lava Jato Operation," it decided not to file its consolidated interim financial statements for the 3rd quarter 2014 not reviewed by the independent auditors.  These facts are set out below:

(i) Obtained a waiver for its earliest financial reporting covenants that allows the Company to release its interim financial statements for the 3rd quarter 2014 by January 31, 2015, with no risk of acceleration of its finance debt by its creditors;

(ii) On November 21, 2014, Petrobras received a subpoena from the U.S. Securities and Exchange Commission (SEC) requesting certain documents relating to an investigation of the Company by the SEC;

(iii) On December 3, 2014, Petrobras gained access to the depositions of Mr. Julio Gerin de Almeida Camargo (Grupo Toyo) and Mr. Augusto Ribeiro de Mendonça Neto (Grupo Setal) given as state's evidence to prosecutors;

(iv) On December 9, 2014, the Company was served with a class-action complaint filed by Mr. Peter Kaltman before the U.S. Court (United States District Court, Southern District of New York).  We expect additional complaints to be filed, which could potentially be consolidated with Kaltman's complaint;

(v) On November 11, 2014, criminal charges were filed by the Brazilian Public Prosecutor's Office against several individuals, including the Former Director of Downstream, Paulo Roberto Costa, and managers of other companies for active corruption, passive corruption, organized crime, money-laundering and falsification of documents.

290.    On December 18, 2014, it was reported by *Reuters* in an article entitled "Brazilian Lawmakers Urge Indictments in Petrobras Scandal," that a Brazilian congressional committee investigating Petrobras's corruption scandal recommended that prosecutors bring charges against

- 99 -

52 people for alleged money laundering and racketeering.  This call for indictments was reported to

come after Brazilian federal prosecutors charged 39 people for the bribery scheme.

291.    On December 22, 2014, *ABC News* published an article entitled "Ex Petrobras

Manager Says She Spoke With CEO About Anomalies," which stated, in pertinent part, as follows:

> Petrobras' former manager of downstream operations, Venina Velosa da
> Fonseca, said during a Sunday night interview aired on Globo TV that she met with
> Foster in 2008 and told her about inflated contracts and payments for services that
> were not carried out.  Foster led the energy and gas division at that time before
> becoming CEO in 2012.
>
> "I met with the CEO personally when she was director of the gas and energy
> unit. At that time, we discussed the matter.  I handed over to her the documents about
> the complaints," she said during the interview on Globo TV.  "Afterward, she had
> access to these anomalies at the management meetings."

292.    On December 29, 2014, the Company issued a press release announcing that it would

release its third quarter 2014 financial statements in January 2015 without the report of its external

auditor.

293.    On January 10, 2015, the *Business Recorder* published an article entitled "Petrobras

Offers Leniency Terms to Contractors," reporting that Petrobras asked 23 companies implicated in

the bribery scheme to admit guilt.

294.    On January 28, 2015, Petrobras filed the 3Q14 Form 6-K with the SEC and reported

its financial results for the third quarter of 2014.  The 3Q14 Form 6-K discussed the kickback

scheme and acknowledged that the Company's PPE assets had been overstated, but failed to quantify

the overstatement or the impairment charge that was necessary.  The 3Q14 Form 6-K stated, in

pertinent part, as follows:

> On November 13th, 2014 as a result of the facts and proofs obtained in the
> "Operation Lava Jato" Petrobras decided to postpone the release of its third quarter
> 2014 financial results.  In short, the testimonies examined by Petrobras have
> indicated the commission of unlawful acts, such as cartelization of suppliers and
> former employees taking bribes, indicating that the payments to such suppliers were

- 100 -

improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments.

Consequently we have concluded that it is impracticable to correctly quantify these improperly recognized values, since the payments were made by external suppliers and cannot be traced back to the company's accounting records.

\*       \*       \*

The appraised assets represent R$ 188.4 billion, or approximately 1/3 of the company's total fixed assets (R$ 597.4 billion) and were based on contracts signed between Petrobras and the companies mentioned in "Operation Lava Jato" from 2004 to April 2012.

\*       \*       \*

The outcome of the appraisals indicated that the assets with fair value below the book value would total R$ 88.6 billion of lower difference. The assets with higher fair value totaled R$ 27.2 billion of higher difference than the book value.

So, we have decided not to use the methodology of determining the fair value as a "proxy" to adjust the company's fixed assets due to fraud and corruption, because this adjustment would include elements with no direct relation with the unlawful payments. We are going to further examine another methodology that takes into account values, deadlines and information from the "Operation Lava Jato" testimonials, in compliance with the requirements of the regulators (CVM and SEC), aimed at releasing the financial statements reviewed.

295.    In response to revelations referenced above, the price of Petrobras Common ADRs declined from $6.56 per ADR on January 28, 2015 to $6.40 per ADR (a 2.44% decline) on January 29, 2015, on extremely heavy trading volume. The price of Petrobras Preferred ADRs declined from $6.94 per ADR on January 28, 2015 to $6.61 per ADR (a 4.76% decline) on January 29, 2015, on extremely heavy trading volume. The price of Petrobras Common Shares declined from $8.63 per share on January 28, 2015, to $8.47 per share (a 1.85% decline) on January 29, 2015, on extremely heavy trading volume. The price of Petrobras Preferred Shares declined from $9.03 per share on January 28, 2015, to $8.75 per share (a 3.10% decline) on January 29, 2015, on extremely heavy trading volume. The full extent of defendants' fraud had still not yet been revealed, so Petrobras Securities continued to remain artificially inflated.

- 101 -

296.    Investors and analysts were frustrated that Petrobras failed to write down the assets involved in the kickback scheme.  For example, a January 28, 2015 analyst report by HSBC Global Research stated, in pertinent part, as follows:

> We have been supporting a long term cautious view on Petrobras investment case for a while.  We believe that now; the uncertainties surrounding the audited balance sheet disclosures and the potential impact of up to USD34bn impairment (76% of current market cap) add too much risk to the case.  We have very low visibility about the potential upside to Petrobras stock at this stage.

> We are downgrading Petrobras to Underweight (V), from Neutral (V), on the back of: 1) limited visibility on when and how will the write-off of recent corruption scandals will affect the company, 2) negative FCF generation for a long period, 3) extremely high leverage at 4.6x Net Debt/EBITDA, and 4) expensive multiples.

297.    On January 28, 2015, *Reuters* published an article entitled "Petrobras Reports Earnings Without Graft Writedowns Despite Delays," reporting that Petrobras released unaudited third quarter results after nearly a three-month delay, without an estimate of how the kickback scheme had overvalued its assets.  The article stated, in pertinent part, as follows:

> Brazil's Petrobras released delayed unaudited third-quarter results on Wednesday, but the state-run oil company's shares slumped as it left investors in the dark over the financial impact of a multibillion-dollar corruption scandal.

> Petroleo Brasileiro SA, as Petrobras is formally known, reported quarterly net profit slid 9.1 percent from the year-ago period to 3.09 billion reais ($1.20 billion).  It postponed an initial plan to publish the results in November after a stream of corruption allegations snowballed into a nationwide scandal.

> The much-anticipated results, however, did not include what investors most want to know: a rough estimate of how badly corruption over-valued the company's assets.  The state-owned oil company reversed an initial decision to include such writedowns under pressure from its chairman, who is close to Brazil's ruling Workers' Party, a person with direct knowledge of the situation told Reuters.

> Failure to deliver the results would have put Petrobras at risk of violating its bond covenants, although it remains to be seen whether the limited report will satisfy debtholders.  The scandal itself had already cut Petrobras, the world's most-indebted and least-profitable major oil company, out of capital markets and put it at risk of losing its investment-grade credit rating.

*       *       *

Investors drove down Petrobras stock in the wake of the earnings release. Common and preferred shares fell nearly 10 percent in afternoon trading in São Paulo, with U.S.-listed American Depositary Receipts down a bit less.

"Without the writedown, what's the point?" wrote analyst Ricardo Kim of XP Investimentos, a Brazilian brokerage that recommends investors avoid the stock.

After initially deciding to take the writedown last week, the board reversed itself under pressure from Chairman and former Finance Minister Guido Mantega, the person with direct knowledge said.

*     *     *

The company is now likely to take the writedowns in its fourth-quarter audited financial statement, which is expected by the end of April, the source added.

*     *     *

IMPRACTICAL TO QUANTIFY

CEO Foster acknowledged that graft and other corruption-related spending should have been booked in past financial statements, but she said the company was still looking at ways to account for the charges in accordance with securities regulations in Brazil and the United States.

"We concluded that it was impractical to quantify these values with precision, given that the payments were made by outside suppliers and cannot be traced to the company's accounting books," Foster wrote in a letter to shareholders and investors accompanying the earnings release.

Brazilian accounting experts questioned that explanation.

"There is no reason for the company not to have estimated, even in a provisional way, the writedowns related to corruption," said Reginaldo Gonçalves an accounting professor at Faculdade Santa Marcelina, a São Paulo university.

298.    On January 28, 2015, *Reuters* also published an article, entitled "Petrobras Still Faces Default Risk Despite Release, Fund says," reporting that New York-based distressed-debt fund Aurelius Capital Management had threatened Petrobras with default on billions of dollars of debt for not including in its third quarter 2014 results an expected charge against earnings related to the kickback scheme.  The article stated, in pertinent part, as follows:

Brazilian state-run oil company Petrobras still runs the risk of being declared in default on billions of dollars of debt even after releasing its delayed third-quarter

- 103 -

earnings before a self-imposed deadline, a New York-based hedge fund said on Wednesday.

*    *    *

"Note 2" of its unaudited results saying that they do not fully meet the International Accounting Standards Board's (IASB) standards shows non-compliance, said Mark Brodsky, Aurelius' chairman.

The Petrobras note to its results says those disclosures related to assets whose value may have been inflated by corruption do not comply with the IASB's IAS-34 rule.

299.     On January 29, 2015, *Reuters* published an article entitled "Brazilian Court Freezes Assets of Former Petrobras CEO Gabrielli," reporting that a Brazilian state court had frozen Gabrielli's assets in connection with investigating the kickback scheme. The article stated, in pertinent part, as follows:

A Brazilian state court froze the assets of former Petrobras Chief Executive Officer Jose Sergio Gabrielli on Wednesday amid an investigation of graft and money-laundering in the government-run oil producer's contracts with construction companies.

State prosecutors in Rio de Janeiro suspect Gabrielli participated in a scheme to overbill Petrobras by 32 million reais ($12.4 million) for construction projects by local company Andrade Gutierrez SA. Gabrielli was CEO of the company formally known as Petróleo Brasileiro SA between 2005 and 2012.

The court also allowed prosecutors to access Gabrielli's tax, banking and phone records, as well as those of former Petrobras executives Renato Duque and Pedro Barusco. Duque and Barusco are being formally investigated by federal prosecutors.

300.     On January 29, 2015, the *New York Times* published an article entitled "Petrobras Case Had $800M in Kickbacks Found So Far," reporting that prosecutors found that the kickback scheme involved at least $800 million in bribes, a figure that they expected would grow as the investigation continued. The article stated, in pertinent part, as follows:

Brazilian prosecutors said Thursday that a kickback scheme at state-run oil company Petrobras involved at least $800 million in bribes and other illegal funds. They expect that figure to grow as they keep investigating.

- 104 -

Federal prosecutors said they've recovered about $170 million involved in the scheme, that over 230 businesses of all sizes are being investigated and that 86 people are facing charges so far.

Several top executives from Brazil's biggest construction and engineering firms remain jailed as the investigation continues, with a judge saying they're a flight risk and cannot be freed.

301.    On February 3, 2015, Fitch Ratings downgraded Petrobras debt from BBB to BBB-.

302.    On February 5, 2015, Petrobras filed a Form 6-K announcing the resignations of Foster and Barbassa, and four other Petrobras executive directors, effective February 6, 2015.

303.    On February 5, 2015, *ABC News* published an article entitled "Warrants issued in Brazil's Petrobras Corruption Scandal," reporting that Brazilian federal prosecutors expected to charge dozens of politicians in Brazil's Workers' Party for funneling money from Petrobras in connection with the kickback scheme.  Brazilian federal prosecutors issued a warrant to the treasurer of the Workers' Party, Joao Vaccari Neto, to testify about the kickback scheme.

304.    On February 10, 2015, the *International Business Times* published an article entitled "Petrobras Scandal: 2000 Employees Under Full-Scale Investigation for Corruption."  The article stated, in pertinent part, as follows:

Two thousand employees of Brazil's state-run oil giant Petrobras are now under investigation in a corruption scandal that has rocked the country for months.

An internal audit led by former Minister of the Federal Supreme Court, Ellen Gracie seized the computers and mobile phones of more than 2,000 employees with access to information regarding projects examined by the federal police's "Lava Jato Operation" (Portuguese for "Operation car wash").

"Men in suits came out of nowhere to get computers and mobile phones. Without notice.  No one knew who they were," an employee who occupies a top position at Petrobras headquarters told *Zero Hora*.

Information saved locally on the mobile phones and computers will help the inquiry work out the scale of the corruption and pinpoint people involved.

Maria das Graças Foster, the CEO of Petroleo Brasileiro (Petrobras) and five members of the state-run oil giant's board of directors, were forced to resign last

week following revelations that the company lost up to $33bn (£21.6bn) in 2014 due to corruption and financial inefficiency.

The board of Petrobras named Brazil's former central bank chief executive officer Aldemir Bendine as its new chief executive last week.

Investigations into the corruption have also focused on President Dilma Rousseff and her Workers' Party, where a senior official was questioned.

Overall, more than 232 companies, including some of Brazil's largest construction and engineering firms have been, or are being investigated.

Some 150 executives and Petrobras directors have also been under investigation.  So far, around 80 people have been charged with corruption, according to local officials.

305.   On February 13, 2015, *The Irish Times* published an article entitled "Petrobras Chief's Banking Past Fuels Market Concerns in Brazil," reporting that although all three of Petrobras's independent Board members had voted against Aldemir Bendine, he would become Petrobras's CEO.  One of these three independent Board members accused the government of "once again imposing its will above the interests of Petrobras, ignoring the appeals of long-term investors." The article stated, in pertinent part, as follows:

Anger at state interference led all three independent members on Petrobras's board to vote against Bendine's appointment.  After their defeat one of the three accused the government of "once again imposing its will above the interests of Petrobras, ignoring the appeals of long-term investors."

This last group has seen the value of its shares routed despite the company's discovery in recent years of giant reserves of oil, and many investors have joined a class action suit in the United States against the company.

*            *            *

"Markets wanted a name to bring Petrobras the credibility and the corporate governance lacking today.  Those hopes were ended with Bendine.  It is not a question of whether he is competent or not but rather than he is linked to Dilma," said Marcelo Varejão, an investment analyst with São Paulo brokerage Socopa.

Bendine has an early chance to earn market credibility as his immediate task is to try to publish 2014 full-year results and have auditor PwC sign them off by the

- 106 -

middle of the year.  That will require a massive write- down of the firm's assets to reflect the damage done by the corruption and mismanagement of recent years.

Such a step will be politically explosive as it will expose to the public the cost of the ruling Workers' Party's stewardship of the company.  Failure to file results on time could see Petrobras facing creditors' claims of tens of billions of euro.  Bendine said he expects to publish the results by the end of March.

306.   On February 20, 2015, *ABC News* published an article entitled "Brazil Prosecutors Seek $1.55B in Petrobras Corruption Case."  The article stated, in pertinent part, as follows:

Brazilian federal prosecutors on Friday said they're seeking $1.55 billion from six construction and engineering companies for their alleged involvement in a massive kickback scheme at state-run oil firm Petrobras.

The amount included $111 million in compensation for public money prosecutors allege was stolen from Petrobras' coffers, along with $333 million in fines and $1.11 billion in punitive damages.

307.   On February 24, 2015, *Reuters* published an article entitled "Former Petrobras Executive Charged with Taking Bribes," reporting that Brazilian federal prosecutors charged Cerveró with racketeering, bribery, and money laundering in connection with accepting bribes to help engineering and construction firms win contracts with Petrobras.

308.   On March 18, 2015, additional details about the regulators' investigations of the Petrobras kickback scheme were revealed.  On that date, *Reuters* published an article entitled "Brazil Audit Court to Investigate Petrobras Board Members," reporting that Brazil's Federal Audits Court decided to investigate whether Petrobras's Board practiced "acts of ruinous management" or failed "to act with the necessary care."  *Reuters Africa* published an article entitled "Brazil Comptroller to Probe More Contractors in Petrobras Scandal," reporting that Brazil's Comptroller-General's Office added six construction and engineering firms to its investigation of the Petrobras kickback scheme. Additionally, *The Wall Street Journal* published an article entitled "Swiss Authorities Order Freeze of Assets Related to Petrobras Scandal," reporting that Switzerland's Office of the Attorney General

- 107 -

ordered the freezing of approximately $400 million in assets in Swiss bank accounts connected to the Petrobras kickback scheme.

309.    In response to the revelations referenced above, the price of Petrobras Common ADRs declined from $5.66 per ADR on March 18, 2015 to $5.26 per ADR (a 7.07% decline) on March 19, 2015, on extremely heavy trading volume.  The price of Petrobras Preferred ADRs declined from $5.75 per ADR on March 18, 2015 to $5.39 per ADR (a 6.26% decline) on March 19, 2015, on extremely heavy trading volume.  The price of Petrobras Common Shares declined from $9.09 per share on March 18, 2015 to $8.69 per share (a 4.40% decline) on March 19, 2015, on extremely heavy trading volume.  The price of Petrobras Preferred Shares declined from $9.27 per share on March 18, 2015 to $8.90 per share (a 3.99% decline) on March 19, 2015, on extremely heavy trading volume.

Further, additional information was disclosed to market participants through the end of July 2015 and Petrobras securities continued to drop in price as a consequence.

**H.    The Forms 20-F and Registration Statements Omitted Known Trends, Events, and Uncertainties that Were Impacting, and Would Impact, the Company's Financial Results**

310.    Pursuant to Items 5(D) and 8(B) of Form 20-F, and Item 6(a) of Form F-3, which incorporates by reference the registrant's latest Form 20-F, the Forms 20-F filed during the Relevant Period, and the Registration Statements filed in connection with the 2013 U.S. Notes and 2014 U.S. Notes offerings, and 2010 Prospectus Supplement issued in connection with the Company's offering of Petrobras's Common Shares, including Common ADRs, and Preferred Shares, including Preferred ADRs, were required to furnish: (i) "Trend information," pursuant to Item 5(D) of Form 20-F, which discusses "for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the

- 108 -

company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition"; and (ii) "Significant Changes," pursuant to Item 8(B) of Form 20-F, which discloses "whether or not any significant change has occurred since the date of the annual financial statements, and/or since the date of the most recent interim financial statements, if any, included in the document."

311.    This required information is substantially similar to the information required under Item 303 of Regulation S-K [17 C.F.R. §229.303] ("Item 303"), including any known trends, events, or uncertainties that have caused or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.

312.    In 1989, the SEC issued an interpretive release on Item 303 and the disclosure required under the regulation.  *See Management's Discussion and Analysis of Financial Condition and Results of Operations* ("*MD&A*"), SEC Release No. 6835, 1989 WL 1092885, at *1 (May 18, 1989) (hereinafter referred to as "1989 Interpretive Release").  In the 1989 Interpretive Release, the SEC stated that:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract. . . .  A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

*Id*. at *4.

313.    Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1)  Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)  If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

*Id*. at *6.

314.    The following were known trends, uncertainties, demands, commitments, or events that were reasonably likely to have a material effect on the Company's net sales or revenues, income from continuing operations, profitability, liquidity, or capital resources, or that caused the Company's reported financial information not necessarily to be indicative of future operating results or financial condition, and therefore were required to be disclosed by defendants, but were not:

(a)    that for more than a decade, senior Petrobras executives actively participated in a massive collusion, bribery, and kickback scheme pocketing at least $800 million in exchange for causing Petrobras to pay inflated amounts on at least $81.4 billion in contracts;

(b)    Petrobras's financial results and condition were materially overstated due to the kickback scheme alleged herein, including the material overstatement in the value of the Company's assets, book value, PPE, shareholders' equity, and income, and an understatement in the Company's expenses and debt-to-equity ratio;

(c)    the fraudulent kickback scheme alleged herein subjected the Company to numerous undisclosed risks, including monetary risks and reputational risks, which would adversely affect its future financial condition and prospects; and

(d)    the value of the Company's assets and shareholders' equity was false and misleading because the inflated amounts associated with the scheme had been incorporated into the

- 110 -

total assets, book value of PPE, and shareholders' equity recorded on the Company's financial statements, which were presented in violation of applicable accounting standards.

I.    **The Forms 20-F and Registration Statements Omitted to Include Significant Risk Factors Required to Be Disclosed Therein**

315.    Pursuant to Item 3(D) of Form 20-F and Item 3 of Form F-3, the Forms 20-F filed during the Relevant Period, and the Registration Statements filed in connection with the 2013 U.S. Notes and 2014 U.S. Notes offerings and 2010 Prospectus Supplement, were required to furnish the following information:  (1) pursuant to Item 3(D) of Form 20-F, "Risk factors," which "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk"; and (2) pursuant to Item 3 of Form F-3, the information required by Item 503 of Regulation S-K [17 C.F.R. §229.303] ("Item 503"), which includes, among other things, a "discussion of the most significant factors that make the offering risky or speculative."  Defendants, however, failed to disclose the following as required under Items 503 and Item 3(D):

(a)    that for more than a decade, senior Petrobras executives actively participated in a massive collusion, bribery, and kickback scheme pocketing at least $800 million in exchange for causing Petrobras to pay inflated amounts on at least $81.4 billion in contracts;

(b)    Petrobras's financial results and condition were materially overstated due to the kickback scheme alleged herein, including the material overstatement in the value of the Company's assets, book value, PPE, shareholders' equity, and income, and an understatement in the Company's expenses and debt-to-equity ratio;

(c)    the fraudulent kickback scheme alleged herein subjected the Company to numerous undisclosed risks, including monetary risks and reputational risks, which would adversely affect its future financial condition and prospects; and

- 111 -

(d)      the value of the Company's assets and shareholders' equity was false and misleading because the inflated amounts associated with the scheme had been incorporated into the total assets, book value of PPE, and shareholders' equity recorded on the Company's financial statements, which were presented in violation of applicable accounting standards.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

316.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the Company's name were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The defendants, by virtue of their receipt of information reflecting the true facts regarding Petrobras, their control over and/or receipt and/or modification of Petrobras's allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Petrobras, participated in the fraudulent scheme alleged herein.

317.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity of, or at least the reckless disregard of, personnel at the highest levels of the Company.

318.     As alleged above in detail, defendants knew, or recklessly disregarded, that Petrobras engaged in a massive kickback scheme involving billions of dollars' worth of contracts and at least hundreds of millions of dollars in illegal payments.  Defendants knew, or had reason to know, of these facts during the Relevant Period because of, *inter alia*, the following: (i) the admissions of the

- 112 -

kickback scheme by senior Petrobras executives; (ii) the involvement in the kickback scheme by senior Petrobras executives; (iii) the magnitude and scope of the kickback scheme; (iv) the resignations of Petrobras executives in connection with the kickback scheme; (v) the harsh retaliation against those who tried exposing the kickback scheme; and (vi) the motive of the Petrobras Defendants.

319.    Petrobras admitted that its assets were overvalued and that downward adjustments were needed after reviewing evidence of the kickback scheme.  Petrobras's senior officers, including Barusco, Cerveró, and Costa, admitted that the kickback scheme was widespread and commonplace throughout Petrobras, involved billions of dollars' worth of contracts, lasted for over a decade, and implicated top Petrobras executives and Brazilian politicians.  And Foster admitted that Petrobras has found compelling evidence that SBM bribed Petrobras to win contracts.

320.    Numerous high-level Petrobras executives, including Cerveró, Costa, Duque, and Gabrielli, have been arrested or are being investigated in connection with the kickback scheme. Various executives have had assets seized or have agreed to pay back money.  For example, Costa has agreed to turn over assets amounting to at least $25.8 million, and Gabrielli's assets have been frozen.  The most senior officials at Petrobras were aware of the kickback scheme during the Relevant Period.  The Executive Directorate was comprised of individuals at the center of the scheme alleged herein, as well as those who were aware of the scheme and its impact on the Company, including, Costa (Director of Downstream/Supply), Duque (Chief Services Officer), Barusco (Executive Manager of Engineering and Duque's right-hand man), Cerveró (Director of International Division), Foster (director of Gas & Energy until 2012 and then CEO), Barbassa (CFO), and Gabrielli (CEO from 2005 to February 2012).

321.    The magnitude and scope of the kickback scheme is staggering, including in terms of duration, the amount of money, and number of people and firms involved.  For example, Barusco testified that he first started taking bribes in 1997 or 1998 and that by 2003 or 2004 bribes had become institutionalized at Petrobras.  At least 25 companies were members of the cartel that charged inflated values for contracts related to approximately $76.83 billion worth of Petrobras's assets.  In fact, Petrobras has temporarily banned these 25 companies from bidding for Petrobras contracts, and asked them to admit their guilt and involvement in the kickback scheme and pay damages.  More than 50 Brazilian politicians have been implicated in the kickback scheme.  And Brazilian officials are investigating at least 2,000 Petrobras employees in connection with the kickback scheme.

322.    Scienter is further supported by the fact that numerous Petrobras executives have resigned as a result of the scheme, including the following: Foster; Barbassa; José Miranda Formigli, former Upstream Director; José Antônio de Figueiredo, former Engineering, Technology and Procurement Director; and Machado, former CEO of Transpetro, who is on unpaid leave.

323.    Petrobras's harsh retaliation against senior executives who tried exposing the kickback scheme supports scienter as well.  An example is the treatment of Cunha, an independent member of the Petrobras Board who has represented minority investors since 2013.  Cunha was on a Petrobras audit committee investigating the Pasadena and Abreu e Lima refineries.  During a February 25, 2014 Petrobras Board meeting, Cunha rejected Petrobras's 2013 earnings report, partially because he said that insufficient time was allowed and insufficient information was given to analyze Petrobras's refinery investments.  Then during an April 25, 2014 Petrobras Board meeting, the Board removed Cunha from the audit committee.  Cunha has lodged a complaint with Brazil's

Securities and Exchange Commission, known as the CVM, questioning his removal and the committee's independence.

324.   Additionally, Petrobras retaliated against Venina Velosa da Fonseca, Petrobras's former manager of downstream operations.  As alleged above, Fonseca personally met with Foster in 2008 and also provided her with documents that reflected inflated contracts and payments for services that were not carried out.  Foster led Petrobras's Energy & Gas Division at that time and reported to Gabrielli.  Since 2008, Fonseca alerted Barbassa and Foster, the Petrobras Board, and others about irregularities with transactions.

325.   Fonseca delivered documents and a computer to the Brazilian officials who are leading the Operation Car Wash investigation.  These documents reflect warnings to senior Petrobras executives.  For example, Fonseca discovered misappropriation of funds in the Communications Department of the Supply Division of Petrobras in 2008 and 2009 in the form of a pattern of contractors rigging bids and overfilling them by up to 20% of the estimates.  Fonseca raised this issue to Costa, who insinuated that she would bring down important Brazilian politicians if she complained about the misappropriated funds.

326.   Fonseca forwarded her complaints to Gabrielli.  Gabrielli created a committee to investigate these complaints, which ultimately found that Petrobras paid 58 million reais in contracts for communication services that were not performed.  In the morning on April 3, 2009, Fonseca emailed Foster about the 58 million reais that was embezzled.  That same day, Fonseca created a document entitled "Internal Document of the Petrobras System," in which she concluded that administrative irregularities, such as a scheme to divert money from Petrobras, existed in the Communications Department.  Fonseca again wrote to Foster that same night to seek her help.

327.    After making these allegations of wrongdoing, Fonseca was sent to Petrobras's Singapore division in February 2010.  Fonseca was asked not to do any work when arriving in Singapore.

328.    On October 7, 2011, Fonseca emailed Foster about violations of Petrobras's Code of Ethics and serious problems with contracts and bids.  Fonseca said that she could deliver documents to Foster about these problems, and she raised issues surrounding Costa.

329.    Fonseca described a Petrobras internal audit, which was performed in June 2012, which revealed that much of the cost increase at the Abreu e Lima refinery was due to add-on contracts awarded to the cartel contractors implicated in the kickback scheme.  This cost increase was estimated to be $3.1 billion in padded bids.  This internal audit also blamed Costa for modifying the original plan for Abreu e Lima to add unnecessary features, and it was presented to the Board, including Foster, who despite being informed of the loss, approved the unneeded additions to the project.  According to Petrobras's 2012 Form 20-F, the following were on the Board in 2012: Foster, Guido Mantega, Miriam Aparecida Belchior, Francisco Roberto de Albuquerque, Josué Christiano Gomes da Silva, Jorge Gerdau Johannpeter, Márcio Pereira Zimmermann, Luciano Galvão Coutinho, Sergio Franklin Quintella, and Pinheiro.

330.    As recently as November 17, 2014, Fonseca emailed Foster, explaining the harassment that Fonseca faced in alerting Petrobras executives to the kickback scheme.  She had had a gun pointed at her head and her daughters had been threatened.  Also in Fonseca's email, she had explained that she had documentation supporting the irregularities that she found.  She explained that she had presented the matter to Petrobras's legal and audit departments and other competent authorities.  And in Singapore, Fonseca explained in her email that she had learned about other problems.

- 116 -

331.   Two days after Fonseca's email to Foster on November 17, 2014, Petrobras's Board fired Fonseca.

332.   The harsh treatment of Fonseca after she communicated the misconduct at Petrobras to her superiors supports scienter.   Indeed, Fonseca stated during an interview with *Globo* that "[d]uring the whole communication process, [she] was very harassed . . . [and] very pressured." According to Fonseca, "[t]he whole time, the president's assistants, the assistants of the directors, they were in my office saying: 'There's a lot of people involved.   You can't treat it like this.'"

## VII.   LOSS CAUSATION

333.   As detailed herein, defendants engaged in a scheme to deceive Plaintiff and the market and a course of conduct that artificially inflated the price of Petrobras Securities and operated as a fraud or deceit on Plaintiff by failing to disclose and misrepresenting the adverse facts detailed herein.   As defendants' prior misrepresentations and fraudulent conduct were disclosed, and when the materialization of the risks that had been concealed by defendants occurred and became apparent to the market, the prices of Petrobras Securities declined significantly as the prior artificial inflation came out of the Petrobras Securities prices.

334.   As a result of its purchases of Petrobras Securities, Plaintiff suffered economic loss, *i.e.*, damages, under the federal securities laws.   Defendants' false and misleading statements had the intended effect and caused Petrobras Securities to trade at artificially inflated prices, with the price of Petrobras Common ADRs reaching as high as $53.01 on November 25, 2009, and the price of Petrobras Preferred ADRs reaching as high as $46.91 on December 2, 2009.   The price of Petrobras Common Shares reached as high as $45.10 on December 1, 2009, and the price of Petrobras Preferred Shares reached as high as $39.79 on December 1, 2009.

335.    By concealing from Plaintiff the adverse facts detailed herein, defendants presented a misleading picture of Petrobras's business, products, and operations.   As the truth about the Company was revealed to the market, the prices of Petrobras Securities fell significantly, removing the inflation from the prices, causing real economic loss to Plaintiff, who had purchased Petrobras Securities during the Relevant Period.

336.    As alleged above, the declines in the prices of Petrobras Securities after the corrective disclosures came to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.   The timing and magnitude of the price declines in Petrobras Securities negates any inference that the loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

337.    The economic loss, *i.e.*, damages, suffered by Plaintiff was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Petrobras Securities and the subsequent significant decline in the value of Petrobras Securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.   PLAINTIFF'S RELIANCE IS PRESUMED THROUGH THE FRAUD-ON-THE-MARKET DOCTRINE

338.    To the extent available, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that the markets for Petrobras Securities were efficient markets for the following reasons, among others:

(a)    This Court has made findings that the securities at issue herein were traded in an efficient market.  *See In re Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016).

(b)    Petrobras Common and Preferred ADRs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient stock market, and Petrobras Common

- 118 -

Shares and Preferred Shares met the requirements for listing and were listed and actively traded on the SPSE;

(c)     Petrobras regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Petrobras was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

339.    As a result of the foregoing, the market for Petrobras Securities digested current information regarding Petrobras from all publicly available sources and reflected such information in the prices of the Petrobras Securities.

340.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding Petrobras, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Relevant Period material misstatements and omissions set forth above, that requirement is satisfied here.

IX.   **PLAINTIFF'S DIRECT RELIANCE ON DEFENDANTS' FALSE AND
MISLEADING STATEMENTS**

341.   Plaintiff's allegations regarding direct reliance relate only to its claims where reliance is an element of the claim and where the presumption of reliance is unavailable.

342.   Plaintiff purchased Petrobras Securities between July 20, 2010 and July 20, 2015. During the Relevant Period, Plaintiff employed individuals to manage its investment portfolios and make investment decisions on its behalf.   Throughout the Relevant Period, Plaintiff's employees undertook security-specific research to identify companies in which to invest.   As part of this research, Plaintiff's employees reviewed and analyzed an issuer's balance sheets, assets, liabilities, earnings, profitability, prospects, and management/governance characteristics.   Plaintiff's employees made their investment decisions based on this market research and analysis.

343.   Plaintiff's employees employed their ordinary investment research and analysis in determining whether to invest in Petrobras Securities on Plaintiff's behalf.   This research and analysis included a review of the financial statements Petrobras publicly filed with the SEC.   As part of this analysis, Plaintiff's employees directly relied upon the information publicly disclosed by Petrobras, including in its Forms 20-F filed with the SEC, during the Relevant Period.   In particular, in making the decision to purchase Petrobras Securities, Plaintiff's employees relied upon the financial statements included in Petrobras's 2010 Form 20-F, 2011 Form 20-F, and 2012 Form 20-F, including the Company's statements regarding its earnings, assets, liabilities, and PPE, among other statements.   Plaintiff's employees also relied upon the Company's representations in those filings that its financial statements complied with IFRS and/or U.S. GAAP, as well as the certifications issued by Petrobras executives in connection with those filings.

344.   Plaintiff's employees relied on the Company's statements in those filings as being materially complete, and as not omitting material information, including information regarding

- 120 -

Petrobras's financial condition and compliance with applicable laws and regulations.  Plaintiff and Plaintiff's employees did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's public statements, including, without limitation, its Form 20-F filings, were materially false and misleading and/or materially incomplete when deciding to purchase, sell, or hold Petrobras Securities during the Relevant Period.

345.    Petrobras's false and/or misleading statements in its Forms 20-F had a material influence on Plaintiff's investment in Petrobras Securities.  These material misstatements caused Plaintiff to purchase Petrobras Securities following Petrobras's issuance of the false and misleading statements complained of herein.

## X.    NO SAFE HARBOR

346.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Petrobras who knew that those statements were false when made.

## XI.   COUNTS

### COUNT I

### For Violation of §10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder

347.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against Petrobras and PGF.

348.    During the Relevant Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

349.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Petrobras U.S. Securities during the Relevant Period.

350.    Plaintiff acquired Petrobras U.S. Securities without knowledge that defendants had misstated or omitted material facts.  In acquiring Petrobras U.S. Securities, Plaintiff relied directly or indirectly on the false and misleading statements and omissions made by the defendants.

351.    Plaintiff would not have purchased Petrobras U.S. Securities at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

352.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of Petrobras U.S. Securities.

1243584_1

## COUNT II

### For Violation of §18 of the Exchange Act

353.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against Petrobras and PGF.

354.    Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts in documents filed with the SEC by Petrobras and PGF's predecessor in interest, PifCo, including filings made on Form 20-F.

355.    In connection with the purchase of Petrobras U.S. Securities, Plaintiff, and/or its respective agents, actually read and relied upon the SEC filings of Petrobras and PGF's predecessor in interest, PifCo, including: the 2010 Form 20-F, the 2011 Form 20-F, and the 2012 Form 20-F (and any other documents incorporated by reference therein).  Plaintiff, and/or its respective agents, relied on the statements in those filings as being materially complete and as not omitting material information, as further described in ¶¶341-345.  The reliance by Plaintiff, and/or its respective agents, was reasonable.

356.    When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, Plaintiff was significantly damaged by the resulting drop in the value of Petrobras U.S. Securities.

357.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff suffered damage in connection with its purchases of Petrobras U.S. Securities.

358.    By virtue of the foregoing, defendants have violated §18 of the Exchange Act.

**XII.  ADDITIONAL ALLEGATIONS IN SUPPORT OF PLAINTIFF'S CLAIMS AS A PURCHASER OF PETROBRAS U.S. NOTES UNDER THE SECURITIES ACT**

359.    Plaintiff alleges claims under the Securities Act in connection with its purchase of the 2013 U.S. Notes and 2014 U.S. Notes (defined below and collectively referred to herein as the "U.S. Notes").  Plaintiff does not claim for purposes of the Securities Act claims that defendants Petrobras or PGF committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

360.    On or about May 13, 2013, defendants Petrobras and PGF filed with the SEC the 2013 Preliminary Prospectus Supplement for PGF's 2013 U.S. Notes (the "2013 Preliminary Prospectus Supplement").  The 2013 Preliminary Prospectus Supplement incorporated by reference Petrobras's inaccurate financial statements as of December 31, 2011 and 2010, and Petrobras's inaccurate financial statements as of December 31, 2012.  On or about May 15, 2013, defendants Petrobras and PGF filed with the SEC the 2013 Final Prospectus Supplement for PGF's 2013 U.S. Notes (the "2013 Final Prospectus Supplement").  According to the 2013 Preliminary and Final Prospectus Supplements, the 2013 U.S. Notes would trade in the DTC's Same-Day Funds Settlement System located in New York City.  In May 2013, the NYSE informed the SEC that it certified approval for listing on the NYSE and registration of the 2013 U.S. Notes.  The 2013 Final Prospectus Supplement incorporated by reference Petrobras's inaccurate financial statements as of December 31, 2011 and 2010, and Petrobras's inaccurate financial statements as of December 31, 2012.  On or about May 20, 2013, Petrobras and PGF filed with the SEC a Form 8-A12B Registration Statement for the 2013 U.S. Notes, which along with the 2013 Preliminary and Final Prospectus Supplements are collectively referred to herein as the "2013 U.S. Notes Offering Documents."

- 124 -

361.    On or about March 10, 2014, defendants Petrobras and PGF filed with the SEC the 2014 Preliminary Prospectus Supplement for PGF's 2014 U.S. Notes (the "2014 Preliminary Prospectus Supplement").  The 2014 Preliminary Prospectus Supplement incorporated by reference Petrobras's inaccurate financial statements as of December 31, 2011, and Petrobras's inaccurate financial statements as of December 31, 2013 and 2012.  On or about March 11, 2014, defendants Petrobras and PGF filed with the SEC the 2014 Final Prospectus Supplement for PGF's 2014 U.S. Notes (the "2014 Final Prospectus Supplement").  According to the 2014 Preliminary and Final Prospectus Supplements, the 2014 U.S. Notes would trade in the DTC's Same-Day Settlement System located in New York City.  In March 2014, the NYSE informed the SEC that it certified approval for listing on the NYSE and registration of the 2014 U.S. Notes.  The 2014 Final Prospectus Supplement incorporated by reference Petrobras's inaccurate financial statements as of December 31, 2011, and Petrobras's inaccurate financial statements as of December 31, 2013 and 2012.  On or about March 17, 2014, defendants Petrobras and PGF filed with the SEC a Form 8-A12B Registration Statement for the 2014 U.S. Notes, which along with the 2014 Preliminary and Final Prospectus Supplements are collectively referred to herein as the "2014 U.S. Notes Offering Documents."

362.    The 2014 U.S. Notes Offering Documents incorporated Petrobras SEC filings by reference, including, among others, the: (i) 2011 Form 20-F; (ii) 2011 Form 20-F/A; (iii) 2012 Form 20-F; (iv) August 10, 2012 Form 6-K; (v) February 26, 2014 Form 6-K; (vi) March 7, 2014 Form 6-K; and (vii) March 11, 2014 Form 6-K.  The 2014 U.S. Notes Offering Documents also incorporated by reference "[a]ny future filings of Petrobras on Form 20-F with the SEC after the date of this prospectus supplement and prior to the completion of the offering of the securities offered by this prospectus."

- 125 -

363.    The 2013 U.S. Notes offering and 2014 U.S. Notes offering are collectively referred to herein as the "U.S. Notes Offerings."

364.    Certain details for the U.S. Notes Offerings are set forth below:

| Note | Offering Size (U.S. Dollars) | Issue Date | Issue Price |
|------|------------------------------|------------|-------------|
| 4.375% Global Notes due 2023 | 3,500,000,000 | 5/15/2013 | 98.828 |
| 5.625% Global Notes due 2043 | 1,750,000,000 | 5/15/2013 | 98.027 |
| 3.000% Global Notes due 2019 | 2,000,000,000 | 5/15/2013 | 99.352 |
| Floating Rate Global Notes due 2019 | 1,500,000,000 | 5/15/2013 | 100 |
| 2.000% Global Notes due 2016 | 1,250,000,000 | 5/15/2013 | 99.584 |
| Floating Rate Global Notes due 2016 | 1,000,000,000 | 5/15/2013 | 100 |
| 3.250% Global Notes due 2017 | 1,600,000,000 | 3/11/2014 | 99.957 |
| 4.875% Global Notes due 2020 | 1,500,000,000 | 3/11/2014 | 99.743 |
| 6.250% Global Notes due 2024 | 2,500,000,000 | 3/11/2014 | 99.772 |
| 7.250% Global Notes due 2044 | 1,000,000,000 | 3/11/2014 | 99.166 |
| Floating Rate Global Notes due 2017 | 1,400,000,000 | 3/11/2014 | 100.000 |
| Floating Rate Global Notes due 2020 | 500,000,000 | 3/11/2014 | 100.000 |

365.    The Registration Statements for the U.S. Notes Offerings contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation because of the following facts, which existed at the time of the U.S. Notes Offerings:

(a)    for more than a decade, senior Petrobras executives actively participated in a massive collusion, bribery, and kickback scheme pocketing at least $800 million in exchange for causing Petrobras to pay inflated amounts on at least $81.4 billion in contracts;

(b)    Petrobras's financial results and condition were materially overstated due to the kickback scheme alleged herein, including the material overstatement in the value of the Company's assets, book value, PPE, shareholders' equity, and income, and an understatement in the Company's expenses and debt-to-equity ratio;

(c)    the Company's SEC filings failed to disclose then presently known trends, events, or uncertainties associated with the kickback scheme that were reasonably likely to have a material effect on Petrobras's future operating results;

- 126 -

(d)     the fraudulent kickback scheme alleged herein subjected the Company to numerous undisclosed risks, including monetary risks and reputational risks, which would adversely affect its future financial condition and prospects; and

(e)     the value of the Company's assets and shareholders' equity were false and misleading because the inflated amounts associated with the scheme had been incorporated into the total assets, book value of PPE, and shareholders' equity recorded on the Company's financial statements, which were presented in violation of applicable accounting standards.

366.    Furthermore, the Registration Statements for the U.S. Notes Offerings contained untrue statements of material fact and omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation for the reasons set forth above.

367.    Additionally, the financial information about Petrobras contained in the Registration Statements for the U.S. Notes Offerings, including the documents incorporated by reference therein, contained untrue statements of material fact and omitted material information because those documents: (i) overstated the amount of Petrobras's assets; (ii) understated the Company's expenses, which resulted in a concomitant overstatement of Petrobras's reported income; and (iii) failed to disclose loss contingencies associated with the unlawful bribery and kickback scheme perpetrated by Petrobras management.

368.    Pursuant to Items 5(D) and 8(B) of Form 20-F, and Item 6(a) of Form F-3, which incorporates by reference the registrant's latest Form 20-F, the Forms 20-F filed during the Relevant Period, and the Registration Statements filed in connection with the U.S. Notes Offerings, were required to furnish, among other things, known trends, uncertainties, demands, commitments, or events that were reasonably likely to have a material effect on the Company's net sales or revenues,

1243584_1

income from continuing operations, profitability, liquidity, or capital resources, or that caused the Company's reported financial information not necessarily to be indicative of future operating results or financial condition for the reasons set forth above.

369.    Pursuant to Item 3(D) of Form 20-F and Item 3 of Form F-3, the Forms 20-F filed during the Relevant Period, and the Registration Statements filed in connection with the U.S. Notes Offerings, were required to furnish, among other things, a discussion of the most significant factors that make the offering risky or speculative for the reasons set forth above.

## COUNT III

### For Violation of §11 of the Securities Act

370.    Plaintiff repeats and realleges each and every allegation in ¶¶359-369 above as if fully set forth herein.

371.    This Count is alleged pursuant to §11 of the Securities Act, 15 U.S.C. §77k, against Petrobras and PGF.

372.    The Registration Statements for the U.S. Notes Offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

373.    Defendants Petrobras and PGF are the registrants for each U.S. Notes Offering and were responsible for the contents and dissemination of the 2013 U.S. Notes Registration Statement and 2014 U.S. Notes Registration Statement.

374.    As issuers of the U.S. Notes, Petrobras and PGF are strictly liable to Plaintiff for the misstatements and omissions.

375.    By reasons of the conduct alleged herein, defendants violated, and/or controlled a person who violated, §11 of the Securities Act.

376.    Plaintiff acquired the U.S. Notes pursuant to its respective Registration Statements.

377.    Plaintiff has sustained damages.   The value of the U.S. Notes have declined substantially subsequent to and due to defendants' violations.

**COUNT IV**

**For Violation of §12(a)(2) of the Securities Act**

378.    Plaintiff repeats and realleges each and every allegation in ¶¶359-369 above as if fully set forth herein.

379.    This Count is brought pursuant to §12(a)(2) of the Securities Act on behalf of Plaintiff against Petrobras and PGF.

380.    Defendants were sellers and offerors and/or solicitors of purchasers of the U.S. Notes offered pursuant to the 2013 and 2014 U.S. Notes Offering Documents.

381.    The 2013 and 2014 U.S. Notes Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.   Defendants' actions of solicitation included participating in the preparation of the Petrobras Debt Securities 2013 and 2014 Preliminary and Final Prospectus Supplements and the defendants circulated those offering documents, or otherwise made the preliminary prospectuses available to Plaintiff, before the defendants sold the Petrobras Debt Securities to Plaintiff.

382.    Defendants owed to the purchasers of U.S. Notes, including Plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the 2013 and 2014 U.S. Notes Offering Documents to ensure that such statements were true and that there was no omission

- 129 -

to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the offering materials for the U.S. Notes Offerings as set forth above.

383.    Defendants sold the Petrobras Debt Securities to Plaintiff in the May 2013 and March 2014 U.S. Notes Offerings. Plaintiff did not know, or in the exercise of reasonable diligence, could not have known, of the untruths and omissions contained in the 2013 and 2014 U.S. Notes Offering Documents at the time Plaintiff purchased the Petrobras Debt Securities.

384.    Plaintiff hereby offers to tender to defendants those securities defendants sold to Plaintiff in the May 2013 and March 2014 U.S. Notes Offerings and which Plaintiff continues to own in return for the consideration paid for those securities together with interest thereon. With respect to those Petrobras Debt Securities sold by the defendants to Plaintiff in the May 2013 and March 2014 U.S. Notes Offerings, but which Plaintiff in turn sold, Plaintiff is entitled to rescissory damages.

385.    By reason of the conduct alleged herein, defendants violated, and/or controlled a person who violated the Securities Act. Accordingly, Plaintiff has the right to rescind and recover the consideration paid for the U.S. Notes Plaintiff purchased from the defendants in the May 2013 and March 2014 U.S. Notes Offerings and hereby elects to rescind and tender those securities to the defendants sued herein. With respect to those U.S. Notes Plaintiff purchased from the defendants in the May 2013 and March 2014 U.S. Notes Offerings, and which Plaintiff subsequently sold, Plaintiff is entitled to rescissory damages.

## COUNT V

### For Violation of §15 of the Securities Act

386.     Plaintiff repeats and realleges each and every allegation in ¶¶359-369 above as if fully set forth herein.

387.     This Count is brought pursuant to §15 of the Securities Act.

388.     Petrobras acted as a controlling person of PGF by virtue of its corporate control over PGF.  By reason of Petrobras's control over PGF, as alleged above, defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Petrobras and PGF to engage in the conduct complained of herein.  By reason of such conduct, defendants are liable pursuant to §15 of the Securities Act.

389.     Each of the defendants also was a culpable participant in the violations of §§11 or 12(a)(2) of the Securities Act alleged above.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Awarding compensatory damages in favor of Plaintiff against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.     Rescission or a rescissory measure of damages;

C.     Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

1243584_1

## XIV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  March 10, 2017                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          EVAN J. KAUFMAN

*s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
PATRICK W. DANIELS
THOMAS E. EGLER
TRIG SMITH
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
davew@rgrdlaw.com
patrickd@rgrdlaw.com
tome@rgrdlaw.com
trigs@rgrdlaw.com

- 132 -

1243584_1

ROBBINS GELLER RUDMAN
 & DOWD LLP
ROXANA PIERCE
1701 K Street N.W., Suite 350
Washington, DC 20036
Telephone:  301/332-4618
202/828-8528 (fax)
rpierce@rgrdlaw.com

*Attorneys for Plaintiff ADIA*

- 133 -